UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**PETER LYOYA,** as the
Personal Representative for
the Estate of **PATRICK LYOYA,**

Plaintiff,

v.

**CHRISTOPHER SCHURR** and
**THE CITY OF GRAND RAPIDS,**

Defendants.

Case No. 1:22-cv-1160
Hon. Paul L. Maloney
Mag. Judge Sally J. Berens

**ORAL ARGUMENT
REQUESTED**

## DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS
### ORAL ARGUMENT REQUESTED

Defendant, **CHRISTOPHER SCHURR,** by and through the undersigned counsel,

submits the following Motion to Dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6). Defendant Schurr now asks the Court to dismiss this lawsuit because, as

demonstrated in the attached brief, the Plaintiff has failed to state a claim upon which

relief can be granted

Pursuant to Local Rule 7.1(d), the undersigned counsel certifies that she

communicated the grounds for this motion with opposing counsel in email in an

attempt to ascertain whether the motion will be opposed on Friday, February 3, 2023.

This motion will be opposed by opposing counsel.

Pursuant to Local Rule 7.2(d), Defendant requests oral argument on this

motion so that the parties may appropriately address any questions raised by the Court.

Respectfully submitted,

**SEWARD HENDERSON PLLC**

 /s/Kali M. L. Henderson (P76479)
*Attorneys for Defendant Schurr, only*
210 East 3rd Street, Suite 212
Royal Oak, Michigan 48067
P: (248) 733-3580
F: (248) 733-3633
Dated:   February 6, 2023          E: khenderson@sewardhenderson.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**PETER LYOYA,** as the
Personal Representative for
the Estate of **PATRICK LYOYA,**

Case No. 1:22-cv-1160
Hon. Paul L. Maloney
Mag. Judge Sally J. Berens

Plaintiff,

v.

**CHRISTOPHER SCHURR** and
**THE CITY OF GRAND RAPIDS,**

**ORAL ARGUMENT
REQUESTED**

Defendants.

## BRIEF IN SUPPORT OF DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS

# TABLE OF CONTENTS

Index of Authorities ........................................................................... iii

Concise Statement of the Issues per L.R. 7.1(a) ...................................... ix

Most Controlling Authorities .................................................................x

Introduction ........................................................................................1

Standard of Review ..............................................................................2

Statement of the Event & Allegations ......................................................5

  I.   The Initial Stop ............................................................................5

  II.  The Initial Physical Struggle ..........................................................9

  III. The Continued Physical Struggle ..................................................13

Law and Analysis ...............................................................................21

  I.   The Doctrine of Qualified Immunity: A Two-Step Analysis........................21

  II.  Ofc. Schurr is Entitled to Qualified Immunity Under Both Prongs of the Analysis ..............................................................................23

    A.   Prong One: The Fourth Amendment was not Violated ..........................24

      1.   The Basics of the Objectively Reasonable Analysis ...............................24

      2.   The Graham Analysis in Deadly Force Circumstances..........................26

        i.   Deadly Force When Confronting Weapons .........................................31

          a.   Firearms....................................................................................31

          b.   Other Weapons.........................................................................34

        ii.   Deadly force against unarmed suspects............................................40

      3.   Ofc. Schurr used constitutionally permissible deadly force to stop an armed and actively resistant suspect..............................................................44

    B.   As of April 4, 2022, No Existing Precedent Clearly Established Ofc. Schurr's Conduct as Unconstitutional ......................................................48

Conclusion ........................................................................................54

# INDEX OF AUTHORITIES

## Cases

*Allard v. Weitzman*,
   991 F.2d 1236 (6th Cir. 1993) ................................................................21

*Anderson v. City of Fulton*,
   No. 21-5001, 2021 (6th Cir. Sept. 24, 2021) .......................................34

*Anderson v. Russell*,
   247 F.3d 125 (2001) ............................................................................28

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ............................................................................53

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..............................................................................3

*Ashford v. Raby*,
   951 F.3d 798 (6th Cir. 2020) ......................................................... 22, 24

*Bailey v. City of Ann Arbor*,
    860 F.3d 382 (6th Cir. 2017) ................................................... 2, 3, 4, 22

*Behrens v. Pelletier*,
   516 U.S. 299 (1996) ..............................................................................3

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..............................................................................2

*Bell v. City of Southfield*,
   37 F.4th 362 (6th Cir. 2022) ...................................................... 3, 23, 48

*Bell v. Cumberland Cnty.*,
   665 F. App'x 421 (6th Cir. 2016) .......................................... 43, 44, 45

*Burchett v. Kiefer*,
   310 F.3d 937 (6th Cir. 2002) ................................................................25

*Campbell v. Cheatham Cnty. Sheriff's Dep't*,
   47 F.4th 468 (6th Cir. 2022) ................................................................32

*Carroll v. Carman*,
574 U.S. 13 (2014) ................................................................53

*Champion v. Outlook Nashville, Inc.*,
380 F.3d 893, (6th Cir. 2004)................................................53

*Chappell v. City Of Cleveland*,
585 F.3d 901 (6th Cir. 2009) ................................................35

*City & Cnty. of San Francisco v. Sheehan*,
575 U.S. 600 (2015) ..................................................... passim

*City of Tahlequah v. Bond*,
142 S. Ct. 9 (2021) ....................................................... passim

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ..................................................... 25, 26

*Cockrell v. City of Cincinnati*,
468 Fed. Appx. 491 (6th Cir. 2012) .....................................29

*Columbia Nat. Res., Inc. v. Tatum*,
58 F.3d 1101(6th Cir. 1995)..................................................21

*Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*,
508 F.3d 327 (6th Cir. 2007) ..................................................2

*Cooper v. Parrish*,
203 F.3d 937 (6th Cir. 2000) ....................................... 21, 22

*Davenport v. Causey*,
521 F.3d 544 (6th Cir. 2008) ........................................ passim

*Est. of Erwin by & through Erwin v. Greene Cnty.*,
861 F. App'x 1 (6th Cir. 2021) ..................................... 30, 31

*Goodwin v. City of Painesville*,
781 F.3d 314 (6th Cir. 2015)................................................29

*Gordon v. Bierenga*,
20 F.4th 1077 (6th Cir. 2021), cert. denied, 143 S. Ct. 302 (2022). ...................49

*Graham v. Connor*,
  490 U.S. 386 (1989) ...................................................................................... passim

*Hagans v. Franklin County Sheriff's Office*,
  695 F.3d 505 (6th Cir. 2012) ................................................................................29

*Hicks v. Scott*,
  958 F.3d 421 (6th Cir. 2020) ........................................................................ 26, 32

*Higgason v. Stephens*,
  288 F.3d 868 (6th Cir.2002) .................................................................................53

*Hocker v. Pikeville City Police Dep't*,
  738 F.3d 150 (6th Cir. 2013) ..................................................................................1

*Jordan v. Howard*,
  987 F.3d 537 (2021) ...................................................................................... 28, 32

*Kisela v. Hughes*,
  138 S. Ct. 1148 (2018) ...................................................................... 23, 48, 50, 51

*Krause v. Jones*,
  765 F.3d 675 (6th Cir. 2014) ................................................................................31

*Landis v. Baker*,
  297 F. App'x 453 (6th Cir. 2008) .........................................................................29

*Lee v. Metro. Gov't of Nashville*,
  596 F. Supp. 2d 1101 (M.D. Tenn. 2009), aff'd in part, 432 Fed. Appx. 435 (6th
  Cir. 2011)...............................................................................................................29

*Livermore v. Lubelan*,
  476 F.3d 397 (6th Cir. 2007) ....................................................................... passim

*Lyons v. City of Xenia*,
  417 F.3d 565 (6th Cir. 2005) ................................................................................28

*Mathis v. Parks*,
  741 F. Supp. 567 (E.D.N.C. 1990) .......................................................................28

*Miller v. Village of Pickney*,
  365 Fed. App'x (6th Cir. 2010) ................................................................26

*Mitchell v. City of Warren*,
  803 F.3d 223 (6th Cir. 2015) ...................................................................29

*Mitchell v. Schlabach*
  864 F.3d 416 (6th Cir. 2017) ...................................................................42

*Mullins v. Cyranek*,
  805 F.3d 760 (6th Cir. 2015) ............................................... x, 26, 31, 37

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ...............................................................................3, 21

*Plakas v. Drinski*,
  19 F.3d 1143 (7th Cir. 1994) ...................................................................28

*Pollard v. City of Columbus*,
  780 F.3d 395 (6th Cir. 2015) ............................................................ 31, 34

*Reich v. City of Elizabethtown, Kentucky*,
  945 F.3d 968 (6th Cir. 2019) ........................................................... passim

*Reichle v. Howards*,
  132 S.Ct. 2088 (2012) .................................................................... 21, 53

*Rhodes v. McDannel*,
  945 F.2d 117 (6th Cir. 1991) ...................................................................35

*Rivas-Villegas v. Cortesluna*,
  142 S. Ct. 4 (2021) ........................................................................... passim

*Riverview Health Inst. L.L.C. v. Medical Mut. of Ohio*,
  601 F.3d 505 (6th Cir. 2010) .....................................................................2

*Robinette v. Barnes*,
  854 F.2d 909 (6th Cir. 1988) ........................................................... 28, 30

*Rucinski v. Cnty. of Oakland*,
  655 F. App'x 338 (6th Cir. 2016) ............................................................35

*Saucier v. Katz*,
    533 U.S. 194 (2001) ...........................................................................21

*Scott v. Harris*,
    550 U.S. 372 (2007) .............................................................................3

*Simmonds v. Genesee Cnty.*,
    682 F.3d 438 (6th Cir. 2012) ........................................................ 31, 34

*Smith v. Freland*,
    954 F.2d 343 (6th Cir. 1992) ...........................................................25

*Stevens-Rucker v. City of Columbus*,
    739 F. App'x 834 (6th Cir. 2018) ............................................... passim

