## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PETER LYOYA as the
Personal Representative for
THE ESTATE OF PATRICK LYOYA
(deceased),

Case No. 1:22-CV-1160

*Plaintiff*,

Hon.  Paul L. Maloney
Mag. Judge Sally J. Berens

v.

CHRISTOPHER SCHURR and
THE CITY OF GRAND RAPIDS,
*Defendants*.

---

AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
**JOHNSON LAW, PLC.**
Attorneys for Plaintiff
The Buhl Building
535 Griswold, Ste 2600
Detroit, MI  48226
(313) 324.8300
ahatchett@venjohnsonlaw.com
vjohnson@venjohnsonlaw.com

TIMOTHY S. FERRAND (P39583)
**CUMMINGS, McCLOREY, DAVIS& ACHO, PLC.**
Attorney for the City of Grand Rapids
19176 Hall Road, Ste 220
Clinton Twp., MI  48038
(586) 228.5600
tferrand@cmda-law.com

T. JOSEPH SEWARD (P35095)
KALI M. L. HENDERSON (P76479)
**SEWARD HENDERSON, PLLC.**
210 East. 3rd Street, Ste 212
Royal Oak, MI  48067
(248) 733.3580
jseward@sewardhenderson.com
khenderson@sewardhenderson.com

---

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT SCHURR'S MOTION TO DISMISS

Now comes Plaintiff, Peter Lyoya, as personal representative of the Estate of Patrick Lyoya, deceased, by and through his counsel, Johnson Law, PLC, in response to Defendant Christopher Schurr's Motion to Dismiss.  For the reasons fully set forth in the brief in support of this response, Plaintiff respectfully requests that this Honorable Court deny Defendant's motion in all regards.  Plaintiff has adequately stated a claim for excessive force under the 4th Amendment following the death of Patrick Lyoya, who was fatally shot in the head by Schurr while unarmed and while posing no threat of harm to any individual.  Schurr's assertion that he is entitled to qualified immunity (while he is currently awaiting trial on second-degree murder in connection with Patrick's death) is booth legally incorrect and grossly premature. This matter must be permitted to proceed to discovery and Defendant's motion must be denied in all regards.

Respectfully submitted,

**JOHNSON LAW, PLC**.

By:  */s/ Christopher P. Desmond*
     CHRISTOPHER P. DESMOND (P71493)
     VEN R. JOHNSON (P39219)
     AYANNA D. HATCHETT (P70055)
     Counsel for Plaintiff
     Johnson Law, PLC
     535 Griswold Street, Suite 2600
     Detroit, MI 48226
     (313) 324.8300

Dated: April 7, 2023

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PETER LYOYA as the
Personal Representative for
THE ESTATE OF PATRICK LYOYA
(deceased),

     *Plaintiff*,

v.

CHRISTOPHER SCHURR and
THE CITY OF GRAND RAPIDS,
     *Defendants*.

Case No. 1:22-CV-1160

Hon.  Paul L. Maloney
Mag. Judge Sally J. Berens

---

AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
**JOHNSON LAW, PLC.**
Attorneys for Plaintiff
The Buhl Building
535 Griswold, Ste 2600
Detroit, MI  48226
(313) 324.8300
ahatchett@venjohnsonlaw.com
vjohnson@venjohnsonlaw.com

TIMOTHY S. FERRAND (P39583)
**CUMMINGS, McCLOREY, DAVIS& ACHO, PLC.**
Attorney for the City of Grand Rapids
19176 Hall Road, Ste 220
Clinton Twp., MI  48038
(586) 228.5600
tferrand@cmda-law.com

T. JOSEPH SEWARD (P35095)
KALI M. L. HENDERSON (P76479)
**SEWARD HENDERSON, PLLC.**
210 East. 3rd Street, Ste 212
Royal Oak, MI  48067
(248) 733.3580
jseward@sewardhenderson.com
khenderson@sewardhenderson.com

---

# PLAINTIFF'S BRIEF IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO DEFENDANT SCHURR'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

QUESTIONS PRESENTED....................................................................i

INDEX OF AUTHORITIES.................................................................ii

MOST APPROPRIATE AUTHORITY ..............................................vii

INTRODUCTION ..............................................................................1

STATEMENT OF FACTS ...................................................................2

STANDARD OF REVIEW ..................................................................9

ARGUMENT ......................................................................................10

    I.     Defendant's use of force was excessive and violated
          Patrick Lyoya's rights under the 4th Amendment....................................14

    II.    Defendant is not entitled to qualified immunity where the
          constitutional right at issue was clearly established...............................33

CONCLUSION....................................................................................36

**ISSUES PRESENTED**

I.  WHETHER DEFENDANT SCHURR VIOLATED PATRICK LYOYA'S RIGHTS UNDER THE 4th AMENDMENT WHEN HE FATALLY SHOT PATRICK IN THE BACK OF THE HEAD WHILE HE WAS UNARMED.

II.  WHETHER THE CONSTITUTIONAL RIGHT THAT SCHURR VIOLATED WAS CLEARLY ESTABLISHED AT THE TIME OF THESE EVENTS.

# INDEX OF AUTHORITIES

*Bailey v. City of Ann Arbor*,
860 F.3d 382 (6th Cir. 2017) ........................................................................ 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... 9

*Bell v Cumberland Co*,
665 F App'x 421 (CA 6, 2016) ..................................................................... 11

*Bouggess v Mattingly*,
482 F3d 886 (CA 6, 2007) ......................................................................24-30

*Brosseau v. Haugen*,
543 U.S. 194 (2004) ...................................................................................... 33

*Cahoo v. SAS Analytics Inc.*,
912 F.3d 887 (6th Cir. 2019) ................................................................. 10, 33

*Cardona v. City of Cleveland*,
No. 97-3037 (6th Cir. Nov. 10, 1997) .......................................................... 26

*Champion v. Outlook Nashville, Inc.*,
380 F.3d 893 (6th Cir. 2004) ........................................................................ 16

*Davenport v Causey*,
521 F3d 544 (CA 6, 2008) .....................................................................11, 30-31

*Dominque v. Telb*,
831 F.2d 673 (6th Cir.1987) ......................................................................... 33

*Estate of Kirby v. Duva*,
530 F.3d 475 (6th Cir. 2008) ........................................................................ 31

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*,
428 F.3d 223 (6th Cir. 2005) ........................................................................ 11

*Godawa v. Byrd*,
798 F.3d 457 (2015) ...................................................................................... 12

*Graham v. Connor*,
490 U.S. 386 (1989) ................................................................................. passim

*Grawey v. Drury*,
567 F.3d 302 (6th Cir. 2009) ........................................................................ 13