*Summerland v. Cnty. of Livingston*,
    240 F. App'x 70 (6th Cir. 2007) ........................................................35

*Taylor v. Barkes*,
    135 S. Ct. 2042 (2015) ....................................................................21

*Tennessee v. Garner*,
    471 U.S. 1 (1985) ....................................................... 27, 28, 50, 51

*Thomas v. City of Columbus*,
    854 F.3d 361 (2017) ................................................................. passim

*Thorton v. City of Columbus*,
    727 Fed. App'x 829 (6th Cir. 2018).............................................. 31, 33

*United States v. Agron*,
    921 F.2d 25 (2d Cir. 1990) ...............................................................30

*United States v. Gonzalez*,
    200 F. Supp. 3d 1265 (D.N.M. 2016)................................................30

*United States v. Quiver*,
    805 F.3d 1269 (10th Cir. 2015)........................................................30

*Untalan v. City of Lorain*,
    430 F.3d 312 (6th Cir. 2005) ...........................................................44

*White v. City of Detroit*,
  38 F.4th 495 (2022) .................................................................26

*Whitley v. Albers*,
  475 U.S. 312 (1986) ................................................................25

**Statutes**

Mich. Comp. Laws § 257.256 .............................................6, 46

Mich. Comp. Laws § 257.257(e). .........................................6, 46

Mich. Comp. Laws § 257.311 ....................................................46

Mich. Comp. Laws § 257.901 ....................................................46

Mich. Comp. Laws § 750.413 ...............................................6, 46

Mich. Comp. Laws § 750.81d ....................................................46

Mich. Comp. Laws § 750.82 ......................................................46

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ..................... 2, 3, 20

## CONCISE STATEMENT OF THE ISSUES PER L.R. 7.1(a)

1. Whether Ofc. Schurr is entitled to qualified immunity because he acted constitutionally when he used deadly force once Lyoya armed himself with a Taser, refused all commands to drop it, and was turning to face him?

Defendant answers, "*Yes.*"

Plaintiff answers, "*No.*"

2. Whether Ofc. Schurr is entitled to qualified immunity because his conduct did not violate clearly established law?

Defendant answers, "*Yes.*"

Plaintiff answers, "*No.*"

## Most Controlling Authorities

1. A complaint should be dismissed if it does not contain viable legal theories. *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995.

2. It is well-known that the doctrine of qualified immunity protects government officials from civil liability to the extent that their conduct does not violate clearly established statutory or constitutional rights. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015

3. "Deadly force is objectively reasonable when an officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (quotation omitted); *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015).

# INTRODUCTION

> "No doubt the use of deadly force by police officers is a serious matter and ought to be avoided—**but not at all costs and not in all situations.**" *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 154 (6th Cir. 2013) (emphasis added).
>
> *Christopher Schurr conformed his conduct to the 4th Amendment and instructions from both the United States Supreme Court and Sixth Circuit Court of Appeals during his April 4, 2022, encounter with Patrick Lyoya. The true and filmed record of the encounter demonstrates why this case must be dismissed.*

Tragedy does not equate to liability, no matter how loud the cries of some. The plaintiff here seeks relief that the law cannot provide him. The death of Patrick Lyoya was unfortunate, but not one for which the Defendant, Christopher Schurr, can be held liable because he acted within the bounds of the Fourth Amendment.

Ofc. Schurr now raises the defense of qualified immunity – a doctrine that carefully balances the difficulties public servants face when encountering complicated constitutional questions with the importance of holding bad actors accountable. Qualified immunity requires a plaintiff to demonstrate that (1) a defendant violated a constitutional right that (2) was clearly established. When video captures the underlying incident, the Sixth Circuit now directs that courts must consider the videos, if presented, when assessing the qualified immunity defense in a Rule 12 motion. Here, the undisputable video evidence demonstrates why Plaintiff cannot avoid qualified immunity here under either prong of the analysis.

1

## STANDARD OF REVIEW

> A motion under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of a complaint. *Riverview Health Inst. L.L.C. v. Medical Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010). Defendant now challenges whether Plaintiff can ever plead a viable claim against him.

A complaint must allege all material elements of a "viable legal theory." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007). A court must accept all well-pled factual allegations as true, unless contradicted as discussed below, but "need not accept the plaintiff's legal conclusions or unwarranted factual inferences as true." *Id.* If, after construing the complaint in a light most favorable to the plaintiff, the court determines that he has failed to plead "enough facts to state a claim to relief that is plausible on its face," the court must grant the defendant judgement as a matter of law. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Such a motion is generally confined to the pleadings, but a court may consider other materials where appropriate, such as videos, public records, or materials referenced in the pleadings. *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017) (holding that the district court appropriately considered a video that captured the entire event that was in dispute and contradicted the plaintiff's allegations). As explained by Judge Neff of this District, the *Bailey* decision clarifies the standard of review for 12(b)(6) motions as follows:

Further, if the plaintiff's pleading "internally contradict[s] verifiable facts central to his claims, that makes his allegations implausible." *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017).

The Sixth Circuit recently confirmed that reviewing videos that fall outside the four corners of a pleading is permissible when qualified immunity is raised. *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022). Videos are used "for good reason," because "[q]ualified immunity isn't just a defense to liability—it's immunity from the costs and burdens of suit in the first place." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007) and *Pearson v. Callahan*, 555 U.S. 223, 237 (2009)). Protection from such burdens are lost if officers do not receive dismissal as early as possible. *Id.* "So when uncontroverted video evidence easily resolves a case, we honor qualified immunity's principles by considering the videos." *Id.*

Qualified immunity is an appropriate basis for dismissal under Rule 12(b)(6). *Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005); *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (discussing qualified immunity as right to avoid pretrial matters like discovery and analyzing denial of qualified immunity at motion to dismiss phase); *Ashcroft v. Iqbal*, 556 U.S. 662, 669, 671-86 (2009) (addressing qualified immunity at the motion to dismiss stage). A court can dismiss a complaint under Rule 12(b)(6) "if it is clear that no violation of a clearly established constitutional right could be found under any set of facts that could be proven consistent with the allegations or pleadings." *Id*. This rule, in conjunction with the above discussed qualified immunity

3

video rule, means this Court must decide whether the events as established by the videos and pleadings could never support a violation of clearly established law. See *Bailey*, 860 F.3d at 386, and *Jackson,* 429 F.3d at 589. This is a question of law, assigned to the Court to decide now, not later. *Thomas v. City of Columbus*, 854 F.3d 361, 366 (2017).

STATEMENT OF THE EVENT & ALLEGATIONS

On April 4, 2022, Ofc. Schurr encountered the decedent, Patrick Lyoya. (PageID.18) As mentioned in Plaintiff's Amended Complaint, the incident was captured across multiple videos. Ofc. Schurr's in-car dash camera ("dash-cam") and body-worn camera ('body-cam') first captured the incident, followed later by Lyoya's passenger who captured parts on his cell phone and a doorbell camera across the street. The videos are attached as Exhibits 1, 2, 3, and 8, respectively. The stop and the subsequent uses of force are outlined below, as captured on these videos. The allegations in Plaintiff's Amended Complaint are at odds with the video evidence and such contradictions are also highlighted below.

## I.     THE INITIAL STOP

Ofc. Schurr was driving in his police vehicle when he spotted a tan Nissan, for which he ran a license plate check. (Exhibit 4, DC Scrnsht 1) The Nissan bore license plate "EKP 9367" as seen in the dash-cam video, from which the attached Exhibit 4 screenshot was captured. (Exhibit 1, Dash-cam; Exhibit 4, DC Scrnsht 1) When he ran the license plate through his in-car computer system, the system informed him that the license plate belonged to a Ford Fiesta.[1] (Exhibit 2, Body-

---

[1] Plaintiff includes allegations that suggest there was a discriminatory motive for the stop. Such allegations are distractions. There is only one claim, for excessive force, against Ofc. Schurr. It is well established that an officer's subjective intentions are irrelevant in a Fourth Amendment analysis. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

5

cam, at 3:32; Exhibit 5, BC Scrnsht 2; Exhibit 6, BC Scrnsht 2 Zoomed)[2] Upon learning that the plate did not match the registered vehicle, and contrary to allegation No. 14 that there was "no discernable ground[s]" for the stop (PageID.18), Ofc. Schurr initiated a traffic stop.[3] The video captures the Nissan coming to a stop, before the driver, now known to be Patrick Lyoya, opening his door at the :37 second mark and climbing out. (Exhibit 1, Dash-cam)

Four seconds later Ofc. Schurr yells at Lyoya, who is now standing outside his vehicle, to stay in the car. (Exhibit 1, Dash-cam) Ofc. Schurr can be heard twice telling Lyoya to "stay in the car" before the door is heard closing on his vehicle, signaling that he exited, before he can be seen walking towards Lyoya. (Exhibit 1, Dash-cam). The dash-cam video then shows Ofc. Schurr approach Lyoya, pointing to the Nissan, and faint commands were captured inside the cruiser, which are better heard on the body cam. (Exhibit 1, Dash-cam; Exhibit 2, Body-cam)

On the body cam, the first two loud commands to stay in the car are heard, followed quickly by a third command. (Exhibit 2, Body-cam at :41) Ofc. Schurr then

---

[2] Video times are displayed in the time for the length of the video, not the time stamps on the screen. The screenshots attached hereto are also taken from the video exhibits, with "BC" representing the body-cam, "DC" representing the dash-cam, and "CP" representing the cellphone video.