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ....................................................................................... 13

*Hicks v Scott*,
958 F3d 421 (CA 6, 2020) ............................................................................. 11

*Jacobs v Alam*,
915 F3d 1028 (CA 6, 2019) ........................................................................... 34

*King v. Taylor*,
694 F.3d 650 (6th Cir. 2012) ........................................................................ 34

*Lewis v Charter Twp of Flint*,
660 F App'x 339 (CA 6, 2016) .................................................................. 34-35

*Livermore v Lubelan*,
476 F3d 397 (CA 6, 2007) ............................................................................. 11

*Mitchell v Schlabach*,
864 F3d 416 (CA 6, 2017) ............................................................................. 11

*Mullins v Cyranek*,
805 F3d 760 (CA 6, 2015) ............................................................................. 11

*Murray-Ruhl v Passinault*,
246 F App'x 338 (CA 6, 2007) ...................................................................... 30

*Needham v. Lewis*,
137 S. Ct. 1814 (2017) ................................................................................... 35

*Palma v Johns*,
27 F.4th 419 (CA 6, 2022) ....................................................................... 28-30

*Pearson v. Callahan*,
555 U.S. 223 (2009).................................................................. 13

*Pollard v City of Columbus*,
780 F3d 395 (CA 6, 2015) .......................................................... 11

*Reich v City of Elizabethtown*,
945 F3d 968 (CA 6, 2019) .......................................................... 11

*RMI Titanium Co. v. Westinghouse Elec. Corp.*,
78 F.3d 1125 (6th Cir. 1996) ........................................................ 9

*Robinette v Barnes*,
854 F2d 909 (CA 6, 1988) ......................................................22-23

*Sample v. Bailey*,
409 F.3d 689 (6th Cir. 2005) ...................................................... 17

*Saucier v. Katz*,
533 U.S. 194 (2001)........................................................13-14, 33

*Scott v. Harris*,
550 U.S. 372 (2007)............................................................ 11, 14

*Scozzari v City of Clare*,
723 F Supp 2d 974 (ED Mich, 2010)............................................. 32

*Scozzari v Miedzianowski*,
454 F App'x 455 (CA 6, 2012) .................................................... 32

*Shreve v. Jessamine County Fiscal Court*,
453 F.3d 681 (6th Cir. 2006)....................................................... 34

*Sigley v. Kuhn*,
Nos. 98-3977 (6th Cir. Jan. 31, 2000) ........................................... 26

*Simmonds v Genesee Co*,
682 F3d 438 (CA 6, 2012) .......................................................... 11

*Smith v. Cupp*,
430 F.3d 766 (6th Cir. 2005) ................................................................. 31, 34

*Sova v. City of Mount Pleasant*,
142 F.3d 898 (6th Cir. 1998) ....................................................................... 14

*Stevens-Rucker v City of Columbus*,
739 F App'x 834 (CA 6, 2018) ..................................................................... 11

*Tennessee v. Garner*,
471 U.S. 1 (1985)............................................................................... passim

*Thomas v City of Columbus*,
854 F3d 361 (CA 6, 2017)............................................................... 11, 31-32

*Thornton v City of Columbus*,
727 F App'x 829 (CA 6, 2018) ..................................................................... 11

*Wesley v Campbell*,
779 F.3d 421 (6th Cir, 2015)........................................................................ 10

## MOST APPROPRIATE AUTHORITY

*Bouggess v Mattingly*, 482 F3d 886, 896 (CA 6, 2007)

*Graham v. Connor*, 490 U.S. 386, 393-94 (1989)

*Palma v Johns*, 27 F.4th 419 (CA 6, 2022)

*Tennessee v. Garner*, 471 U.S. 1, 7 (1985)

---

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT SCHURR'S MOTION TO DISMISS

---

### INTRODUCTION

Christopher Schurr murdered Patrick Lyoya.  He shot him in the back of the head while he pinned him to the ground.  Patrick was unarmed.  He never struck Schurr, he never threated him and he was not aggressive toward him.  While Patrick was unarmed, suspected of no serious crime and posing no threat of harm to Schurr or anyone else, Schurr killed him without so much as even providing a warning.  He was terminated and charged with 2nd degree murder pursuant to MCL 750.317, which carries a possible life sentence.  Subsequently, he was bound over for trial (which has yet to occur) by a neutral district court judge who determined there was sufficient evidence to proceed with the prosecution.  Thereafter, that judge's determination was confirmed by a Kent County Circuit Court judge who denied Schurr's subsequent motion to quash.

Defendant now moves to dismiss the Estate's cause of action.  It matters not, according to Defendant, that there has been no discovery, or that qualified immunity is disfavored at the pleadings stage or that the City of Grand Rapids, the Kent County Prosecutor and multiple judges have all determined that the evidence allows for a conclusion that Schurr murdered Patrick.  Only an unreasonable person could reach such a conclusion, according to Defendant.

1

Contrary to Defendant's assertions in this motion, Plaintiff has pled a viable cause of action against Schurr pursuant to 42 U.S.C. § 1983.  As is set forth thoroughly in Plaintiff's Complaint, Schurr's use of force was unreasonable and violated Patrick's clearly established constitutional rights, as demonstrated by the binding precedent of both the United States Court of Appeals for the 6th Circuit and the United States Supreme Court.  Defendant's motion is entirely devoid of merit and must be denied.

### STATEMENT OF FACTS

The rain drizzled on Monday, April 4, 2022. It was around eight o'clock in the morning, when Patrick Lyoya ("Patrick") and his friend, Aime Tuyishme ("Aime")--two young Black men--were conspicuously driving through a residential neighborhood in Grand Rapids. Patrick was driving a tan 2003 Nissan Altima and Aime sat in his front passenger seat.  This ultimately fatal traffic stop was recorded in part by Schurr's body camera, Schurr's dash camera, and Aime's cell phone. (Exhibit A, Synchronized Videos). The entire interaction--from the moment Patrick was pulled over to the moment he was murdered--lasted approximately three minutes and thirty seconds. Ex. A.

Defendant, Christopher Schurr ("Schurr"), was on patrol in the area as a police officer for the City of Grand Rapids.  Schurr's path crossed with Patrick and Aime in the area of Nelson Avenue, SE and Griggs Street. (Defendant Schurr's Exhibit 1,

Dash Cam). But Schurr was driving in the opposite direction. *Id*.  Once their cars passed each other, Schurr immediately turned into a driveway, where his in-car video roughly began recording only to back out and begin following behind Patrick's car. (Schurr's Ex. 1 @ 12:11:05). Seconds later, Schurr activated his emergency lights to pull Patrick over. (Schurr's Ex. 1 @12:11:33).