[3] If Lyoya was given the plate, displaying it is a misdemeanor under MCL 257.256. If Lyoya stole the plate, mere possession of it is a felony under MCL 257.257(e) If Lyoya stole the car and put another plate on it to disguise it, he would be guilty of a felony under MCL 750.413.

commands Lyoya to "get in the car," before Lyoya asks what he did, while disobeying commands and standing outside the Nissan. (Exhibit 2, Body-cam)

Ofc. Schurr then explains that he is stopping Lyoya and asks if he has a license, twice. (Exhibit 2, Body-cam) When Lyoya responds by asking "for what?" Ofc Schurr, again, explains that he is stopping him and asks (for a third, then fourth time) whether he has a license. (Exhibit 2, Body-cam) Ofc. Schurr also asks whether Lyoya speaks English, upon hearing Lyoya's heavily accented, short questions. (Exhibit 2, Body-cam)

When Lyoya finally answers that "yes," he has a license, Ofc. Schurr asks to see it. (Exhibit 2, Body-cam at 1:00). Lyoya asks what he did wrong, while bending to the right and reaching with his hand, as if to grab a wallet from a right-side pocket. (Exhibit 2, Body-cam) Ofc. Schurr obliges, explaining that the "plate doesn't belong on this car." (Exhibit 2, Body-cam) He then asks Lyoya, again, and again, for the fifth and sixth time, whether he has a license. (Exhibit 2, Body-cam)

After staring open-mouthed and unmoving for at least three seconds, Lyoya turns to the Nissan and says that his license is in the car. (Exhibit 2, Body-cam) Ofc. Schurr commands him to get it and Lyoya slowly begins opening the door, asking again what he did. (Exhibit 2, Body-cam) Ofc. Schurr explains, again, that the plate does not match. (Exhibit 2, Body-cam) Lyoya asks the passenger to grab him his wallet, and the passenger opens the door and begins to look through the glove

compartment. (Exhibit 2, Body-cam at 1:24) At one point, Lyoya even directs the passenger, stating "right there," and pointing. (Exhibit 2, Body-cam at 1:31)



*Screenshot from Exhibit 1, Dash-cam at 1:37, showing Ofc. Schurr patiently*
*waiting while Lyoya interacts with the passenger*

Eighteen seconds pass while the passenger looks for the license, until Lyoya closes the door after saying "Alright, let me look." (Exhibit 2, Body-cam at 1:42) Lyoya begins walking to the front of the car and Ofc. Schurr quickly tells him, "nope, nope, nope," and grabbing him by the upper right arm, indicating that he was not going to let Lyoya walk away. (Exhibit 2, Body-cam) Ofc. Schurr continues to apprehend Lyoya, grabbing onto Lyoya's left side as Lyoya turns away from him, all while continuing with verbal commands to "stop" (twice) and "put your hands—" (Exhibit 2, Body-cam) Ofc. Schurr is not able to finish that command because Lyoya begins to fight his way out of Ofc. Schurr's grasp. (Exhibit 2, Body-cam; Exhibit 1, Dash-cam at 1:48).



*Screenshot from Exhibit 1, Dash-cam at 1:48 showing Lyoya lift and throw back his elbows in an attempt to escape Ofc. Schurr's grasp*

## II.   THE INITIAL PHYSICAL STRUGGLE

The video shows Lyoya pull, spin, push, and run away from Ofc. Schurr.

(Exhibit 1, Dash-cam at 1:48, Exhibit 2, Body-cam at 1:48)





*Screenshots from Exhibit 1, Dash-cam*





9

Ofc. Schurr can be heard yelling at Lyoya to stop for a third time before Lyoya looks at him and decides to turn and run. (Exhibit 2, Body-cam at 1:50) Ofc. Schurr follows Lyoya around the rear of the Nissan and across the front yard of the yellow home, while radioing that he has one suspect running. (Exhibit 2, Body-cam at 1:53)

Ofc. Schurr is quickly able to grab Lyoya and tackle him to the ground. (Exhibit 1, Dash-cam at 1:56) Ofc. Schurr is able to land on top of Lyoya, who is initially flat on the ground. (Exhibit 1, Dash-cam at 1:57)



*Screenshot from Exhibit 1, Dash Cam at 1:57 showing Lyoya on the ground underneath Ofc. Schurr*

But Lyoya quickly begins to struggle to stand back up by pushing himself off the ground, while Ofc. Schurr commands him to "stop," for the fourth and fifth time. (Exhibit 1, Dash-cam at 1:59, Exhibit 2, Body-cam at 1:59, 2:02)

Lyoya did not stop though. With Ofc. Schurr on top of him, sometimes completely, Lyoya was able to push to a standing position, before being forced back

down by Ofc. Schurr, who manages to utter a muffled "stop" for a sixth time. (Exhibit 1, Dash-cam at 1:58-2:06; Exhibit 2, Body-cam at 1:58-2:06) This time Lyoya verbally responds to this command with "okay," although the video shows his actions do not mirror his words, as Ofc. Schurr continues to struggle, pushing Lyoya's head down to the ground. (Exhibit 2, Body-cam at 2:06)

Again, Lyoya does not stop. Ofc. Schurr tries several things simultaneously in response to Lyoya rolling to his front to push of the ground: he yells at him to stop, for a seventh and eighth time; he strikes (punches) Lyoya in the head; and continues to push down on him using his arms and the weight of his body. (Exhibit 1, Dash-cam at 2:07-2:12; Exhibit 2, Body-cam at 2:07-2:12) When these efforts also fail to convince Lyoya to stop resisting, Ofc. Schurr applies two knee strikes and then tells Lyoya to put his arms behind his back. (Exhibit 1, Dash-cam at 2:12-2:15; Exhibit 2, Body-cam at 2:16) Lyoya can be heard yelling "okay," and it appears that the struggle lessens for a period of time, allowing Ofc. Schurr to time to command Lyoya twice more to place his hands behind his back. (Exhibit 2, Body-cam at 2:17-2:26)

> *During this time, the dash-cam shows the passenger's door opens (at 2:03) and the passenger steps out (at 2:16) to begin filming the encounter. (Exhibit 3, Passenger Video)  Ofc. Schurr glances up in the direction of the Nissan at 2:08 and 2:20. A neighbor also comes out (2:00) and stands just behind the struggle, making his presence known verbally. At this time, it is unknown if*

*Ofc. Schurr saw these events, but it can be accepted that Ofc. Schurr made*

*efforts to look up at his surroundings and that these events occurred.*



*Screenshot from Passenger Video, Exhibit 3 at :03 showing Lyoya resisting attempts to take him to the ground*

The dash-cam shows that the struggle did not end; Lyoya is still resisting and manages to partially stand, before being forced back down to the ground. (Exhibit 1, Dash-cam at 2:25)

12



*Screenshot from Exhibit 1, Dash-cam at 2:25 of Lyoya partial standing*

Once Lyoya is back down on the ground, Ofc. Schurr lies on top of him, working to

use his entire bodyweight to keep Lyoya down, for approximately eight seconds.

(Exhibit 1, Dash-cam at 2:25-2:33) At this point, Ofc. Schurr has been wrangling,

chasing, and wrestling with Lyoya for forty-five (45) seconds.

---

## III.    THE CONTINUED PHYSICAL STRUGGLE

Over the next seven seconds, Lyoya fights against Ofc. Schurr and manages

to stand. (Exhibit 1, Dash-cam at 2:33-2:40)



*Screenshot from Exhibit 3, Passenger Video of Lyoya forcing his way to standing*

13

Ofc. Schurr can be heard breathing heavily and calling for more cars. (Exhibit 2, Body-cam at 2:33) The Dash-cam then shows the two travel across the lawn of the yellow house, before disappearing out of view. (Exhibit 1, Dash-cam at 2:40-2:49) The body cam captures more heavy breathing and the ninth and tenth commands to "stop" (and to "stop resisting"), while the Passenger's video shows them still engaged in a struggle across the lawn. (Exhibit 3, Passenger Video at :22-:34)

With Lyoya turning and leaning, Ofc. Schurr attempts another knee strike but Lyoya stands straighter, apparently unaffected. (Exhibit 3, Passenger Video at :35) Ofc. Schurr then tries to throw Lyoya to the ground, but Lyoya ducks, spins, raises his right elbow, and stands before yelling to the passenger to "get the key!" (Exhibit 3, Passenger Video at :38-:43)



*Screenshots from Exhibit 3, Passenger Video at :41, :42, and :43*

The body cam is blocked and blurry while this struggle occurs, until Ofc. Schur is behind Lyoya's back. (Exhibit 2, Body-cam at 3:03) Lyoya then turns to face Ofc. Schurr, raising his left hand towards Ofc. Schurr's rising right hand that

14

now holds his Taser.



*Screenshot from Exhibit 2, Body-cam at 3:06*

Lyoya then reaches towards Ofc. Schurr and his hand covers the body cam momentarily. (Exhibit 2, Body-cam at 3:06) As Ofc. Schurr tries to aim the Taser at Lyoya, Lyoya reaches for it, grabs it, and directs it away from him. (Exhibit 2, Body-cam, at 3:08-3:09)



*Screenshot from Exhibit 2, Body-cam at 3:09 showing Lyoya grab the Taser*

15

The two then struggle over the Taser; Lyoya with a firm grasp on the weapon, while Ofc. Schurr moves it up and down while attempting to pull it from the grip of Lyoya. (Exhibit 2, Body-cam at 3:09; Exhibit 3, Passenger Video at :52) The two step in a rotation, ending with Lyoya falling to the ground, still firmly grasping the Taser and, Ofc. Schurr falling to the ground with him. (Exhibit 2, Body-cam at 3:10-3:13; Exhibit 3, Passenger Video at :52-:54) The two continue to fight for control of the Taser while on the ground for four seconds (Exhibit 3, Passenger Video at :54-58), before Ofc. Schurr, audibly out of breath, is finally able to yell "Let go of the Taser!" (Exhibit 2, Body-cam at 3:19; Exhibit 3, Passenger Video at :59)

When they initially go to the ground at this time, Lyoya is lying face up and Ofc. Schurr is on top of him, face down. (Exhibit 3, Passenger Video at 1:01) The two continue to struggle over the Taser in this position for at least the next eighteen (18) seconds. (Exhibit 3, Passenger Video at) Within that time, Ofc. Schurr manages to yell at Lyoya to let go of the Taser for a second time. (Exhibit 3, Passenger Video at 1:10) Ofc. Schurr, still locked in a struggle over the Taser with Lyoya, moves his body clockwise over the top of Lyoya. (Exhibit 3, Passenger Video at 1:19) The Passenger's video fails to capture the image of what occurs over the next sixteen (16) seconds between Lyoya and Ofc. Schurr, but it does document that the passenger walks closer and is saying things. (Exhibit 3, Passenger Video at 1:19-1:35). The Ring Video from across the street, while distant, shows that the two

16

remain in the same location and down on or near the ground. (Exhibit 8, Ring Camera 2 at :57-1:22).