Patrick pulled his car over to the side of the road. *Id*. Aime stayed in the front passenger seat, while Patrick got out and stood next to his car. (Schurr's Ex. 1, @12:11:46). Schurr, before he could even get out of his patrol car, started yelling at Patrick to "stay in the car." *Id*. Without hesitation, Schurr charged right over to where Patrick was standing. (Schurr's Exhibit 2, BWC @ 8:11:46).

Patrick asked Schurr what he did wrong. (Schurr's Ex. 2 @ 8:11:53).  Schurr responded that he was stopping him and asked Patrick if he had a license. (Schurr's Ex. 2 @ 8:11:56).  Again and again, Patrick asked what did he do wrong (Schurr's Ex. 2 @ 8:11:59-8:12:10), to which finally Schurr stated that the license plate on Patrick's Nissan did not match the vehicle.  (Schurr's Ex. 2 @ 8:12: 11). Still standing by his driver's door, Patrick told Schurr that his driver's license was in the car. (Schurr's Ex. 2 @ 8:12:19). Schurr directed Patrick to "get it" for him. (Schurr's Ex. 2 @ 8:12:21).  Patrick opened his driver's door and stood in his doorway next to Schurr as he tried to direct Aime to retrieve his license from inside of the car. (Schurr's Ex. 2 @ 8:12:26-8:12:48). When Aime couldn't locate his license, Patrick

3

shut the driver's door and began walking toward the front end of his car.  (Schurr's Ex. 2 @ 8:12:48).

Patrick had turned away and had taken a few steps when Schurr said "no, no" and grabbed Patrick to turn him around. (Schurr's Ex. 2 @ 8:12:50). Schurr told him to put his hands behind his back. (Schurr's Ex. 2 @ 8:12:53). Patrick rotated his body to escape Schurr's grasp and immediately moved away toward an adjacent yard. (Schurr's Ex. 2 @ 8:12:54-56).  Schurr radioed once, saying "got one running" and proceeded to chase after Patrick.  (Schurr's Ex. 2 @ 8:12:58). The moment Patrick began to run is depicted below, and it demonstrates that Patrick was not moving toward Schurr aggressively, but was only seeking to move away from him.



Schurr initiated the second physical contact when he tackled Patrick from behind to the ground. (Schurr's Ex. 1 @ 12:13:01).  At the same time, Patrick's passenger door opened and one of the neighbor appeared. *Id*. Even from a distance, Schurr's dashcam clearly captured Schurr punching (Schurr's Ex. 1 @12:13:16) kneeing Patrick (Schurr's Ex. 1 @12:13:18), at which point Aime emerged from the car (Schurr's Ex. 1 @ 12:13:19).   Aime started to record what was happening to Patrick on his cell phone. (Schurr's Exhibit 3, Passenger Aime's Cell Phone). Meanwhile, the neighbor remained just steps behind Schurr as he was on top of Patrick.  (Schurr's Ex. 3).  Schurr forced the side of Patrick's head into the ground, yelled stop (more than once) and yelled at Patrick to get his hands behind his back. (Schurr's Ex. 2 @ 8:13:03-13).

Patrick struggled to get back on his feet and extricate himself from Schurr. (Schurr's Ex. 1 @ 12:13:45).  Aime moved closer and closer toward Patrick and Schurr.  (Schurr's Ex. 1 @ 12:14:09-39).

Without warning, Schurr drew his Taser. Schurr grabbed Patrick's sweater with his left hand while he drew and aimed his Taser at him with his right. (Schurr's Ex. 2 @ 8:14:11-16; also please see still frame from Schurr's bwc).   Patrick reflexively extended his left arm to deflect the Taser's barrel away from him, to protect himself, as is pictured below. *Id*. At the sound of the first Taser deployment,

Aime is heard saying, "Why you gotta do all that, bruh? [Patrick's] good, man." (Schurr's Ex. 3 @ 0:00:51).  The probe didn't make contact with Patrick.



Axon_Body_3_Video_2022-04-04_0811_X6039A52S_frame -5634

Still physically holding on to Patrick, Schurr deployed the second Taser cartridge. Patrick grabbed the barrel of the Taser, as he fell to the ground, in an effort to re-direct its aim away from him.



6

Knowing the Taser could only be used in drive-stun mode after the second cartridge was deployed, Schurr nonetheless began to command Patrick to let go of the Taser. (Schurr's Ex. 3 @ 0:00:58).  Simultaneously, Schurr pinned Patrick to the ground using his full body weight on Patrick's back. (Schurr's Ex. 3).  Schurr let go of his Taser with his left hand, which had been positioned underneath Patrick's upper body, and yelled again to Patrick to let go of the Taser. (Schurr's Ex. 3). In the next moments, Schurr continued to bear down on Patrick's back, forced Patrick's face into the ground with his left hand, as he used his right hand to draw his gun. (Schurr's Ex. 3). Without saying a word, Schurr placed the gun to the base of Patrick's skull and fired. (Schurr's Ex. 3). The moment immediately before the shot is depicted below.  It demonstrates that Schurr had control over Patrick and was in a superior position that would have allowed him to take a variety of alternative courses of conduct.



As the Court will see when viewing the available video footage, at no point in the encounter did Patrick move toward Schurr.  At every moment, Patrick only sought to escape the violence and aggression Schurr unreasonably employed from the early moments of their encounter.  He never threated Schurr, struck Schurr or acted with any form of aggression.  Schurr, in contrast, violated numerous policies and national policing standards, as is alleged in Plaintiff's Amended Complaint and is explained by Plaintiff's highly-qualified police procedure experts Thomas Tiderington and Ken Katsaris (attached as Exhibits B and C, respectively).

The City of Grand Rapids requested an investigation and put Schurr on paid leave. Weeks later, on June 9, 2022, the Kent County Prosecutor—Chris Becker--charged Schurr with second-degree murder.  Thereafter, Grand Rapids terminated Schurr from its police force.   Schurr was bound over on those charges and subsequently filed a motion to quash, which was denied.

As a result of the above-described events, Plaintiff filed this cause of action, which presents claims against both Schurr and the City of Grand Rapids.  Plaintiff alleged that Schurr is liable under 42 U.S.C. § 1983 for violating Patrick's right to be free from excessive force under the 4th Amendment, and further alleged that the City of Grand Rapids is subject to municipal liability for being the moving force behind that violation.  Now, prior to any discovery having occurred, both Defendants move to dismiss Plaintiff's Complaint.  Yet, the motions are entirely without merit.