When the Passenger Video finds the two again, Lyoya is still underneath Ofc. Schurr, positioned differently now though, indicating that the movement has continued. (Exhibit 3, Passenger Video at 1:36)



*Screenshot from Exhibit 3, Passenger Video at 1:36*

Ofc. Schurr commands Lyoya to let go of the Taser a third, then fourth time. (Exhibit 3, Passenger Video at 1:41, 1:46) Ofc. Schurr struggles to stay on top of Lyoya and keep his left hand on the Taser, which is in Lyoya's right hand, as Lyoya pushes himself up off the ground with his left arm. (Exhibit 3, Passenger Video at 1:50)



*Screenshot from Exhibit 3, Passenger Video at 1:50*



*Screenshot from Exhibit 3, Passenger Video at 1:51*

It is then that, with Lyoya lifting him off the ground and still grasping the Taser, that Ofc. Schurr unholsters his firearm and positions it at Lyoya's back. (Exhibit 3, Passenger Video at 1:51) Ofc. Schurr commands Lyoya for a fifth time to drop the Taser. (Exhibit 3, Passenger Video at 1:52)



*Screenshot from Exhibit 3, Passenger Video at 1:53, also attached as Exhibit 7*

Lyoya does not drop it though. Instead, he pushes himself up more, bringing his right side further underneath himself as he turns his body to the side, as if to turn to towards Ofc. Schurr. (Exhibit 3, Passenger Video at 1:52) Lyoya pushes himself to the right and brings his left arm closer to his body, positioning his arm at ninety-degree angle, similar to a push-up. (Exhibit 3, Passenger Video at 1:53) His legs have also noticeably shifted from facing down to facing to the side. (Exhibit 3, Passenger Video at 1:53)



*Exhibit 3, Passenger Video at 1:54 showing the yellow of the Taser visible in Lyoya's hand and the change in position of his legs clear*

Ofc. Schurr pushes himself up onto Lyoya's back, forcing Lyoya's head to the ground, and Ofc. Schurr fires one shot. Lyoya then collapses to the ground.

Ofc. Schurr, visibly breathing heavily, commands the passenger to get back, grabs his radio, takes a few moments to breathe before he stands and radios in that he was involved in a shooting. (Exhibit 3, Passenger Video at 1:55)

# LAW AND ANALYSIS

## I.   THE DOCTRINE OF QUALIFIED IMMUNITY: A TWO-STEP ANALYSIS

It is well-known that the doctrine of qualified immunity protects government officials from civil liability to the extent that their conduct does not violate clearly established statutory or constitutional rights. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012). As originally announced in *Saucier v. Katz*, there are two parts to a qualified immunity analysis: (1) whether a constitutional right was violated, and (2) whether the right was clearly established. 533 U.S. 194 (2001); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Plaintiff's liability theory in this case is not viable, and subject to dismissal under Rule 12(b)(6), because Ofc. Schurr is entitled to qualified immunity under both prongs of the traditional two-step analysis. *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) (quoting *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993)) (holding that complaints must state viable claims).

Now that Ofc. Schurr has raised this defense, the plaintiff bears the burden of demonstrating he is not entitled to it. *Livermore v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). To carry this burden and survive a qualified immunity defense, the plaintiff "cannot simply assert a constitutional violation and rely on broadly stated general rights..." *Cooper v. Parrish*, 203 F.3d 937, 951 (6th Cir. 2000). Instead, he must be able to allege facts that could support a plausible constitutional violation,

especially in light of indisputable video evidence. *Id.*; *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017). In the context of a Fourth Amendment excessive force claim, the Court's duty is to decide whether the alleged force used was objectively reasonable. *Thomas v. City of Columbus*, 854 F.3d 361, 366 (2017).

After pleading facts that could support a constitutional violation, the plaintiff must then demonstrate that the constitutional right was clearly established. A right is clearly established if it was "so clear that *every* reasonable officer…would have recognized that the force used was excessive—and not just in the abstract but in the *precise* situation [the officer] was facing." *Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020). The Sixth Circuit recently provided a clear summary of the Supreme Court's recent clarifications of this prong's requirements:

> Except in an obvious circumstance, it's not enough for a plaintiff to offer cases that merely stand for the general proposition that the Fourth Amendment bars the use of excessive force. Instead, when it comes to excessive force, the [Supreme] Court has repeatedly told us that specific cases are especially important. **The unlawfulness of the officer's acts must be so well defined that no reasonable officer would doubt it.**
>
> In addition, a plaintiff cannot point to unpublished decisions to meet this burden. Basic logic tells us at least this much. After all, the qualified-immunity inquiry looks at whether a right has been clearly established. For a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. Yet how can an unpublished case place a question beyond debate when it doesn't even bind a future panel of this court? It can't. So at a minimum, [the plaintiff] must provide on-point caselaw that would bind a panel of this court.

*Bell v. City of Southfield, Michigan*, 37 F.4th 362, 367–68 (6th Cir. 2022) (cleaned up with quotes from *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8, (2021) (per curiam) *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11–12 (2021) (per curiam); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018), and other citations omitted) (emphasis added).

Section II, below, explains why Plaintiff has not, nor can he, plead a claim that overcomes either prong of the qualified immunity analysis based on the indisputable video evidence.

## II.   OFC. SCHURR IS ENTITLED TO QUALIFIED IMMUNITY UNDER BOTH PRONGS OF THE ANALYSIS

Ofc. Schurr is entitled to qualified immunity because the videos demonstrate that Plaintiff cannot plead a constitutional violation nor a violation of clearly established law. While courts are free to address the prongs in any order, here Defendant will address them in traditional sequence. First, Defendant will explore the precise requirements of the Fourth Amendment to show why he did not violate it. Therein Defendant asks the Court to rule that his conduct was objectively reasonable. *Thomas*, 854 F.3d at 366 (holding that "objective reasonableness is a legal conclusion reserved for this court."). Second, Defendant will explain why, under Supreme Court precedent, the unlawfulness of his actions was not well defined such that a reasonable officer would not know he had violated the Consitution. In

that argument, Defendant urges this Court to rule that his conduct did not violate clearly established law.

### A.   Prong One: The Fourth Amendment was not Violated

#### 1.   *The Basics of the Objectively Reasonable Analysis*

All claims that an officer employed excessive force are analyzed under the Fourth Amendment's "reasonableness" standard, which permits an officer to use a reasonable amount of force. *Graham v. Connor*, 490 U.S. 386, 395-96 (1989) Under *Graham*, the appropriate inquiry is whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him. *Id*. at 397. It does not include an analysis of the seized individual's subjective beliefs regarding what was reasonable. *Ashford v. Raby*, 951 F.3d 798, 802 (6th Cir. 2020) (citing *Graham*, 490 U.S. at 396).

Proper application of the "reasonableness" standard requires careful attention to the particular circumstances and consideration of (1) where the crime fell on the spectrum of severity, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Graham*, 490 U.S. at 396. This list is not exhaustive. *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007). As explained in *Graham*, these factors must be considered from the officer's perspective as the events unfolded:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97 (internal quotations and citations omitted) (emphasis added).

The "reasonableness" standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). Courts "must avoid substituting [their] personal notions of proper police procedure for the instantaneous decision of the officer at the scene." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). The Supreme Court explained this is because,

> [l]ike prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). Thus, courts "must never allow the theoretical, sanitized world of [their] imagination to replace the dangerous and complex world that

policemen face every day." *Id*. They must recognize that "[w]hat constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." *Id*.

Courts are reluctant to second-guess an officer's split-second decision, reasoning that considering alternatives likely only "replace[s] one hazard with another, and in the process insert[s] the officer, never a judge, into harm's path." *White v. City of Detroit*, 38 F.4th 495, 499 (2022). This principle is especially true when officer safety is at issue in a dangerous situation. *Miller v. Village of Pickney*, 365 Fed. App'x 652 (6th Cir. 2010). A good example of such deference was seen in *Miller* where the Sixth Circuit found that it was not excessive for an officer to strike an arrestee in the face while the arrestee was handcuffed. *Id.* at 655-56. The Court held that while the officer could have reacted differently, his actions were not objectively unreasonable because of the information he did know, despite what he did not know or take the time to assess. *Id.* at 656.

2.   The <u>Graham</u> *Analysis in Deadly Force Circumstances*

When deadly force is involved, the analysis within this Circuit requires an evaluation of the "whether the suspect presented an immediate danger to the officers or others." *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020) (citing *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015)). When applying this analysis, the Sixth Circuit holds that "[d]eadly force is objectively reasonable when an officer 'has

probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).

Before diving into prior applications of this standard that demonstrate why Ofc. Schurr's use of deadly force was reasonable, it is practical to do two things first: (1) to recognize six settled points of law regarding the use of deadly force; and (2) to review the established dangers of the Taser. As to the first task, understanding and accepting these points will allow the Court to correctly assess the force in question and avoid distractions. The six points are:

1) **That the subjective intentions of neither the decedent or officer are relevant, only the perspective of an objectively reasonable officer on the scene is relevant.**
   *Ashford v. Raby*, 951 F.3d 798, 802 (6th Cir. 2020); *see also Graham*, 490 U.S. at 397.