Contrary to Defendants' assertions, the video evidence available to the Court cannot serve as basis for dismissing this action.  Not only does that footage show that the use of force was unreasonable, but the law demonstrates that a dispositive motion on an excessive force case is almost always premature if it is filed before discovery occurs.  Plaintiff has adequately stated each of the claims in his Complaint and this matter must proceed forward to discovery.

### STANDARD OF REVIEW

Defendants bring their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the facial sufficiency of the complaint.  *See RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  Rule 12(b)(6) provides that the defendant bears the burden of demonstrating that a plaintiff has not stated a claim upon which relief can be granted.  Under the pleading requirements of Fed. R. Civ. P. 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"

As the Supreme Court provided in *Ashcroft v. Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

(citing *Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## LAW AND ANALYSIS

In moving to dismiss Plaintiff's Complaint, Defendant contends that he is entitled to qualified immunity relative to Plaintiff's claim of excessive force.  At the outset, it must be noted that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v Campbell*, 779 F.3d 421, 433 (6th Cir, 2015).  As the 6th Circuit has explained, "[t]o survive the motion to dismiss on qualified-immunity grounds, the plaintiff must allege facts that plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019). "Although a defendant's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Id*. at 899.

See also *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring) (observing that the fact-intensive nature of the qualified immunity test makes it "difficult for a defendant to claim qualified immunity on the pleadings before discovery" (emphasis in original)).

The contents of Defendant's motion only reaffirms the principles set forth above. In arguing that Schurr is entitled to qualified immunity, Defendant has discussed numerous cases with different degrees of detail. It appears to Plaintiff, however, that each and every case that Defendant discusses with any level of significance is a case involving a motion for summary judgment following discovery. Based on counsel's review, each of the following cases, which includes cases cited by Defendant as the most appropriate authority, involved summary judgment and not a motion to dismiss: *Bell v Cumberland Co*, 665 F App'x 421 (CA 6, 2016); *Davenport v Causey*, 521 F3d 544 (CA 6, 2008); *Hicks v Scott*, 958 F3d 421 (CA 6, 2020); *Livermore v Lubelan*, 476 F3d 397 (CA 6, 2007); *Mitchell v Schlabach*, 864 F3d 416 (CA 6, 2017); *Mullins v Cyranek*, 805 F3d 760 (CA 6, 2015); *Pollard v City of Columbus*, 780 F3d 395 (CA 6, 2015); *Reich v City of Elizabethtown*, 945 F3d 968 (CA 6, 2019); *Simmonds v Genesee Co*, 682 F3d 438 (CA 6, 2012); *Stevens-Rucker v City of Columbus*, 739 F App'x 834 (CA 6, 2018); *Thomas v City of Columbus*, 854 F3d 361 (CA 6, 2017); *Thornton v City of Columbus*, 727 F App'x 829 (CA 6, 2018).

Twelve cases.  Defendant has directed this Court to no less than twelve cases where qualified immunity was only decided on the basis of a full and complete record developed through the course of discovery and is using them to argue that this case should be dismissed prior to *any* discovery occurring (again, while fully knowing that Schurr has been terminated, charged with 2nd degree murder and bound over for trial).

Plaintiff anticipates that Defendant will respond that no discovery is necessary here because these events were captured on video.  Not so.  Defendant makes that assertion in their brief while citing to *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017).  Yet, Defendant's brief acknowledges that the *Bailey* video "captured the entire event that was in dispute and contradicted the plaintiff's allegations."  The 6th Circuit has rejected calls to rely on video evidence alone where that video does not fully capture the events at issue or contradict the allegations of the Plaintiff.  See *Godawa v. Byrd*, 798 F.3d 457, 463 (2015).

The video evidence here did *not* capture the entire event (nor does it contradict Plaintiff's account).  Defendant's own statement of facts acknowledges in multiple instances that Schurr's body camera became dislodged and did not capture all of the events, just as it acknowledges that the other video evidence available is sometimes not helpful because of the angles from which it was recorded and the positioning of the parties' bodies.

Plaintiff submits that the video evidence available to the Court (as will be discussed in greater detail below) leaves no doubt that the use of force here was excessive and unconstitutional.  However, Plaintiff is not required to make that showing at this stage, as this is a motion to dismiss prior to discovery.  A man is dead and a former police officer has been charged with his murder.  There are eyewitnesses to these events as well as physical evidence that will speak to the unreasonableness of the force that was used.  To dismiss this cause of action on the basis of qualified immunity solely by relying on incomplete video evidence and Defense counsel's characterization of that video without the opportunity for discovery would be wholly contrary to the law.

Turning now to the specific nature of qualified immunity, government officials may invoke qualified immunity as a defense only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Questions of qualified immunity are determined resolved by a two-step inquiry: "viewing the facts in the light most favorable to the plaintiff, determines whether: 1) the violation of a constitutional right has occurred; and 2) the constitutional right at issue 'was clearly established at the time of the defendant's alleged misconduct.'" *Grawey v. Drury*, 567 F.3d 302, 308 (6th Cir. 2009) (quoting *Saucier v. Katz*, 533 U.S. 194,

201 (2001)).  Plaintiff will address those prongs in turn below.

Finally, while this motion was brought pursuant as a motion to dismiss as opposed to a motion for summary judgement, the Court will see that Defendant's motion depends on its interpretation or characterization of pieces of evidence, including video footage of these events.  The Supreme Court emphasized "the importance of drawing inferences in favor of the nonmovant" when addressing questions of qualified immunity for purposes of summary judgment. *Tolan*, 134 S. Ct. at 1866.  When addressing either prong of the qualified immunity test, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.*; *Sova v. City of Mount Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). Rather, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion[,]'" which, "[i]n qualified immunity cases[,]…usually means adopting the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## I.  The use of force was unreasonable and in violation of Patrick Lyoya's rights under the 4th Amendment

### a.  Plaintiff's Complaint properly pleads that Schurr's use of force was constitutionally excessive

The first inquiry of the qualified immunity analysis examines whether "the facts alleged show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  It is well established that the right to be free from

14

excessive force is guaranteed by the Fourth Amendment's protections against unreasonable seizures. *See* U.S. Const. amend. IV; *see also Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  The Supreme Court in *Tennessee v. Garner* established that a police officer's use of deadly force is a "seizure" within the meaning of the Fourth Amendment and that claims alleging the use of such force are evaluated under the Fourth Amendment's "reasonableness standard." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Under that standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Graham*, 490 U.S. at 397.  Like *Garner*, the present case of course includes an application of deadly force.  The *Garner* Court set forth that the use of deadly force is objectively reasonable *only* where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Garner*, 471 U.S. at 11.