2) **That an officer's "bad tactics" that lead to or created the need for deadly force cannot support a Fourth Amendment violation.**
   *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015).

3) **That whether an officer had other means of force at his disposal is irrelevant.**
   *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008).

4) **That officers are not required to use the *least intrusive* force possible; they are required only to use *reasonable* force. Thus, a court could believe that less force could have sufficed, but still find the force used**

**was reasonable under the law.**

*Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005); *Davenport*, 521 F.3d at 552; *see also Plakas v. Drinski*, 19 F.3d 1143, 1148-49 (7th Cir. 1994) (explaining and exploring the logic of this proposition).

5) **That an officer does not need to wait until a weapon is aimed at him before he may use deadly force.**

*Anderson v. Russell*, 247 F.3d 125, 131 (2001); *Jordan v. Howard*, 987 F.3d 537, 544 (2021).

6) **That if deadly force is justified, the method and application are irrelevant,[4] i.e., *deadly force is deadly force*, regardless of where or how it is applied, such that a shot to the chest is the same as a shot to the back of the head because they all can result in death.**

*See Tennessee v. Garner*, 471 U.S. 1, 31(1985) (J. O'Connor dissenting) (recognizing that the majority opinion did not limit its holding to firearms only); *see also Mathis v. Parks*, 741 F. Supp. 567, 572 (E.D.N.C. 1990) (Magistrate Judge's Recommendation) (recognizing that *Garner* limits the use of deadly force "regardless of the nature of the instrumentality used in applying the force"); *and Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988) (explaining that deadly force is that which the user knows will "create a substantial risk of causing death or serious bodily harm.")

With these principles established, analysis of the below cases ushers in but one conclusion: Ofc. Schurr's use of deadly force fell within the Fourth Amendment's

---

[4] That is not to say the duration of the force is irrelevant. Deadly force must remain justified throughout its use.

constitutional bounds.

As to the second point, the Taser is recognized as a weapon that has the capability to cause serious injury or death in either of its two modes. The Taser, invented by a NASA scientist over fifty years ago, is an electric stun-gun that has two modes, probe mode and drive-stun mode. *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 506 (6th Cir. 2012); *Cockrell v. City of Cincinnati*, 468 Fed. Appx. 491, 492 (6th Cir. 2012). In both modes, it delivers an electrical charge. *Id.* And while the Taser carries "a significantly lower risk of injury than physical force," when used by trained police officers, it is also capable of causing serious injury or death when used improperly. *Hagans*, 695 F.3d at 510; *Landis v. Baker*, 297 F. App'x 453, 464 (6th Cir. 2008) (recognizing the serious danger of improper Taser usage); *Mitchell v. City of Warren*, 803 F.3d 223, 227–28 (6th Cir. 2015) (recognizing that the manufacturer advises officers the Taser can cause serious injury or death and to avoid using a Taser on the face, throat, or groin); *Goodwin v. City of Painesville*, 781 F.3d 314, 324–25 (6th Cir. 2015) (recognizing that officers are trained that improper application, such as to certain areas or for lengthy time periods, risks serious injury); *Lee v. Metro. Gov't of Nashville*, 596 F. Supp. 2d 1101, 1127-28 (M.D. Tenn. 2009), aff'd in part, 432 Fed. Appx. 435 (6th Cir. 2011) (holding that the manufacturer

warns that repeated Taser exposures can impair breathing and respiration).[5]

For purposes of this motion, Defendant accepts Plaintiff's allegation that the Taser was only capable of drive-stunning at the time deadly force was used. But just because a drive-stun may not incapacitate an officer, does not mean that it may not result in serious injury or death. The above case law makes clear that officers are trained that the application of a Taser could result in such consequences. The Taser could also be used as a blunt weapon. *See Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988) ("[A]s any faithful reader of mystery novels can attest, an instrument of death need not be something as obviously lethal as a gun or knife. The ubiquitous 'blunt object' kills just as effectively."). And the Sixth Circuit is clear one point:

> **The Fourth Amendment does not require that officers expose themselves to a plausible risk of bodily injury to avoid using [ ] force against an armed assailant, much less to grapple with them for control of the weapon.**

*Est. of Erwin by & through Erwin v. Greene Cnty.*, 861 F. App'x 1, 6 (6th Cir. 2021).[6]

---

[5] See also *United States v. Quiver*, 805 F.3d 1269, 1272 (10th Cir. 2015) ("As the burn marks to Officer Friday's thigh show, a Taser in drive-stun mode is capable of causing serious bodily injury if applied to a sensitive spot, for instance, an eye."); *United States v. Agron*, 921 F.2d 25, 26 (2d Cir. 1990) (holding that stun gun is a dangerous weapon); *United States v. Gonzalez*, 200 F. Supp. 3d 1265, 1269–70 (D.N.M. 2016) (holding that use of a Taser in drive-stun mode constitutes a dangerous weapon for federal sentencing purposes because it is capable of inflicting serious bodily injury).

[6] The original quote stated non-deadly force but "non-deadly" was omitted above because the principle translates just the same to deadly force for two reasons: (1) deadly force was considered, and determined as an appropriate response to a weapon in *Erwin*; (2) *Erwin* relies on a deadly force case, *Reich*, for this proposition, citing

i.    Deadly Force When Confronting Weapons

The use of deadly force generally falls into three different scenarios: 1) those involving suspects in cars; 2) those involving unarmed suspects; and 3) those involving armed suspects. The overall standard is the same, but within this Circuit, and for qualified immunity specificity purposes, a distinct line of caselaw has evolved for each scenario. In this instance, the decedent, Lyoya, was not driving when deadly force was used, so the first category does not provide guidance to Ofc. Schurr. The other two categories, especially the third, provide guidance since Ofc. Schurr wrestled with an unarmed Lyoya who then armed himself with a Taser. However, despite an extensive search, Defendant was not able to locate any cases within this Circuit wherein an officer was confronted with a Taser, let alone his own Taser. Thus, a discussion of suspects armed with both firearms and other weapons is instructive, and where Defendant begins his analysis below.

a.    Firearms

Cases wherein a suspect is armed with a firearm present the most straight-forward analysis when it comes to deadly force.[7] When a firearm is pointed at an

---

*Reich's* holding that "officers need not wait to be within striking range of an assailant to deploy force"). *Erwin*, 861 Fed. Appx. at 6.

[7] *See Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007); *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 445 (6th Cir. 2012); *Krause v. Jones*, 765 F.3d 675, 680 (6th Cir. 2014); *Pollard v. City of Columbus*, 780 F.3d 395, 403 (6th Cir. 2015); *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015); *Thorton v. City of Columbus*, 727 Fed. App'x 829, 837 (6th Cir. 2018); *Hicks v. Scott*, 958 F.3d 421,

officer or someone else, or an officer reasonably believes that to be the case, this Circuit "will generally deny qualified immunity only if there is a genuine dispute of fact as to whether the gun was pointed at someone." *Hicks v. Scott*, 958 F.3d 421, 435–36 (6th Cir. 2020). But when the suspect does not point their firearm at the officer, the question becomes whether the officer reasonably feared for his safety. To answer that question, the Sixth Circuit recently explained that Courts must look at "additional indicia that the safety of the officer or others [was] at risk." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 480 (6th Cir. 2022).

Caselaw from the Sixth Circuit has instructed officers as to what some of those indicators may be, although the analysis still ultimately boils down to the "totality of the circumstances." *Livermore*, 476 F.3d at 404. In *Livermore,* the Sixth Circuit said it did not matter whether the suspect aimed his rifle at an officer because the totality of the circumstances indicated the **suspect was violent**, **intent on evading arrest**, and **an officer was exposed to his potential violence**. *Id.* at 404-05. The Court summarized how the suspect contributed to a standoff with officers that led to his co-conspirator's death, had set fire to buildings, was present when his co-conspirator shot at officers, had wired his home with explosives, was in close proximity to a vulnerable officer, and "rather than surrender as agreed upon—he

---

435 (6th Cir. 2020); *Jordan v. Howard*, 987 F.3d 537, 544 (6th Cir. 2021); *Puskas v. Delaware County*, ___ F. 4th ___; 2023 WL 107973 (6th Cir. 2023).

exited his burning residence armed with a rifle." *Id.* at 404-05. Under the totality of these circumstances, the Court found the use of deadly force was reasonable. *Id.* at 405.

While in *Thomas*, an officer responded to a reported burglary and saw two men running towards him from the reported apartment, one holding a gun. *Thomas*, 854 F.3d at 363. The officer, without determining who the men were, or seeing anything else, shot and killed the man holding the gun, who was getting closer and approximately ten feet away. *Id.* It turned out that the man killed was actually the victim of the crime who had wrestled the gun away from the burglar; but still the Sixth Circuit said the officer's use of deadly force was reasonable. The Court relied on the following factors in reaching that determination: the officer "responded to a dangerous call in a high-crime area," the **officer was alone**, and the **suspects were in close proximity** having quickly closed a 40-foot separation to 10 feet. *Id.* at 365-66. The Court stated that "[a]t this range, a suspect could raise and fire a gun with little or no time for an officer to react;" therefore, the use of deadly force was reasonable. *Id.* at 366.

Body language, prolonged and/or hazardous resistance, unstable behavior, and distance are also factors considered by the Sixth Circuit in response to firearms threats. *See Thorton*, 727 Fed. App'x at 837 (finding shooting reasonable because the "manner in which [suspect] was holding the weapon combined with the short

33

distance" supported reasonable believe that suspect posed a serious physical threat); *Pollard*, 780 F.3d at 403 (finding shooting reasonable even though suspect ultimately did not have firearm but officers reasonably believed he did because suspect was wanted on rape charge, potentially armed, and so determined to avoid arrest he engaged in high-speed pursuit that ended with intentional crash into semi-truck); *Simmonds v. Genesee County*, 682 F.3d 438, (6th Cir. 2012) (finding deadly force reasonable where suspect threatened to kill ex-girlfriend's parents, was intoxicated, demonstrated mentally unstable behavior, ignored commands, was potentially armed with firearms he owned, and fled).