"The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 US at 11.  "[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious

physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12.  Here, it is entirely undisputed that Schurr never warned Patrick regarding either the taser or his firearm.

Determining whether the use of force is reasonable requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Garner*, 471 U.S. at 8.  The Supreme Court instructed that courts should weigh "[1.] the severity of the crime at issue, [2.] whether the suspect pose[d] an immediate threat to the safety of the officers or others, [3.] and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9).  This Circuit has also considered an individual's mental illness or diminished capacity in assessing the reasonableness of a particular use of force. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004).

The test for reasonableness under the Fourth Amendment "is not capable of precise definition or mechanical application" and "its proper application requires careful attention to the facts and circumstances of each particular case[.]" *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9)).  The factors set forth above do not constitute an exhaustive list and the ultimate inquiry is "whether the totality of the circumstances justifies a particular sort of seizure." *Id*.   In analyzing claims

involving deadly force, the 6th Circuit has adhered to the tenet that "only in rare instances may an officer seize a suspect by use of deadly force." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005).

When viewing the pleadings in this case through the lens of the legal principles established above, there can be no dispute that Plaintiff has pleaded the necessary elements of an excessive force action.  Below is a portion of Plaintiff's Amended Complaint (See ECF No. 2, PageID 21-22), states, among other allegations, that:

40. Based on the totality of the circumstances, Defendant Schurr's act of shooting Patrick in the back of the head was objectively unreasonable.

41. Schurr lacked any lawful basis to shoot and kill Patrick.

42. Schurr was on top of Patrick and holding Patrick down to the ground at the time Schurr reached for his deadly weapon, placed it to the back of Patrick's head, and pulled the trigger.

43. Patrick was not armed and posed no threat to Schurr or any other person's safety.

44. When he shot Patrick in the back of the head, Schurr had no information to support a reasonable suspicion that Patrick was dangerous.

45. No reasonable officer would have responded to Patrick's get away from a traffic stop as a reasonable basis to use deadly force.

46. Schurr's actions constituted excessive force in violation of the Fourth Amendment.

47. As a proximate result of Schurr's illegal and unconstitutional conduct, Patrick Lyoya died and suffered damages as a result.

Thus, Plaintiff has alleged that Patrick was unarmed, posed no threat to Schurr or anyone else, was not dangerous, was not engaged in a serious crime and that any reasonable officer would have known that deadly force was not constitutionally permitted under the circumstances Schurr was facing.  Plaintiff has also submitted expert affidavits confirming each of those allegations.  While Plaintiff ordinarily do so at this stage, Defendant's brief failed to accept Plaintiff's allegations as true and the use of expert witnesses serves to confirm that Plaintiff will be able to support each and every one of his theories through discovery.

Plaintiff's allegations, when accepted as true and when compared to the *Graham* factors, set forth the necessary elements of this claim.  Yet, as the Court will see, this motion is in no way about the sufficiency of Plaintiff's pleadings (despite being characterized as a Rule 12 motion), as Defendant never attempts to discuss the actual allegations in that complaint.  Instead, Defendant immediately pivots to fact-based arguments prior to the parties having any access to discovery- the discovery that this Circuit repeatedly emphasizes is crucial to qualified immunity determinations.

### b. Even when moving beyond the face of the Complaint, Defendant's motion must be denied

Because Plaintiff's pleadings, when accepted as true, set forth all the necessary elements of a claim for excessive force pursuant to 42 U.S.C. § 1983, this motion must be denied.   Though Plaintiff in no way believes that Defendant's factual disputes regarding Plaintiff's allegations are proper at this pre-discovery stage, Plaintiff will nonetheless address why those arguments are unavailing from a substantive standpoint.

At the outset, Plaintiff must draw the Court's attention to the glaring misrepresentation that infects the entirety of Defendant's motion.  On page 31 of Defendant's brief, Defendant asserts that "Ofc. Schurr wrestled with an unarmed Lyoya who then armed himself with a Taser." That never happened.  Defendant, the moving party, is obligated to take the evidence in the light most favorable to Plaintiff.  Instead, Defendant is blatantly mischaracterizing Patrick Lyoya's conduct and denigrating him in order to justify murder.

Patrick Lyoya never armed himself with a taser and Defendant has *zero* evidence to the contrary.  At most, Schurr voluntarily released his taser at the last moment before shooting Patrick.  What the video does show, though, is that prior to Schurr utilizing his taser, Schurr had already tackled Patrick and pinned him to the ground (as Defendant acknowledges on p 10 of his brief), punched Patrick in the head (p 11 of Defendant's brief), applied two knee strikes (p 11 of Defendant's

brief), tackled Patrick again (p 12 of Defendant's brief) and attempted another knee strike and another tackle (p 14 of Defendant's brief).  During the duration of those events, all prior to the introduction of the taser, Patrick did not strike or threaten Schurr in any way.  At no time did Patrick attempt to do anything other than flee from Schurr.

As a precursor to those events, Schurr was not pulling over Patrick because he was suspected of a serious crime.  At most, Schurr asserts that Patrick's license plate did not match his vehicle (a subject not yet proven or explored because of the lack of discovery).  Thus, while much of the case law involving lethal force involves suspects accused of felonious behavior, the present case has no such allegations.  Patrick's conduct before and during his encounter with Schurr alerted Schurr to the fact that Patrick was not a threat.

After Schurr had demonstrated his willingness to use violence toward Patrick, he then chose to withdraw his taser while standing in close proximity to Patrick.  Patrick, as he had been doing throughout the encounter, continued to try to protect himself- not by using any force of his own, but by directing the taser away from his body so as not to be injured.  Patrick's hand was on the barrel of the taser, not the handle or trigger, and Schurr never once lost control of it.  Notably, Patrick's act of trying to guard against the taser is but one of the reasons why officers are not supposed to pull their tasers while in close proximity to a subject.  Distance is

required to be able to use a taser safely and effectively, and Schurr, despite allegedly being trained on those facts, disregarded that requirement.  Specifically, as Ken Katsaris explains in his affidavit attached as Exhibit C, Defendant needed to be at least 7 feet away from Patrick for his taser probes to get the requisite spread to create an incapacitating electrical current in Plaintiff's body.

As is explained by Plaintiff's expert Thomas Tiderington at ¶¶ 9-13 of his affidavit, all of Schurr's conduct to this point was in deviation of his training and the applicable policies.  Tiderington has opined that Schurr violated those policies when he physically engaged with Patrick and drew his taser (without warning) while they were in close proximity, rather than simply wait for backup to arrive.  Tiderington explains that by drawing the taser while physically engaged with Patrick, Patrick predictably made contact with the taser to prevent himself from being shocked. Likeiwse, Plaintiff's expert Ken Katsaris has opined that Schurr violated his training relative to the foot pursuit and his use of the taser (both by using it in too close of a proximity to Plaintiff and by not providing a proper warning), which prevented the taser from being effective.  And while Defendant may take issue with Plaintiff submitting expert opinions at this stage (despite Defendant moving beyond the pleadings in is motion), Plaintiff's Amended Complaint contains the same allegations, which must be accepted as true.