### b. Other Weapons

Next the discussion must turn to cases wherein the Sixth Circuit has found deadly force to be constitutional when officers were confronted with weapons other than firearms. As previously stated, Defendant is aware of no case within this Circuit where an officer was confronted with his own Taser, but the Sixth Circuit has authorized deadly force in response to other objects. *See Anderson v. City of Fulton*, No. 21-5001, 2021 WL 4344956, at *2 (6th Cir. Sept. 24, 2021) (finding it reasonable to twice shoot individual running at officer with steel pole with knife attached for breaking windows, even after suspect dropped pole because it was still within reaching distance); *Summerland v. Cnty. of Livingston*, 240 F. App'x 70, 77

(6th Cir. 2007) (finding it constitutional to shoot mentally ill man armed with what deputies perceived to be an axe).

Knives are the most common type of other weapon the Sixth Circuit has confronted. *See Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968 (6th Cir. 2019) (suspect was armed with three-inch knife); *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 842 (6th Cir. 2018) (suspect evaded officers with large kitchen knife), *Rucinski v. Cnty. of Oakland*, 655 F. App'x 338, 341 (6th Cir. 2016) (deadly force was reasonable against suspect who pulled switchblade knife out, opened it, and verbally challenged officers before walked within five feet of officers); *Chappell v. City Of Cleveland*, 585 F.3d 901 (6th Cir. 2009) (holding that it was reasonable to shoot suspect that stepped towards officers with a raised knife, standing within five to seven feet, and refusing commands to drop the knife); *Rhodes v. McDannel*, 945 F.2d 117 (6th Cir. 1991) (holding that officer constitutionally shot suspect with a knife after he failed to follow commands to drop the knife and advanced to within four to six feet of the officer). In most of these cases, the Sixth Circuit focused on the danger the knife *could* cause if the suspects continued their advances, without requiring the officers to get within arm's reach to find out if the suspect was truly capable and intent on injuring them.

For instance in *Reich*, the officers encountered a shirtless, pacing man with a knife who walked towards them and was only within six to twelve feet of the nearest

officer. *Reich*, 945 F.3d at 979. The decedent, Blough, had been on his way to a mental health facility to treat his schizophrenia when he pulled out a three-inch knife and got out of the car at a red light. *Id.* at 973. His fiancé, Reich, called 911 when he walked through traffic and she reported that he had schizophrenia, was not on his medication, had a knife, and thought everyone was out to get him. *Id.* at 973-74. Ofc. McMillen received this information over the radio and arrived on scene no more than four minutes later. *Id.* at 374. Reich explained that Blough did not like police, had been previously shot, and that she could handle him on her own. *Id.* Ofc. McMillen then left and advised others that if they found Blough the encounter could "go bad." *Id.*

A second officer, Ofc. Richardson, saw Blough pacing between houses in a nearby neighborhood, now with his shirt off and "acting bizarre." *Id.* Reich tried approaching Blough again but he repeatedly refused to cooperate with her. *Id.* With Ofc. McMillen back on the scene, the two officers told Reich to get out of the way and they loudly ordered Blough to put the knife down. *Id.* Blough stepped towards the officers with the knife raised "in a stabbing position." *Id.* Blough told officers they would have to kill him and continued walking towards them; the officers then shot him. *Id.* At the time, Blough was within six to twelve feet of Ofc. Richardson. *Id.* at 979.

The Sixth Circuit held that these circumstances would not allow a jury to "conclude that the police were not in any danger." *Id.* at 981 (cleaned up) (quoting *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th 2015)). The Court emphasized that Blough was **armed**, **belligerent**, **ignored commands**, and **threatening to both Ofc. Richardson and neighborhood residents**. *Id.* Given the circumstances, and the speed at which the events unfolded, the officers' "split-second determination" was reasonable. *Id.*

Likewise, in *Stevens-Rucker*, 739 F. App'x 834 (6th Cir. 2018), the Sixth Circuit found officers constitutionally utilized deadly force to stop an evasive, knife-wielding suspect while demonstrating a proper application of the core principle that only an officer's perspective is relevant to the objectively reasonable analysis. In that case, the officers received a dispatch that a 911 caller was reporting a man with a knife was banging on her door sometime after 5 AM. *Id.* The first officer to respond, Alderman, received updates on his way to the apartment that the man was attempting to re-enter the apartment, "transform[ing] the incident into a possible burglary and a 'two-officer' run." *Id.*  At the apartment, Alderman encountered White; during the encounter, he tased White and fired four shots, none of which hit White but, instead, caused him to run away. *Id.* Alderman did not pursue him. *Id.*

Sgt. Frenz arrived on scene after hearing Alderman say over the radio that he had a suspect at gunpoint and ordering a "10-3" run to signal that an officer was in

37

trouble. *Id.* at 837. Sgt. Frenz was aware that Alderman had fired shots because White had a knife. *Id.* Sgt. Frenz spotted White on "the corner, crouched down, hiding his hands, kind of peering around the corner." *Id.* Sgt. Frenz drew his weapon and approached. *Id.* The following ensued:

> [Frenz] shined his flashlight in White's direction and identified himself. Frenz approached and ordered White to show his hands. Instead White stood up and moved around to the south side of the building where there was a small area partially enclosed by a fence which contained air conditioning units. There were gaps between the fence and the apartment building at either end of the enclosure.
>
> White crouched inside the enclosure as Frenz approached. Once again, Frenz ordered White to show his hands. In response, White stood up; there was a knife in his hand. The men were about twenty feet apart although separated by the fence. Frenz knew that there were other officers in the area and he caught a glimpse of one, who turned out to be Kracht. Seeing that Frenz had White at gunpoint, Kracht holstered his gun and withdrew his Taser. According to Kracht's deposition testimony, he fired it at White, who was unaffected and instead began to move toward the gap in the fence that was closest to Frenz. For his part, Frenz testified that he felt that White was coming at him. Before White was able to leave the enclosure, Frenz fired three shots. One of them hit White in the shoulder. At the time Frenz fired, he estimates that he was six to eight feet from White, albeit on the other side of the fence.
>
> * * *
>
> Despite being wounded, White fled with the three officers—McKee, Frenz, and Kracht—all in pursuit. McKee left the others and looped around in another direction. He eventually saw White emerge from a breezeway and head north. McKee followed. With the three officers in pursuit, McKee elected to slow, crouch, and fire two shots at White. One of those shots may have struck White who continued to flee. After turning through a breezeway, McKee encountered White, who had stopped and was facing the officer. He still held a knife. The two were about fifteen feet apart. Though his gun was drawn, McKee's finger was not on the trigger.

[ ] McKee felt that White was close enough to strike at him. He aimed at White's "center mass" and fired two shots. Before the shots, White was staring at McKee with a blank expression. As McKee put it, "[T]hat's the first time I'd actually made eye contact with Mr. White ... and there was no expression whatsoever." White collapsed after the shots. McKee fired two more times:

> He was laying on his left side kind of with his arm underneath, his left arm underneath almost in front of him, and was trying to post himself back up, meaning push up to get himself back off the ground.

> One of the shots hit White in the chest. According to an affidavit sworn by McKee, "[t]he time between the second and third set of shots may have been only a second or even fractions of a second."

*Id.* at 837-38. White was pronounced dead at the scene after being handcuffed. *Id.*

White's Estate filed suit against the City, Frenz, and McKee, alleging that the officers used excessive force. *Id.* at 838. The Sixth Circuit ultimately granted the officers qualified immunity. *Id* at 843.

The plaintiff argued that "a reasonable fact finder could find that Jason White was merely moving away from Frenz and Kracht and posed no imminent deadly or serious threat to anyone." *Id.* at 840. The Sixth Circuit rejected this argument, holding that it was White's movements, not his motive for the movements that formed the basis for its ruling because the actions must be viewed through the perspective of a reasonable officer. *Id.* Thus, while it was possible White was only trying to leave the enclosure, a reasonable officer could have perceived this a threatening movement towards the officer. *Id.* Refusing to second guess Frenz' split-

second decision, the Sixth Circuit found Frenz' conduct reasonable. *Id.* at 842.

    ii.    <u>Deadly force against unarmed suspects</u>

Lastly, this Court should consider the Sixth Circuit's precedent on the use of deadly force against unarmed suspects, which, on the scale of guidance to Ofc. Schurr, is the most distant but still instructive because it is a recognition of the danger an individual can pose to an officer, even without a weapon.

In *Davenport v. Causey*, 521 F.3d 544, 547 (6th Cir. 2008), an officer was conducting a routine traffic stop after he saw the plaintiff, Davenport, speeding. Davenport exited his vehicle and ignored repeated commands from the officer, Ofc. Causey, to get back in the vehicle. *Id.* Davenport crossed his arms, leaned against his car, and asked "if Officer Causey 'was going to write him a damn ticket.'" *Id.* Ofc. Causey viewed these as acts of aggression and he "considered himself to be in danger." *Id.* That danger increased when Ofc. Causey approached, reached for Davenport, and Davenport brushed his hand away. *Id.*

Feeling threatened, Ofc. Causey activated his Taser to gain control of Davenport. *Id.* Davenport tried to divert the Taser by grabbing the Taser wires and charged towards the source of the wires, out of view of the dashcam. *Id.* Davenport disputed Ofc. Causey's allegation that Davenport struck him while off camera. *Id.* at 548. Ofc. Causey then approached to use the Taser in drive-stun mode but was met with multiple blows from Davenport. *Id.* A second officer, Ofc. Pugh,

approached and was also met with several blows from Davenport. *Id.* at 548-49. Ofc. Causey, witnessing Ofc. Pugh being struck, feared that Ofc. Pugh would suffer serious injuries or die, discharged his firearm and struck Davenport. *Id.* at 549.