It is likewise necessary to address Defendant's characterization of the significance of the taser to this case.  Defendant states with apparent seriousness that even though he concedes that taser could be used, at most, in drive stun mode (which Patrick had no training in), it was nonetheless still a deadly weapon that justified Schurr's shooting of Patrick.  Further, as Ken Katsaris has explained at ¶ 22 of his affidavit, this model of taser contained a unique safety switch that could disable the taser completely and that can only be overridden by a trained user.  And because Patrick never once possessed that Taser, Defendant is actually arguing that the mere *presence* of the taser on the scene justified the shooting.  In support of that argument, Defendant quotes *Robinette v Barnes*, 854 F2d 909, 912 (CA 6, 1988), for the idea that "[i]ndeed, as any faithful reader of mystery novels can attest, an instrument of death need not be something as obviously lethal as a gun or knife. The ubiquitous 'blunt object' kills just as effectively."

When the Court in *Robinette* made the statement that Defendant provides without any context, it was not talking about a taser.  The deadly weapon at issue in that case was a police dog, which the Defendant officer was asserting was not tantamount to lethal force despite it killing the Plaintiff.  The Court was not analyzing whether an officer was justified in shooting a suspect because of that suspect's possession of a blunt object and the potential to use it to harm the officer.  Defendant Schurr did not believe that Patrick Lyoya, who had exhibited no

aggression or violence whatsoever, was preparing to beat him to death with a taser that he never possessed.  If he did, that belief was not reasonable.  Not only had Patrick not been violent, but he was pinned beneath Schurr, who was armed with a firearm and who had the ability to simply move away from Patrick if he desired. Further, Schurr was equipped with body armor, which he also would have understood could negate the drive-stun ability of the taser.  These are all aspects of the use of force that can only be addressed through discovery.

As a final note on *Robinette*, the more important takeaway from that case was that *before* the Defendant officers utilized the police dog that attacked the Plaintiff, they warned the Plaintiff of their intent to do so *three times*.  *Id*. at 911.  Schurr never provided Patrick with a single warning before shooting him in the back of the head (in contravention of the requirement from *Garner*), which prevented Patrick from seeing that he had even drawn his firearm.

The reason why Defendant is trying to portray Patrick as being armed with a taser is to create the impression that Schurr had no choice but to use lethal force. That effort fails automatically because Patrick never possessed any weapon, including the taser.  Importantly though, Defendant also fails to appreciate that an individual's possession of a weapon does not create a right to use deadly force. Instead, as the 6th Circuit has said, "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to

him or others, deadly force is not justified." *Bouggess v Mattingly*, 482 F3d 886,

896 (CA 6, 2007).

In *Bouggess*, the Defendant officer was operating undercover in a sting

operation in which he was planning on buying narcotics from several individuals,

including the Plaintiff.  The Defendant testified that when he arrived at the scene of

the buy, the Plaintiff got out of a vehicle and lifted his shirt.  According to the

Defendant, he understood that gesture to be an indication that the Plaintiff *was* armed

with a concealed weapon.  *Id*. at 888, n 1.  It appears that the drug purchase never

occurred, because several of the suspects reached into the Defendant's car, stole

money and fled.

When the Defendant sought to see which direction the suspects ran in, he

observed the Plaintiff picking up money from the ground.  *Id*. at 888.  He then tried

to arrest the Plaintiff and a struggle ensued.  The officer testified that during the

struggle, the Plaintiff "had this look in his eyes like, he just had this look in his eyes

like, man I'm going to kill you." *Id*. at 888, n 2.  After seeing that look, the Defendant

pulled his firearm and testified that the Plaintiff "was trying to take it from him

during the struggle and that one shot was fired toward the ground during the

struggle." *Id*.  He testified that when the shot was fired into the ground, he believed

at the time that he had been shot in the foot.  *Id*.  The struggle then apparently ended

and the Plaintiff again began to flee.  The Defendant then shot the Plaintiff three

times in the back.  *Id*. at 889.  He died shortly after and it was subsequently discovered that he was carrying a concealed pistol.  *Id*.

When analyzing whether the Defendant was entitled to qualified immunity, the 6th Circuit began by setting forth the *Graham* factors discussed above.  It then stated that "[u]sing those factors and other relevant facts, it is our task to determine whether Mattingly had an objectively reasonable belief that Newby posed an imminent threat of serious physical harm to him or to others. If Mattingly did not have such a belief, then his use of deadly force violated the Fourth Amendment." *Id*. at 890.

The Court held that the Defendant was not entitled to qualified immunity.  In doing so, it concluded that while the officer testified that the Plaintiff was armed, "[t]oo much evidence throws doubt on Mattingly's bare assertion that he suspected that Newby had a weapon." *Id*. at 890-891.  In casting doubt on the officer's account that he was fearful for his life, the Court noted that the officer never communicated those concerns over the radio.  Of course, the same is true here.  Schurr never told anyone on the radio that he feared Patrick, that Patrick was trying to take his taser or that he believed lethal force was needed.  The *Bouggess* Court also noted that even if it was true that Plaintiff had his own weapon, deadly force would only be appropriate if it was reasonable to believe that the Plaintiff was going to *use* that weapon against the officer or others, and that amounted to a question of fact.

Like here, the Defendant in *Bouggess* also cited the Plaintiff's acts of resisting and fleeing as demonstrating that force was proper. Again, the Court rejected the argument, stating that "[i]t cannot reasonably be contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, and without evidence of any intention on the suspect's part to seriously harm the officer, could constitute probable cause that the suspect poses an imminent danger of serious physical harm to the officer or to others." *Id*. at 891. The Court cited numerous cases where qualified immunity was denied in the face of a contention that a suspect intended to wrestle away an officer's weapon and use it against him. Id. at 891-892. (*Sigley v. Kuhn*, Nos. 98-3977, 99-3531, 2000 U.S. App. LEXIS 1465, at *2-3, *15 (6th Cir. Jan. 31, 2000) (unpublished) (denying summary judgment on qualified immunity grounds when deadly force was employed after a suspect tackled an officer and wrestled him to the ground because there was a disputed issue of fact as to whether the suspect tried to take away the officer's gun); *Cardona v. City of Cleveland*, No. 97-3037, 1997 U.S. App. LEXIS 32113, at *9-14 (6th Cir. Nov. 10, 1997) (unpublished) (denying qualified immunity where officer and suspect struggled, and the suspect was shot during the struggle, where there was a disputed issue of fact as to whether the officer and suspect struggled over a gun).