In analyzing the reasonableness of Ofc. Causey's use of force, the Sixth Circuit noted that the analysis is not limited to the three factors outlined in *Graham*. *Id.* The analysis can include other considerations, such as the demeanor of the suspect, the size of the individuals, whether the suspect was fighting with the police, or whether the suspect was intoxicated and noncompliant. *Id.* at 551. The Court also noted that "[e]very new case can also present new circumstances that are relevant in determining whether that particular situation required deadly force." *Id.*

Applying the above analysis, the Sixth Circuit held that Ofc. Causey's use of force was objectively reasonable. *Id.* at 554. The Court considered the following factors in reaching this decision: (1) that Davenport ignored commands; (2) that Davenport actively resisted arrest; (3) that Davenport attacked two officers; (4) that Davenport displayed enough strength to knock an officer down; (5) that Davenport displayed irrational anger by reacting so violently to a simple traffic stop for speeding; and, (6) that the situation evolved rapidly, in less than one minute and eight seconds. *Id.* at 552-53. The Court refused the plaintiff's argument that Ofc. Causey had other means of force available to him before resorting to deadly force.

*Id.* at 554. The Court also refused to second guess Ofc. Causey's split-second decision, finding his decision in the rapidly evolving scenario to be reasonable. *Id.*

In *Mitchell v. Schlabach*, 864 F.3d 416, 419 (6th Cir. 2017), the Sixth Circuit found the use of deadly force to be constitutional when the reportedly intoxicated suspect aggressively walked towards an officer following a high-speed car chase. In reaching this determination, the Court relied in part on the suspect's intentional defiance and challenge of the officer. *Id.* at 421-22. In assessing the threat to the officer, the Court rejected the Plaintiff's argument that the decedent "was simply 'walking' toward [the officer]" with no weapon in his hands. *Id.* at 421. The Court said that not only did the video contradict this description, but noted that the suspect had walked "with speed, purpose, and confidence despite the fact that [the officer] had a gun trained on him." *Id.* The Court also noted how the suspect continued his behavior, including verbally threatening the officer, despite a change in path by the officer. *Id.* 421-22. The Court also emphasized that the suspect's lack of a weapon did not negate the threat he presented. *Id.* at 422-423. The Court concluded that, based on this behavior, in conjunction with the suspect's already extremely dangerous car chase, the officer reasonably feared that the suspect posed a significant threat of death or serious physical injury. *Id.* at 422.

In *Bell v. Cumberland Cnty.*, 665 F. App'x 421 (6th Cir. 2016)[8], the officer used constitutionally permissible deadly force following a prolonged physical struggle after exhausting all other remedies. The officer in *Bell*, Deputy Human, confronted a known domestic abuser, Fish, who had trespassed onto the property of his victim despite a warning two days prior. *Bell*, 665 F. App'x at 422. Deputy Human was called to the property after the victim's father reported that Fish had broken into the home, armed himself with a knife and meat cleaver, and stated the pair would both die that day. *Id.* Upon his arrival, Deputy Human was informed by the victim that Fish was there but that she was okay. *Id.* at 423. Deputy Human tried to speak with Fish but Fish took off running. *Id.*

After a search of the property outside, Deputy Human eventually found Fish in the home's "dimly lit" basement. *Id.* Deputy Human told Fish they needed to go upstairs and talk, but Fish disobeyed all commands. *Id.* Fish became agitated, assumed a fighting stance, and lunged at the victim. *Id.* His presence and commands failing to control the situation, Deputy Human next turned to his pepper spray but it had no effect on Fish and "was eventually knocked from his hands." *Id.* Deputy Human next tried to physically control Fish and grabbed his arm, but Fish resisted by tackling Deputy Human into a steel pole. *Id.* The struggle continued for Deputy

---

[8] While unpublished, this case does prove to be a resource for the application of the deadly force doctrine.

Human, with Fish repeatedly pulling him down to the ground and hitting him "in the sides and the back of [the] head with something." *Id.* During this incessant struggle, Deputy Human next tried his baton, again to no avail because Fish "batted it away." *Id.* With Fish sitting on his chest and reaching for a cast iron pan, Deputy Human unholstered his gun and shot Fish. *Id.*

When Fish's sister brought suit, alleging that the shooting was excessive, the Sixth Circuit affirmed the District Court's finding that "no reasonable juror could find that Deputy Human violated Fish's constitutional rights." *Id.* The Court found that not only did the testimony from the only witnesses (Human and the victim) confirm that Fish presented a sufficient threat, the *Graham* analysis also supported the use of deadly force. *Id.* at 425-26. The Court explained that the crime of trespassing elevated with the "unprovoked aggravated assault" on Deputy Human that entitled him to defend himself. *Id.* at 426. Deputy Human faced serious risk from the repeated attack and cast iron skillet threat. *Id.* The Court highlighted how Deputy Human had "exhausted all other options," before resorting to his gun to save himself. *Id.* Lastly, the Court noted that while Fish was actively attacking Deputy Human, "resistance alone is enough to increase the weight that must be given to the state's interest in a deadly-force seizure." *Id.* (cleaned up) (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 317 (6th Cir. 2005)).

    3.    *Ofc. Schurr used constitutionally permissible deadly force to stop an armed and actively resistant suspect*

Consideration of the above case law can lead to but one conclusion: Ofc. Schurr's split-second decision to use deadly force was reasonable. Like *Bell v. Cumberland*, Ofc. Schurr not only faced a sufficient threat to justify deadly force, but the *Graham* analysis also leads to the conclusion that his actions were reasonable. First, as to the threat, Ofc. Schurr was faced with the threat of his own Taser in the untrained hands of Lyoya, who had already demonstrated that he was intent on evading arrest even if it meant fighting and disarming an officer. The Taser, even in drive-stun mode, can cause serious injury or death if used improperly, such as a tase to the head (imagine a charge to the eyes), neck, or groin, or lead to further opportunities for Lyoya to injure Ofc. Schurr while distracted by the pain. The Fourth Amendment does not require Ofc. Schurr to take such a risk with his body and life. With Lyoya armed and turning to face him after a prolonged and exhausting struggle, Ofc. Schurr had probable cause to believe that Lyoya posed a significant threat of causing him serious physical injury or death.

Through the lens of *Graham* the threat Lyoya presented becomes clearer. The first factor looks at the severity of the crime. When Ofc. Schurr encountered Lyoya, he was investigating the fact that Lyoya was driving a car with a plate for different car which could implicate a number of dangerous crimes, especially given that the improper plate hid the identity of the owner/driver. At this time, Ofc. Schurr did not know Lyoya's name, if he owned the vehicle, or if he owned the plate. If Lyoya was

given the plate, displaying it is a misdemeanor under Mich. Comp. Laws § 257.256. If Lyoya stole the plate, mere possession of it is a felony under Mich. Comp. Laws § 257.257(e). If Lyoya stole the car and put another plate on it to disguise it, he would be guilty of a felony under Mich. Comp. Laws § 750.413. These are serious crimes, often indicative of even more serious crimes. *Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir. 1990) (holding that it was not unreasonable for officer to approach stolen vehicle with weapon drawn knowing only that it was stolen). Lyoya's crimes clearly evolved to also include felony Assault, Battery, and Resisting and Obstructing, Mich. Comp. Laws § 750.81d; Felonious Assault, Mich. Comp. Laws § 750.82; and a misdemeanor for failing to produce his license, Mich. Comp. Laws §§ 257.311 and 901. Under these circumstances, an objectively reasonable officer could believe that Lyoya was dangerously, and suspiciously, determined to not be identified or arrested. This factor weighs in favor of Ofc. Schurr.

The second factor evaluates the threat posed by Lyoya. As discussed above, Lyoya posed an immediate threat to the safety of Ofc. Schurr once he armed himself with the Taser. There were also two other known individuals in the immediate vicinity who could be harmed if Lyoya erratically used the Taser in his endless efforts to escape, not counting the neighborhood full of people like in *Reich*. This factor weighs in favor of Ofc. Schurr.

The third factor considers whether Lyoya was resisting arrest or fleeing.

Lyoya was indisputably both actively resisting and attempting to evade arrest by flight. His resistance began almost immediately when he refused to get back in the car, and never ceased. In total, he ignored 23 commands from Ofc. Schurr and refused to answer six questions. He ran, pushed, and pulled away from Ofc. Schurr continuously. Ofc. Schurr cycled through several different types and levels of force, all of which Lyoya resisted; he resisted commands, physical controls, a tackle, punches, knee strikes, and a Taser. Ofc. Schurr gave Lyoya every opportunity to comply; even after Lyoya had grabbed the Taser, Ofc. Schurr ordered him to drop it five times. At one point, Lyoya even attempted to involve the passenger in his resistance when he directed him to grab the keys. Lyoya gave no indication that he intended to comply, continually escalating his resistance. Ofc. Schurr was not required to wait to experience Lyoya's next escalation, such as feeling a Taser pressed into his neck,  before he could defend himself using deadly force. This factor weighs in favor of Ofc. Schurr.

The flexibility of the *Graham* analysis requires the Court to consider other factors in its totality analysis. Here, those factors are:

- Proximity: Ofc. Schurr was in close contact with Lyoya, positioned behind him on his back, such that Lyoya could easily reach him with the Taser if he continued turning or merely reached his arm across his body.

- Bizarre behavior: Lyoya behaved bizarrely when he first encountered Ofc. Schurr by not answering simple questions, staring open mouthed at him, and refusing to provide a license he claimed to have.

- Unusual strength: Throughout the encounter Lyoya demonstrated unusual strength, fighting off Ofc. Schurr's numerous control attempts;

- Lack of back-up officers: Ofc. Schurr was alone throughout the entire encounter. He was also outnumbered as Lyoya's passenger climbed out and began to encroach upon the struggle with Lyoya, presenting an additional danger that Ofc. Schurr could not ignore.