Of additional relevance to the present case, the Defendant in *Bouggess* was also denied qualified immunity because, "Mattingly never warned Newby that he

26

might shoot, as required by *Garner* when feasible under the circumstances. Nothing indicates that a warning was infeasible." *Id*. at 892.  That is of course equally true here.  Schurr never warned Patrick that he drew his firearm and was preparing to use it despite it being entirely feasible to do so.  Uttering the simple phrase "stop or I'll shoot" takes no effort whatsoever.  Patrick, while facedown on ground, would not have been able to see or perceive Schurr's weapon, making a warning all the more imperative (this is but one reason why Schurr's insistence that it is irrelevant that he shot Patrick in the back of his head as opposed to elsewhere on his body is incorrect. The location of the shot is relevant to Patrick's lack of knowledge that lethal force was imminent, and it is relevant to whether that force was necessary as it speaks to the positioning of the parties' bodies and their respective abilities to cause harm).

Despite being the moving party and despite the warning requirement emanating from the seminal case on excessive force (*Garner*), Defendant never once mentions that the requirement exists and was disregarded by Schurr.  Again, Plaintiff has pled that no warning was given regarding either the taser or the firearm, the video proves it and Plaintiff's experts each confirm that the failures to warn were improper.

Thus, in *Bouggess*, the Defendant officer was denied qualified immunity despite testifying that 1.) he believed the Plaintiff was armed with a concealed weapon (which proved to be true), 2.) the Plaintiff looked like he intended to kill the officer, 3.) the Plaintiff attempted to wrestle the officer's firearm from him and that

4.) the Plaintiff was not complying with orders and was trying to flee during a physical struggle.  The lack of evidence regarding the Plaintiff's intent to harm the officer or anyone else, coupled with the officer's failure to provide the constitutionally required warning of his intent to use deadly force, necessitated a trial. The same is true here, and that is evident even before Plaintiff has had access to discovery (unlike the parties in *Bouggess*).

The 6th Circuit's recent opinion in *Palma v Johns*, 27 F.4th 419 (CA 6, 2022), decided just over a month before this shooting, is also instructive.  In *Palma*, the Defendant officer went to a home to respond to a family dispute.  According to the officer, when he arrived at the home and exited his cruiser, the Plaintiff was already standing outside with a hood on and his hands in his pockets.  He began to walk towards the officer.  Despite the officer repeatedly greeting the Plaintiff, the Plaintiff never responded.  He just continued to walk toward the officer.  The Plaintiff appeared to be "determined" and "aggressive."  *Id*. at 423.  The officer called for backup.  He told the Plaintiff to stop and remove his hands from his pockets.  The Plaintiff did not listen.  The officer then tased the Plaintiff.  Ultimately, he tased him three times.  The Plaintiff persisted.  The officer retreated and warned the Plaintiff that "this is how people get shot."  The officer fell to the ground because of muddy conditions and testified that he thought the Plaintiff's "intention was to physically reach [him], assault [him], and perhaps obtain [his] weapon."  By now, according to

the officer, "Palma had a 'crazed look on his face,' and [] Palma's 'appearance, demeanor, and behavior told [him] that [Palma] was not going to stop.'" *Id*. at 425. Consequently, the officer unholstered his gun while continuing to retreat.  The officer then shot at the Plaintiff's leg, in a hope that it would stop him.  It did not.  The Plaintiff continued toward the officer, who then shot at him until he stopped moving.

The 6th Circuit held that the officer in *Palma* was not entitled to qualified immunity, noting that "Throughout the entire encounter, Palma never said anything to Johns, he never reached out towards Johns, and he never verbally threatened Johns. Palma did not raise his fists or make any threatening gestures. But because Palma did not respond to commands, and kept walking towards Johns, Johns believed the situation 'was more than a friendly encounter.' *Id*. at 425.

In denying qualified immunity, the *Palma* Court noted not only that the Plaintiff had not been violent or aggressive, but also noted that testimony of other witnesses contradicted the account of the officer.  Again, this is an issue decided at the summary judgment stage, not the pleading stage.  There are eyewitnesses to this shooting just like there were in *Palma*. There is evidence to gather and discovery to conduct.  Defendant is filing this motion now to preclude those processes from occurring, because the evidence in this case will not be favorable to him (as evidenced by  the 2nd degree murder charge).

Just as *Bouggess* and *Palma* leave no doubt that the present motion must be denied, other authorities likewise shed light on the deficiencies in Defendant's position.  As *Bouggess* noted, the Plaintiff in that case demonstrated no willingness to harm the officer, which prompted the denial of qualified immunity.  In *Murray-Ruhl v Passinault*, 246 F App'x 338, 346 (CA 6, 2007), the Court held similarly and provided some additional guidance, stating that "Here, Passinault did not have a prolonged interaction with Murray in which he demonstrated a willingness to harm an officer or engage in reckless behavior. In fact, examining the plaintiff's statement of the facts, we would have to conclude that Passinault lacked any reason to believe that he would harm anyone in his attempt to drive away from the area."  *Murray-Ruhl v Passinault*, 246 F App'x 338, 346 (CA 6, 2007).  Thus, the amount of time the officer has to observe the Plaintiff's behavior is relevant.  The interaction in this case was fairly prolonged, lasting several minutes in total.  Not once in those several minutes did Patrick do anything other than try to flee and protect himself from Schurr.  He never demonstrated any willingness to harm anyone.

Just as the duration of the interaction is relevant to assessing Patrick's lack of an intent to harm anyone, so too is it relevant to understanding the unreasonableness of Schurr's conduct.  In *Davenport v Causey*, 521 F3d 544, 553 (CA 6, 2008), one of the dozen summary judgment cases on which Schurr relies, the Court stated that "[t]he time from Mr. Davenport beginning to strike Officer Causey to Mr. Davenport

being shot was, as we noted, merely four seconds. Once Mr. Davenport began his attack, things evolved very rapidly, which provided Officer Causey less time for, and requires us to give more deference to, on-the-spot decision making." *Davenport v Causey*, 521 F3d 544, 553 (CA 6, 2008).