All of these factors support the serious threat Lyoya presented and the government's interest in apprehending him with deadly force. Therefore, this Court should rule that Ofc. Schurr acted constitutionally when he was forced to resort to deadly force.

### B. As of April 4, 2022, No Existing Precedent Clearly Established Ofc. Schurr's Conduct as Unconstitutional

A review of the constitutional boundaries set forth in the preceding case law also demonstrates why Ofc. Schurr did not act contrary to clearly established precedent. The Supreme Court's analysis and clarification of the doctrine across *City and County of San Francisco v. Sheehan*, *Kisela v. Hughes, City of Tahlequah v. Bond*, and *Rivas-Villegas v. Cortesluna*, support a finding that, at a minimum, clearly established law did not prohibit Ofc. Schurr's use of force. *See also Bell v. City of Southfield*, 37 F.4th 362, 367-68 (6th Cir. 2022) (clearly synthesizing the Supreme

Court's instructions for the clearly established analysis); *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021), cert. denied, 143 S. Ct. 302 (2022).

First, in *Sheehan*, the Supreme Court addressed the use of deadly force by an officer responding to a violent woman suffering from mental illness. *City and County of San Francisco v. Sheehan,* 575 U.S. 600, 602 (2015). The officers in *Sheehan* were dispatched to a group home where a woman, Sheehan, was no longer adequately caring for herself and required intervention. *Id.* at 603-04. The officers were taken to Sheehan's room and Sheehan initially reacted violently to their entry, grabbing a five-inch kitchen knife and threatening the officers. *Id.* at 604. The officers exited the apartment, only to re-enter minutes later with their weapons drawn. *Id.* at 605. When they re-entered, Sheehan was still armed with the knife; one officer pepper-sprayed Sheehan in the face but when she refused to drop the knife, Sheehan was shot multiple times by both officers. *Id.* at 605-06.

Sheehan sued the officers and their employer, alleging in part that the officers used excessive force by entering the second time without attempting to accommodate her disability. *Id.* at 606, 613. The Supreme Court agreed with the Ninth Circuit that the officers used reasonable force when they shot Sheehan,[9] but had to address whether it was clearly established that they should not have entered

---

[9] The Court specifically held that "[n]othing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing multiple rounds." *Sheehan*, 575 U.S. at 613.

the apartment the second time. *Id.* at 612-13. In answering that question, the Court first rejected the Ninth Circuit's reliance on *Graham* to establish any controlling rule because the facts were far too different. *Id.* at 613-614. The Court next rejected the Ninth Circuit's conclusions that two of its other precedents were sufficiently factually similar because one did not involve deadly force and another did not apply because the entries were not legally similar under that Circuit's rule.[10] *Id.* at 614-615. Because these cases did not provide the officers with sufficient notice that their conduct was unconstitutional, they were entitled to qualified immunity. *Id.* at 616.

Three years later, the Supreme Court again addressed the clearly established analysis in a deadly force case in *Kisela v. Hughes*, 138 S.Ct. 1148 (2018). There the Court again warned that precedent like *Graham* and *Garner* do not generally clearly establish law. *Kisela*, 138 S.Ct. at 1153. There, the plaintiff, Kisela, was reported by neighbors to be "hacking a tree with a kitchen knife." *Id.* at 1151. When officers arrived, they saw Kisela come out of her house carrying a large knife. *Id.* Kisela walked towards another woman on the scene and stopped within six feet of her. *Id.* The officers drew their firearms and told Kisela to drop the knife "at least twice." *Id.* Kisela "appeared calm, but she did not acknowledge the officers' presence or drop

---

[10] Here the Court also suggested the Circuit precedent may be insufficient to clearly establish constitutional principles, writing "even if 'a controlling circuit precedent could constitution clearly established federal law in these circumstances.'" *Sheehan*, 575 U.S. at 614 (quoting *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

the knife." *Id.* An officer then fired four shots, striking Kisela. *Id.* The Ninth Circuit found that this constituted an "obvious" constitutional violation. *Id.*

The Supreme Court disagreed and explained why the violation was not obvious by any means. *Id.* at 1152. The Court first rejected any reliance on *Garner* or *Graham* for clearly established purposes. *Id.* at 1153. Quoting itself, the Court emphasized that "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Id.* Turning next to the Ninth Circuit's own precedent, the Court again suggested that even Circuit precedent may be insufficient to determine a constitutional standard, before finding no sufficiently analogous Night Circuit case law. *Id.* The Court pointed out that the Ninth Circuit had found almost the exact same conduct to be constitutional when officers responded to a man with a sword, allowing an officer to believe his conduct was lawful in responding to Kisela. *Id.* The Court then found the other precedent relied on by the Ninth Circuit too distinct because they were either decided after the incident with Kisela or so factually distinct that "a reasonable police officer could miss the connection between the situation [in those cases] and the situation confronting Kisela…" *Id.* at 1154.

In October 2021, the Supreme Court delivered a clear statement on the clearly established prong of the qualified immunity analysis with its twin decisions in *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021), and *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021). In these cases, the Supreme Court echoed its prior instruction to lower

courts "not to define clearly established law at too high a level of generality." *Bond*, at 11. Such that in both cases, the Supreme Court reiterated that "[s]pecificity is especially important in the Fourth Amendment context, where…it is sometimes difficult for an officer to determine how the relevant legal doctrine…will apply to the factual situation the officer confronts." *Rivas-Villegas,* 142 S. Ct. at 8; *Bond*, at 142 S. Ct. 11-12.

In *Rivas-Villegas*, the Supreme Court was critical of the Ninth Circuit for finding the law clearly established based on one materially distinguishable case. *Rivas-Villegas,* at 8. The plaintiff failed to put forth any case law with sufficiently similar facts that would have notified the officer that his specific conduct was unlawful and relied solely on the one case. *Id.* Because of that, the officer was entitled to qualified immunity. *Id.* at 9.

While in *Bond*, the Supreme Court reviewed the four cases relied on by the Tenth Circuit and rejected each one as insufficient to provide notice of the particular right at issue. *Bond*, at 12. *Bond* involved an intoxicated man that would not leave his ex-wife's garage. *Id.* at 10. When confronted by officers, the decedent grabbed a hammer, raised it "as if preparing to swing a baseball bat," ignored commands to drop the hammer, and instead stepped into a clear path to an officer and raised the hammer even higher while taking a stance to charge or throw at an officer. *Id.* 10-11. It was then that he was shot. *Id.* at 11. In explaining why the next most analogous

case was insufficient to provide notice, the Supreme Court wrote:

> The officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands. Officers Girdner and Vick, by contrast, engaged in a conversation with Rollice, followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer.

*Id.*at 12.

These last two opinions also re-emphasized the Court's stance questioning whether Circuit precedent can set a single constitutional standard. The Sixth Circuit has presumed that its precedent or Supreme Court precedent could clearly establish a constitutional right. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (citing *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir.2002)). The Supreme Court again suggested that this presumption may be wrong in writing "[e]ven assuming that controlling Circuit precedent clearly establishes law for purposes of § 1983…" *Rivas-Villegas* at 8. This notion was first suggested in *Reichle v. Howards*, 566 U.S. 658, 665 (2012), and has been emphasized more than once since. *See Sheehan,* 575 U.S. at 614 (quoting *Carroll v. Carman*, 574 U.S. 13, 17 (2014)). And while a review of prior Supreme Court discussions lends supports to such an interpretation, *Ashcroft v. al-Kidd*, 563 U.S. 731, 746 (2011) (discussing how controlling case law must apply throughout the entirety of the United State), the Court still has not yet answered this question. The Court's emphasis on this issue, however, does emphasize the need for specificity, such that this Court should find

that the Supreme Court has, at a minimum, required that there be sufficiently analogous case law from the controlling circuit court for a right to be clearly established.

The thorough review of case law in Section II(A) demonstrates that the Sixth Circuit has never held that an officer acts unreasonably when he responds with deadly force to an actively resistant suspect that has disarmed him, fought against him to the point of exhaustion for multiple minutes, and who, while engaged in close contact with the officer, is turning to face the officer with the officer's Taser in hand, which is capable of causing serious injury or death.

## CONCLUSION

The question before this Court is one that it must answer: Whether Ofc. Schurr acted constitutionally in using deadly force. This question is posed by Defendant, accepting the pleaded facts and video evidence in a light most favorable to the Plaintiff. Chris Schurr is accepting the pleaded facts in light most favorable to the plaintiff, except those that are clearly contradicted by the video. As demonstrated above, the only answer to that question is that he acted constitutionally, as defined by Supreme Court and Sixth Circuit precedent as of April 4, 2022.

Respectfully submitted,

**SEWARD HENDERSON PLLC**
 /s/Kali M.L. Henderson (P76479)
*Attorneys for Defendants*

54

210 East 3rd Street, Suite 212
Royal Oak, Michigan 48067
P: (248) 733-3580
F: (248) 733-3633
Dated:   February 6, 2023          E: khenderson@sewardhenderson.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared in Microsoft Word 365, which calculated a word count of 12,635. The undersigned has filed a motion to exceed the word count, to which all parties concurred. The motion has yet to be granted due to a misunderstanding of this District's procedures.

/s/ Kali M. L. Henderson
210 East 3rd Street, Suite 212
Royal Oak, Michigan 48067
P: (248) 733-3580
F: (248) 733-3633
Dated:   February 6, 2023          E: khenderson@sewardhenderson.com

## PROOF OF SERVICE

I hereby certify that on **Monday, February 6, 2023**, I electronically filed the foregoing document with the Clerk of the court using the ECF system, which will send notification to the following: *All Parties and Attorneys of Record.*

/s/ Farah Hammoud
**SEWARD HENDERSON PLLC**
210 East 3rd Street, Suite 212
Royal Oak, MI 48067
T: (248) 733-3580
F: (248) 733-3633
E: fhammoud@sewardhenderson.com

55