To be clear, even if this interaction had been rapid, lethal force would have still been improper- "the fact that a situation unfolds relatively quickly 'does not, by itself, permit [officers] to use deadly force.'" *Estate of Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)) (alteration in *Kirby*). Unlike *Davenport*, though, this interaction did not take mere seconds.  If the *Davenport* Court found it necessary to give *more* deference to the Officer's decision making because of the short window of time, than the inverse is necessarily true- where, as here, an officer is not making a split-second decision, they have ample opportunity to make sound decisions and their judgment should be afforded *less* deference.  Schurr had every opportunity to take a different course of conduct.  His actions were deliberate, intentional and calculated.  These are not the actions that qualified immunity was intended to shield.

There is yet another aspect of this case on which Defendant is silent but which requires the denial of qualified immunity (and it is once again a proposition contained in the very authority on which Defendant relies).  In *Thomas v City of Columbus*, the 6th Circuit explained that "[s]ometimes, the time or space available to

31

an officer may mean that the reasonable thing to do is monitor the suspect, issue a warning, or take cover." *Thomas*, 854 F.3d at 366-67.   Judge Ludington, in the Eastern District of Michigan, has opined similarly, stating that "[w]hether the Officers had the option of taking a few steps back to address their safety concerns is simply one factual circumstance that must be considered to evaluate whether the use of deadly force was reasonably necessary to protect the Officers and other individuals." *Scozzari v City of Clare*, 723 F Supp 2d 974, 983 (ED Mich, 2010). While his opinion is not binding on this Court, it was affirmed by the 6th Circuit. *Scozzari v Miedzianowski*, 454 F App'x 455 (CA 6, 2012).   Once again, each of Plaintiff's police procedures experts have likewise opined that Schurr was obligated to create space from Patrick before determining if lethal force was required.

Here, *at every moment during the interaction,* Schurr had the ability to create space, monitor Patrick or issue a warning.   He did none of that, despite binding authority in this circuit establishing it would be appropriate.   Patrick was trying to get away from Schurr, who continuously closed that space. At the moment of the shooting, Schurr had Patrick pinned to the ground and was in a dominant position on his back.   He had a gun in his hand and Patrick had no weapon.   He could have simply stepped back from Patrick, displayed his weapon and issued a warning.   His decision to instead use lethal force was unreasonable, particularly where Patrick had

demonstrated no intent or ability to harm anyone at any moment and was not suspected of a serious crime.

## II.     The constitutional right at issue was clearly established

Defendant also argues that summary judgment is proper because the constitutional right at issue was not clearly established.

The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The Supreme Court has repeatedly emphasized that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151)*.* An officer will be denied qualified immunity if he violates a statutory or constitutional right that was "so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir.1987).

"[A]n official can be on notice that his conduct violates established law even in novel factual situations." *Cahoo v. SAS Analytics Inc,* 912 F.3d 887, 898 (6th Cir., 2019) (quotations and citation omitted). "As this Court has stated, the 'sine qua non' of the clearly established inquiry is fair warning." *Id*. (quotations and citation

omitted). "There does not need to be a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Id*.

As the 6th Circuit has explained, "[c]ases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006). More directly, the 6th Circuit has stated that "It is clearly established constitutional law that an officer cannot shoot a non-dangerous fleeing felon in the back of the head." *Smith v Cupp*, 430 F3d 766, 775-76 (CA 6, 2005). The *Smith* Court additionally noted that "[t]he absence of any *Garner* preconditions to the use of deadly force makes this an 'obvious' case..." *Id*. at 776 (CA 6, 2005). Similarly, the 6th Circuit has stated that it has "authorized the use of deadly force only in rare instances." *Jacobs v Alam*, 915 F3d 1028, 1040 (CA 6, 2019) (internal citation omitted). "It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012) (internal quotation marks omitted).

Though it is unpublished, the 6th Circuit's opinion in *Lewis v Charter Twp of Flint*, 660 F App'x 339, 347 (CA 6, 2016) is also instructive. In *Lewis*, the 6th Circuit was addressing a qualified immunity defense prior to any discovery where a fatal police shooting was entirely captured on camera. The video of that shooting is linked

in the footnote below, as it will demonstrate to the Court how the 6th Circuit has previously treated pre-discovery motions in police shooting cases where video evidence is available.[1]  In addition to concluding that the officer in *Lewis* violated the Plaintiff's constitutional rights, the Court also held those rights were clearly established, stating "where, as here, the facts viewed in the light most favorable to the plaintiff permit a finding that a reasonable officer would not have perceived *any* imminent threat to himself or others, the broader propositions of *Graham* and *Garner* suffice to clearly establish the right at issue." *Id*. at 347.  The Defendant in Lewis subsequently sought certiorari in the United States Supreme Court, and the petition was denied.  *Needham v. Lewis*, 137 S. Ct. 1814, 197 L. Ed. 2d 757 (2017).

Simply stated, if no reasonable officer would have concluded that Patrick Lyoya posed a deadly threat to either the officer or a member of the public (which is precisely the case here), the above case law unequivocally holds that it was clearly established that he had a right to be free from lethal force.  Consequently, as pleaded, Defendant violated Patrick's clearly established constitutional right to be free from excessive force under these precise circumstances and is not entitled to qualified immunity.

---

[1] https://www.youtube.com/watch?v=r4vK98dyyzs

CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that Defendant Schurr's motion to dismiss be denied in all regards. Plaintiff adequately stated a claim for excessive force pursuant to 42 U.S.C. § 1983. While the video footage currently available only serves to demonstrate that the use of force here was unreasonable, the law of this Circuit establishes that qualified immunity is generally improper at the pleading stage. That is particularly true here, where the available evidence demonstrates that Patrick Lyoya never posed a threat of harm to any individual and where multiple reasonable actors have already concluded that there is probable cause to believe not only that Schurr's conduct was unreasonable, but was criminal. Defendant's motion is entirely without merit and the parties must be permitted to proceed to discovery.

Respectfully submitted,

**JOHNSON LAW, PLC**.

By: */s/ Christopher P. Desmond*
CHRISTOPHER P. DESMOND (P71493)
VEN R. JOHNSON (P39219)
AYANNA D. HATCHETT (P70055)
Counsel for Plaintiff
Johnson Law, PLC
535 Griswold Street, Suite 2600
Detroit, MI 48226
(313) 324.8300

Dated: April 7, 2023

36

## **CERTIFICATE OF COMPLIANCE**

I hereby affirm that this brief is in compliance with LCivR7.2(b)(i) and contains <u>8,568</u> words in the Times New Roman Font, 14 point, and generated in Microsoft Word processing software, version 2012.

<u>*/s/ Christopher P. Desmond*</u>

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on April 7, 2023, a copy of the forgoing document was served upon the attorneys of record in the above cause, by efiling it on the Court's ECF system.

<u>*/s/ Christopher P. Desmond*</u>