## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PETER LYOYA as the
Personal Representative for
THE ESTATE OF PATRICK LYOYA
(deceased),

     *Plaintiff*,

v.

CHRISTOPHER SCHURR and
THE CITY OF GRAND RAPIDS,
     *Defendants*.

Case No. 1:22-CV-1160

Hon.  Paul L. Maloney
Mag. Judge Sally J. Berens

---

AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
**JOHNSON LAW, PLC.**
Attorneys for Plaintiff
The Buhl Building
535 Griswold, Ste 2600
Detroit, MI  48226
(313) 324.8300
ahatchett@venjohnsonlaw.com
vjohnson@venjohnsonlaw.com

TIMOTHY S. FERRAND (P39583)
**CUMMINGS, McCLOREY, DAVIS& ACHO,
PLC.**
Attorney for the City of Grand Rapids
19176 Hall Road, Ste 220
Clinton Twp., MI  48038
(586) 228.5600
tferrand@cmda-law.com

T. JOSEPH SEWARD (P35095)
KALI M. L. HENDERSON (P76479)
**SEWARD HENDERSON, PLLC.**
210 East. 3rd Street, Ste 212
Royal Oak, MI  48067
(248) 733.3580
jseward@sewardhenderson.com
khenderson@sewardhenderson.com

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE MOTION TO DISMISS ON BEHALF OF DEFENDANT GRAND RAPIDS

Now comes Plaintiff, Peter Lyoya, as personal representative of the Estate of Patrick Lyoya, deceased, by and through his counsel, Johnson Law, PLC, in response to the Motion to Dismiss on behalf of Defendant Grand Rapids.  For the reasons fully set forth in the brief in support of this response, Plaintiff respectfully requests that this Honorable Court deny Defendant's motion in all regards.  Plaintiff has adequately stated a claim for municipal liability against Grand Rapids by pleading that a policy, practice, procedure or custom of that municipality was the moving force behind Defendant Christopher Schurr's violation of Patrick Lyoya's right to be free from excessive force under the 4th Amendment.  This matter must be permitted to proceed to discovery and Defendant's motion must be denied in all regards.

Respectfully submitted,

**JOHNSON LAW, PLC**.

By:  */s/ Christopher P. Desmond*
     CHRISTOPHER P. DESMOND (P71493)
     AYANNA D. HATCHETT (P70055)
     Counsel for Plaintiff
     Johnson Law, PLC
     535 Griswold Street, Suite 2600
     Detroit, MI 48226
     (313) 324.8300
     ahatchett@venjohnsonlaw.com

Dated: April 7, 2023

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PETER LYOYA as the
Personal Representative for
THE ESTATE OF PATRICK LYOYA
(deceased),

     *Plaintiff*,

v.

CHRISTOPHER SCHURR and
THE CITY OF GRAND RAPIDS,
     *Defendants*.

Case No. 1:22-CV-1160

Hon.  Paul L. Maloney
Mag. Judge Sally J. Berens

---

AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
**JOHNSON LAW, PLC.**
Attorneys for Plaintiff
The Buhl Building
535 Griswold, Ste 2600
Detroit, MI  48226
(313) 324.8300
ahatchett@venjohnsonlaw.com
vjohnson@venjohnsonlaw.com

TIMOTHY S. FERRAND (P39583)
**CUMMINGS, McCLOREY, DAVIS& ACHO,
PLC.**
Attorney for the City of Grand Rapids
19176 Hall Road, Ste 220
Clinton Twp., MI  48038
(586) 228.5600
tferrand@cmda-law.com


T. JOSEPH SEWARD (P35095)
KALI M. L. HENDERSON (P76479)
**SEWARD HENDERSON, PLLC.**
210 East. 3rd Street, Ste 212
Royal Oak, MI  48067
(248) 733.3580
jseward@sewardhenderson.com
khenderson@sewardhenderson.com

---

# PLAINTIFF'S BRIEF IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO THE MOTION TO DISMISS ON BEHALF OF GRAND RAPIDS

**TABLE OF CONTENTS**

QUESTIONS PRESENTED.................................................................i

INDEX OF AUTHORITIES..............................................................ii

MOST APPROPRIATE AUTHORITY ...............................................v

INTRODUCTION ...........................................................................1

STATEMENT OF FACTS ................................................................2

STANDARD OF REVIEW ...............................................................9

ARGUMENT ...............................................................................10

    I.    Defendant's use of force was excessive and violated
           Patrick Lyoya's rights under the 4th Amendment ..................................10

    II.    Plaintiff has adequately pled that the moving
           force behind the constitutional violation was a policy,
           practice, procedure or custom of Defendant Grand Rapids ..................29

CONCLUSION.............................................................................38

## ISSUES PRESENTED

I.   WHETHER DEFENDANT SCHURR VIOLATED PATRICK LYOYA'S RIGHTS UNDER THE 4th AMENDMENT WHEN HE FATALLY SHOT PATRICK IN THE BACK OF THE HEAD WHILE HE WAS UNARMED.

II.  WHETHER DEFENDANT IS ENTITLED TO DISMISSAL OF PLAINTIFF'S CLAIM OF MUNICIPAL LIABILITY.

# INDEX OF AUTHORITIES

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970)............................................................. 30

*Baynes v. Cleland*,
799 F.3d 600 (6th Cir. 2015) ........................................... 34

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................. 9

*Bouggess v Mattingly*,
482 F3d 886 (CA 6, 2007) ..................................... passim

*Cardona v. City of Cleveland*,
No. 97-3037 (6th Cir. Nov. 10, 1997) ........................... 23

*City of Canton v. Harris*,
489 U.S. 378 (1989)......................................................31-34

*Davenport v Causey*,
521 F3d 544 (CA 6, 2008) ............................................... 27

*Ellis v. Cleveland Mun. Sch. Dist.*,
455 F.3d 690 (6th Cir. 2006) ......................................... 34

*Estate of Kirby v. Duva*,
530 F.3d 475 (6th Cir. 2008) ......................................... 27

*Graham v. Connor*,
490 U.S. 386 (1989)....................................................passim

*Marchese v. Lucas*,
758 F.2d 181 (6th Cir. 1985) ...................................34-35

*Monell v Dep't of Soc. Servs.*,
436 U.S. 658 (1978)....................................................passim

*Murray-Ruhl v Passinault*,
246 F App'x 338 (CA 6, 2007) ...................................... 26

*Palma v Johns*,
27 F.4th 419 (CA 6, 2022) ............................................................... 24-26

*RMI Titanium Co. v. Westinghouse Elec. Corp.*,
78 F.3d 1125 (6th Cir. 1996) ............................................................ 9

*Robinette v Barnes*,
854 F2d 909 (CA 6, 1988) ............................................................... 18-19

*Sample v. Bailey*,
409 F.3d 689 (6th Cir. 2005) ........................................................... 14

*Scozzari v City of Clare*,
723 F Supp 2d 974 (ED Mich, 2010) ............................................... 28

*Scozzari v Miedzianowski*,
454 F App'x 455 (CA 6, 2012) ........................................................ 28

*Sigley v. Kuhn*,
Nos. 98-3977, 99-3531 (6th Cir. Jan. 31, 2000) ............................. 23

*Smith v. Cupp*,
430 F.3d 766 (6th Cir. 2005) ........................................................... 27

*Tennessee v. Garner*,
471 U.S. 1 (1985) ...................................................................... passim

*Thomas v City of Columbus*,
854 F3d 361 (CA 6, 2017) ............................................................... 28

iv

## MOST APPROPRIATE AUTHORITY

*Bouggess v Mattingly*, 482 F3d 886, 896 (CA 6, 2007)

*City of Canton v. Harris*, 489 U.S. 378, 380 (1989)

*Monell v Dep't of Soc. Servs.*, 436 U.S. 658 (1978)

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO THE MOTION TO DISMISS ON BEHALF OF GRAND RAPIDS**

### INTRODUCTION

Christopher Schurr murdered Patrick Lyoya.  He shot him in the back of the head while he pinned him to the ground.  Patrick was unarmed.  He never struck Schurr, he never threated him and he was not aggressive toward him.  While Patrick was unarmed, suspected of no serious crime and posing no threat of harm to Schurr or anyone else, Schurr killed him without so much as even providing a warning.  He was terminated and charged with 2nd degree murder pursuant to MCL 750.317, which carries a possible life sentence.  Subsequently, he was bound over for trial (which has yet to occur) by a neutral district court judge who determined there was sufficient evidence to proceed with the prosecution.  Thereafter, that judge's determination was confirmed by a Kent County Circuit Court judge who denied Schurr's subsequent motion to quash.

Contrary to Defendant's assertions in this motion, Plaintiff has pled a viable cause of action against both Schurr and Grand Rapids pursuant to 42 U.S.C. § 1983.  As is set forth thoroughly in Plaintiff's Complaint, Schurr's use of force was unreasonable and violated Patrick's clearly established constitutional rights, as demonstrated by the binding precedent of both the United States Court of Appeals for the 6th Circuit and the United States Supreme Court.  That unconstitutional

1

conduct was the direct product of the policies, practices, customs and procedures of Grand Rapids, which continues to ratify that conduct to this day. Defendant's motion is entirely devoid of merit and must be denied.

### STATEMENT OF FACTS

The rain drizzled on Monday, April 4, 2022. It was around eight o'clock in the morning, when Patrick Lyoya ("Patrick") and his friend, Aime Tuyishme ("Aime")--two young Black men--were conspicuously driving through a residential neighborhood in Grand Rapids. Patrick was driving a tan 2003 Nissan Altima and Aime sat in his front passenger seat. This ultimately fatal traffic stop was recorded in part by Schurr's body camera, Schurr's dash camera, and Aime's cell phone. (Exhibit A, Synchronized Videos). The entire interaction--from the moment Patrick was pulled over to the moment he was murdered--lasted approximately three minutes and thirty seconds. Ex. A.

Defendant, Christopher Schurr ("Schurr"), was on patrol in the area as a police officer for the City of Grand Rapids. Schurr's path crossed with Patrick and Aime in the area of Nelson Avenue, SE and Griggs Street. (Defendant Schurr's Exhibit 1, Dash Cam). But Schurr was driving in the opposite direction. *Id*. Once their cars passed each other, Schurr immediately turned into a driveway, where his in-car video roughly began recording only to back out and begin following behind Patrick's car.

(Schurr's Ex. 1 @ 12:11:05). Seconds later, Schurr activated his emergency lights to pull Patrick over. (Schurr's Ex. 1 @12:11:33).

Patrick pulled his car over to the side of the road. *Id*. Aime stayed in the front passenger seat, while Patrick got out and stood next to his car. (Schurr's Ex. 1, @12:11:46). Schurr, before he could even get out of his patrol car, started yelling at Patrick to "stay in the car." *Id*. Without hesitation, Schurr charged right over to where Patrick was standing. (Schurr's Exhibit 2, BWC @ 8:11:46).

Patrick asked Schurr what he did wrong. (Schurr's Ex. 2 @ 8:11:53).  Schurr responded that he was stopping him and asked Patrick if he had a license. (Schurr's Ex. 2 @ 8:11:56).  Again and again, Patrick asked what did he do wrong (Schurr's Ex. 2 @ 8:11:59-8:12:10), to which finally Schurr stated that the license plate on Patrick's Nissan did not match the vehicle.  (Schurr's Ex. 2 @ 8:12: 11). Still standing by his driver's door, Patrick told Schurr that his driver's license was in the car. (Schurr's Ex. 2 @ 8:12:19). Schurr directed Patrick to "get it" for him. (Schurr's Ex. 2 @ 8:12:21).  Patrick opened his driver's door and stood in his doorway next to Schurr as he tried to direct Aime to retrieve his license from inside of the car. (Schurr's Ex. 2 @ 8:12:26-8:12:48). When Aime couldn't locate his license, Patrick shut the driver's door and began walking toward the front end of his car.  (Schurr's Ex. 2 @ 8:12:48).

3

Patrick had turned away and had taken a few steps when Schurr said "no, no" and grabbed Patrick to turn him around. (Schurr's Ex. 2 @ 8:12:50). Schurr told him to put his hands behind his back. (Schurr's Ex. 2 @ 8:12:53). Patrick rotated his body to escape Schurr's grasp and immediately moved away toward an adjacent yard. (Schurr's Ex. 2 @ 8:12:54-56).  Schurr radioed once, saying "got one running" and proceeded to chase after Patrick.  (Schurr's Ex. 2 @ 8:12:58). The moment Patrick began to run is depicted below, and it demonstrates that Patrick was not moving toward Schurr aggressively, but was only seeking to move away from him.



Schurr initiated the second physical contact when he tackled Patrick from behind to the ground. (Schurr's Ex. 1 @ 12:13:01).  At the same time, Patrick's passenger door opened and one of the neighbor appeared. *Id*. Even from a distance,

Schurr's dashcam clearly captured Schurr punching (Schurr's Ex. 1 @12:13:16) kneeing Patrick (Schurr's Ex. 1 @12:13:18), at which point Aime emerged from the car (Schurr's Ex. 1 @ 12:13:19).   Aime started to record what was happening to Patrick on his cell phone. (Schurr's Exhibit 3, Passenger Aime's Cell Phone). Meanwhile, the neighbor remained just steps behind Schurr as he was on top of Patrick.  (Schurr's Ex. 3).  Schurr forced the side of Patrick's head into the ground, yelled stop (more than once) and yelled at Patrick to get his hands behind his back. (Schurr's Ex. 2 @ 8:13:03-13).

Patrick struggled to get back on his feet and extricate himself from Schurr. (Schurr's Ex. 1 @ 12:13:45).  Aime moved closer and closer toward Patrick and Schurr.  (Schurr's Ex. 1 @ 12:14:09-39).

Without warning, Schurr drew his Taser. Schurr grabbed Patrick's sweater with his left hand while he drew and aimed his Taser at him with his right. (Schurr's Ex. 2 @ 8:14:11-16; also please see still frame from Schurr's bwc).   Patrick reflexively extended his left arm to deflect the Taser's barrel away from him, to protect himself, as is pictured below. *Id*. At the sound of the first Taser deployment, Aime is heard saying, "Why you gotta do all that, bruh? [Patrick's] good, man." (Schurr's Ex. 3 @ 0:00:51).  The probe didn't make contact with Patrick.



Axon_Body_3_Video_2022-04-04_0811_X6039A52S_frame -5634

Still physically holding on to Patrick, Schurr deployed the second Taser cartridge. Patrick grabbed the barrel of the Taser, as he fell to the ground, in an effort to re-direct its aim away from him.



6

Knowing the Taser could only be used in drive-stun mode after the second cartridge was deployed, Schurr nonetheless began to command Patrick to let go of the Taser. (Schurr's Ex. 3 @ 0:00:58).  Simultaneously, Schurr pinned Patrick to the ground using his full body weight on Patrick's back. (Schurr's Ex. 3).  Schurr let go of his Taser with his left hand, which had been positioned underneath Patrick's upper body, and yelled again to Patrick to let go of the Taser. (Schurr's Ex. 3). In the next moments, Schurr continued to bear down on Patrick's back, forced Patrick's face into the ground with his left hand, as he used his right hand to draw his gun. (Schurr's Ex. 3). Without saying a word, Schurr placed the gun to the base of Patrick's skull and fired. (Schurr's Ex. 3). The moment immediately before the shot is depicted below.  It demonstrates that Schurr had control over Patrick and was in a superior position that would have allowed him to take a variety of alternative courses of conduct.



As the Court will see when viewing the available video footage, at no point in the encounter did Patrick move toward Schurr.  At every moment, Patrick only sought to escape the violence and aggression Schurr unreasonably employed from the early moments of their encounter.  He never threated Schurr, struck Schurr or acted with any form of aggression.  Schurr, in contrast, violated numerous policies and national policing standards, as is alleged in Plaintiff's Amended Complaint and is explained by Plaintiff's highly-qualified police procedure experts Thomas Tiderington and Ken Katsaris (attached as Exhibits B and C, respectively).

The City of Grand Rapids requested an investigation and put Schurr on paid leave. Weeks later, on June 9, 2022, the Kent County Prosecutor—Chris Becker--charged Schurr with second-degree murder.  Thereafter, Grand Rapids terminated Schurr from its police force.  Schurr was bound over on those charges and subsequently filed a motion to quash, which was denied.

As a result of the above-described events, Plaintiff filed this cause of action, which presents claims against both Schurr and the City of Grand Rapids.  Plaintiff alleged that Schurr is liable under 42 U.S.C. § 1983 for violating Patrick's right to be free from excessive force under the 4th Amendment, and further alleged that the City of Grand Rapids is subject to municipal liability for being the moving force behind that violation.  Now, prior to any discovery having occurred, both Defendants move to dismiss Plaintiff's Complaint.  Yet, the motions are entirely without merit.

Contrary to Defendants' assertions, the video evidence available to the Court cannot serve as basis for dismissing this action.  Not only does that footage show that the use of force was unreasonable, but the law demonstrates that a dispositive motion on an excessive force case is almost always premature if it is filed before discovery occurs.  Plaintiff has adequately stated each of the claims in his Complaint and this matter must proceed forward to discovery.

## STANDARD OF REVIEW

Defendants bring their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the facial sufficiency of the complaint. *See RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  Rule 12(b)(6) provides that the defendant bears the burden of demonstrating that a plaintiff has not stated a claim upon which relief can be granted.  Under the pleading requirements of Fed. R. Civ. P. 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"

As the Supreme Court provided in *Ashcroft v. Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

(citing *Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## LAW AND ANALYSIS

I.     **Plaintiff has adequately pled that there was an underlying constitutional violation where Defendant Schurr violated his right to be free from excessive force under the 4th Amendment**

As is discussed further below, in order to maintain a claim of municipal liability, a Plaintiff must demonstrate that there was an underlying constitutional violation and must then show that the municipality was the moving force behind that violation.  Defendant's first issue in their motion contends that Plaintiff has not established that Christopher Schurr violated his right to be free from excessive force. Defendant states that it is incorporating Schurr's arguments from his own motion to dismiss that is currently pending.  Thus, Plaintiff includes the discussion from his response to Schurr below.  However, before reiterating those points, a separate point must be made.

The City of Grand Rapids, who is currently arguing that Defendant Schurr committed no constitutional violation, terminated Schurr from the police force. Presumably, it did so because it found Schurr's conduct in the present case to be unlawful, contrary to policy, or otherwise unacceptable of one of its officers. Despite that, Grand Rapids is now arguing to this Court that Schurr's conduct was lawful and reasonable. In other words, the City is ratifying Schurr's conduct, even now while the Kent County Prosecutor pursues 2nd degree murder charges against him.

To be clear, Grand Rapids need not contend in this motion that Schurr's conduct was constitutional. If Schurr committed an unconstitutional act but Grand Rapids was not the moving force behind that act, municipal liability would not attach. Grand Rapids is arguing that Schurr acted reasonably not because it has to, but because it is what Grand Rapids believes, despite their termination of Schurr's employment. What a prosecutor and two neutral state court judges have thus far deemed to be probable cause for charges of 2nd degree murder, Grand Rapids sees as effective policing. This, apparently, is exactly how they want their officers to behave. It is that precise climate and culture that led Schurr to believe that it was permissible to shoot a nonviolent, unarmed man in the back of the head without so much as a warning.

Turning back to the merits of Defendant's argument, it is well established that the right to be free from excessive force is guaranteed by the Fourth Amendment's protections against unreasonable seizures. *See* U.S. Const. amend. IV; *see also Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  The Supreme Court in *Tennessee v. Garner* established that a police officer's use of deadly force is a "seizure" within the meaning of the Fourth Amendment and that claims alleging the use of such force are evaluated under the Fourth Amendment's "reasonableness standard." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Under that standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Graham*, 490 U.S. at 397.  Like *Garner*, the present case of course includes an application of deadly force.  The *Garner* Court set forth that the use of deadly force is objectively reasonable *only* where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Garner*, 471 U.S. at 11.

"The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 US at 11.  "[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that

he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12.

Determining whether the use of force is reasonable requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Garner*, 471 U.S. at 8.  The Supreme Court instructed that courts should weigh "[1.] the severity of the crime at issue, [2.] whether the suspect pose[d] an immediate threat to the safety of the officers or others, [3.] and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9).  This Circuit has also considered an individual's mental illness or diminished capacity in assessing the reasonableness of a particular use of force. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004).

The test for reasonableness under the Fourth Amendment "is not capable of precise definition or mechanical application" and "its proper application requires careful attention to the facts and circumstances of each particular case[.]" *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9)).  The factors set forth above do not constitute an exhaustive list and the ultimate inquiry is "whether the totality of the circumstances justifies a particular sort of seizure." *Id*.   In analyzing claims

involving deadly force, the 6th Circuit has adhered to the tenet that "only in rare instances may an officer seize a suspect by use of deadly force." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005).

When viewing the pleadings in this case through the lens of the legal principles established above, there can be no dispute that Plaintiff has pleaded the necessary elements of an excessive force action.  Below is a portion of Plaintiff's Amended Complaint (See ECF No. 2, PageID 21-22), states, among other allegations, that:

> 40. Based on the totality of the circumstances, Defendant Schurr's act of shooting Patrick in the back of the head was objectively unreasonable.

> 41. Schurr lacked any lawful basis to shoot and kill Patrick.

> 42. Schurr was on top of Patrick and holding Patrick down to the ground at the time Schurr reached for his deadly weapon, placed it to the back of Patrick's head, and pulled the trigger.

> 43. Patrick was not armed and posed no threat to Schurr or any other person's safety.

> 44. When he shot Patrick in the back of the head, Schurr had no information to support a reasonable suspicion that Patrick was dangerous.

> 45. No reasonable officer would have responded to Patrick's get away from a traffic stop as a reasonable basis to use deadly force.

> 46. Schurr's actions constituted excessive force in violation of the Fourth Amendment.

47. As a proximate result of Schurr's illegal and unconstitutional conduct, Patrick Lyoya died and suffered damages as a result.

Thus, Plaintiff has alleged that Patrick was unarmed, posed no threat to Schurr or anyone else, was not dangerous, was not engaged in a serious crim and that any reasonable officer would have known that deadly force was not constitutionally permitted under the circumstances Schurr was facing.  Those allegations, when accepted as true and when compared to the *Graham* factors, set forth the necessary elements of this claim.  Yet, as the Court will see, this motion is in no way about the sufficiency of Plaintiff's pleadings (despite being characterized as a Rule 12 motion), as Defendant never attempts to discuss the actual allegations in that complaint. Instead, Defendant immediately pivots to fact-based arguments prior to the parties having any access to discovery- the discovery that this Circuit repeatedly emphasizes is crucial to qualified immunity determinations.

## a.    Even when moving beyond the face of the Complaint, Defendant's motion must be denied

Because Plaintiff's pleadings, when accepted as true, set forth all the necessary elements of a claim for excessive force pursuant to 42 U.S.C. § 1983, this motion must be denied.  Though Plaintiff in no way believes that Defendant's factual disputes regarding Plaintiff's allegations are proper at this pre-discovery stage, Plaintiff will nonetheless address why those arguments are unavailing from a substantive standpoint.

15

At the outset, Plaintiff must draw the Court's attention to the glaring misrepresentation that infects the entirety of Defendant's motion.  On page 31 of Defendant Schurr's brief (which again, Grand Rapids fully adopts), Defendant asserts that "Ofc. Schurr wrestled with an unarmed Lyoya who then armed himself with a Taser." That never happened.  Defendant, the moving party, is obligated to take the evidence in the light most favorable to Plaintiff.  Instead, Defendant is blatantly mischaracterizing Patrick Lyoya's conduct and denigrating him in order to justify murder.

Patrick Lyoya never armed himself with a taser and Defendant has *zero* evidence to the contrary.  At most, Schurr voluntarily released his taser at the last moment before shooting Patrick.  What the video does show, though, is that prior to Schurr utilizing his taser, Schurr had already tackled Patrick and pinned him to the ground (as Defendant acknowledges on p 10 of his brief), punched Patrick in the head (p 11 of Defendant's brief), applied two knee strikes (p 11 of Defendant's brief), tackled Patrick again (p 12 of Defendant's brief) and attempted another knee strike and another tackle (p 14 of Defendant's brief).  During the duration of those events, all prior to the introduction of the taser, Patrick did not strike or threaten Schurr in any way.  At no time did Patrick attempt to do anything other than flee from Schurr.

16

As a precursor to those events, Schurr was not pulling over Patrick because he was suspected of a serious crime.  At most, Schurr asserts that Patrick's license plate did not match his vehicle (a subject not yet proven or explored because of the lack of discovery).  Thus, while much of the case law involving lethal force involves suspects accused of felonious behavior, the present case has no such allegations. Patrick's conduct before and during his encounter with Schurr alerted Schurr to the fact that Patrick was not a threat.

After Schurr had demonstrated his willingness to use violence toward Patrick, he then chose to withdraw his taser while standing in close proximity to Patrick. Patrick, as he had been doing throughout the encounter, continued to try to protect himself- not by using any force of his own, but by directing the taser away from his body so as not to be injured.  Patrick's hand was on the barrel of the taser, not the handle or trigger, and Schurr never once lost control of it.  Notably, Patrick's act of trying to guard against the taser is but one of the reasons why officers are not supposed to pull their tasers while in close proximity to a subject.  Distance is required to be able to use a taser safely and effectively, and Schurr, despite allegedly being trained on those facts, disregarded that requirement.

As is explained by Plaintiff's expert Thomas Tiderington at ¶¶ 9-13, all of Schurr's conduct to this point was in deviation of his training and the applicable policies.  Tiderington has opined that Schurr violated those policies when he

physically engaged with Patrick and drew his taser (without warning) while they were in close proximity, rather than simply wait for backup to arrive.  Tiderington explains that by drawing the taser while physically engaged with Patrick, Patrick predictably made contact with the taser to prevent himself from being shocked. Likeiwse, Plaintiff's expert Ken Katsaris has opined that Schurr violated his training relative to the foot pursuit and his use of the taser (both by using in in too close of a proximity to Plaintiff and not providing a proper warning), which prevented the taser from being effective.  And while Defendant may take issue with Plaintiff submitting expert opinions at this stage, Plaintiff's Amended Complaint contains the same allegations, which must be accepted as true.

It is likewise necessary to address Defendant's characterization of the significance of the taser to this case.  Defendant states with apparent seriousness that even though he knew that taser could be used, at most, in drive stun mode (which Patrick had no training in), it was nonetheless still a deadly weapon that justified Schurr's shooting of Patrick.  And because Patrick never once possessed that Taser, Defendant is actually arguing that the mere *presence* of the taser on the scene justified the shooting.  In support of that argument, Defendant quotes *Robinette v Barnes*, 854 F2d 909, 912 (CA 6, 1988), for the idea that "[i]ndeed, as any faithful reader of mystery novels can attest, an instrument of death need not be something as

obviously lethal as a gun or knife. The ubiquitous 'blunt object' kills just as effectively."

When the Court in *Robinette* made the statement that Defendant provides without any context, it was not talking about a taser. The deadly weapon at issue in that case was a police dog, which the Defendant officer was asserting was not tantamount to lethal force despite it killing the Plaintiff. The Court was not analyzing whether an officer was justified in shooting a suspect because of that suspect's possession of a blunt object and the potential to use it to harm the officer. Defendant Schurr did not believe that Patrick Lyoya, who had exhibited no aggression or violence whatsoever, was preparing to beat him to death with a taser that he never possessed. If he did, that belief was not reasonable. Not only had Patrick not been violent, but he was pinned beneath Schurr, who was armed with a firearm and who had the ability to simply move away from Patrick if he desired. Further, Schurr was equipped with body armor, which he also would have understood could negate the drive-stun ability of the taser. These are all aspects of the use of force that can only be addressed through discovery.

As a final note on *Robinette*, the more important takeaway from that case was that *before* the Defendant officers utilized the police dog that attacked the Plaintiff, they warned the Plaintiff of their intent to do so *three times*. *Id*. at 911. Schurr never provided Patrick with a single warning before shooting him in the back of the head

(in contravention of the requirement from *Garner*), which prevented Patrick from seeing that he had even drawn his firearm.

The reason why Defendant is trying to portray Patrick as being armed with a taser is to create the impression that Schurr had no choice but to use lethal force. That effort fails automatically because Patrick never possessed any weapon, including the taser. Importantly though, Defendant also fails to appreciate that an individual's possession of a weapon does not create a right to use deadly force. Instead, as the 6th Circuit has said, "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is not justified." *Bouggess v Mattingly*, 482 F3d 886, 896 (CA 6, 2007).

In *Bouggess*, the Defendant officer was operating undercover in a sting operation in which he was planning on buying narcotics from several individuals, including the Plaintiff. The Defendant testified that when he arrived at the scene of the buy, the Plaintiff got out of a vehicle and lifted his shirt. According to the Defendant, he understood that gesture to be an indication that the Plaintiff *was* armed with a concealed weapon. Id. at 888, n 1. It appears that the drug purchase never occurred, because several of the suspects reached into the Defendant's car, stole money and fled.

When the Defendant sought to see which direction the suspects ran in, he observed the Plaintiff picking up money from the ground.  Id. at 888.  He then tried to arrest the Plaintiff and a struggle ensued.  The officer testified that during the struggle, the Plaintiff "had this look in his eyes like, he just had this look in his eyes like, man I'm going to kill you."  Id. at 888, n 2.  After seeing that look, the Defendant pulled his firearm and testified that the Plaintiff "was trying to take it from him during the struggle and that one shot was fired toward the ground during the struggle."  *Id*.  He testified that when the shot was fired into the ground, he believed at the time that he had been shot in the foot.  *Id*.  The struggle then apparently ended and the Plaintiff again began to flee.  The Defendant then shot the Plaintiff three times in the back.  *Id*. at 889.  He died shortly after and it was subsequently discovered that he was carrying a concealed pistol.  *Id*.

When analyzing whether the Defendant was entitled to qualified immunity, the 6th Circuit began by setting forth the *Graham* factors discussed above.  It then stated that "[u]sing those factors and other relevant facts, it is our task to determine whether Mattingly had an objectively reasonable belief that Newby posed an imminent threat of serious physical harm to him or to others. If Mattingly did not have such a belief, then his use of deadly force violated the Fourth Amendment." *Id*. at 890.

21

The Court held that the Defendant was not entitled to qualified immunity.  In doing so, it concluded that while the officer testified that the Plaintiff was armed, "[t]oo much evidence throws doubt on Mattingly's bare assertion that he suspected that Newby had a weapon." *Id*. at 890-891.  In casting doubt on the officer's account that he was fearful for his life, the Court noted that the officer never communicated those concerns over the radio.  Of course, the same is true here.  Schurr never told anyone on the radio that he feared Patrick, that Patrick was trying to take his taser or that he believed lethal force was needed.  The *Bouggess* Court also noted that even if it was true that Plaintiff had his own weapon, deadly force would only be appropriate if it was reasonable to believe that the Plaintiff was going to *use* that weapon against the officer or others, and that amounted to a question of fact.

Like here, the Defendant in *Bouggess* also cited the Plaintiff's acts of resisting and fleeing as demonstrating that force was proper.  Again, the Court rejected the argument, stating that "[i]t cannot reasonably be contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, and without evidence of any intention on the suspect's part to seriously harm the officer, could constitute probable cause that the suspect poses an imminent danger of serious physical harm to the officer or to others." *Id*. at 891.  The Court cited numerous cases where qualified immunity was denied in the face of a contention that a suspect intended to wrestle away an officer's weapon and use it against him. Id. at 891-892.

(*Sigley v. Kuhn*, Nos. 98-3977, 99-3531, 2000 U.S. App. LEXIS 1465, at \*2-3, \*15 (6th Cir. Jan. 31, 2000) (unpublished) (denying summary judgment on qualified immunity grounds when deadly force was employed after a suspect tackled an officer and wrestled him to the ground because there was a disputed issue of fact as to whether the suspect tried to take away the officer's gun); *Cardona v. City of Cleveland*, No. 97-3037, 1997 U.S. App. LEXIS 32113, at \*9-14 (6th Cir. Nov. 10, 1997) (unpublished) (denying qualified immunity where officer and suspect struggled, and the suspect was shot during the struggle, where there was a disputed issue of fact as to whether the officer and suspect struggled over a gun).

Of additional relevance to the present case, the Defendant in *Bouggess* was also denied qualified immunity because, "Mattingly never warned Newby that he might shoot, as required by *Garner* when feasible under the circumstances. Nothing indicates that a warning was infeasible." *Id*. at 892. That is of course equally true here. Schurr never warned Patrick that he drew his firearm and was preparing to use it despite it being entirely feasible to do so. Uttering the simple phrase "stop or I'll shoot" takes no effort whatsoever. Patrick, while facedown on ground, would not have been able to see or perceive Schurr's weapon, making a warning all the more imperative (this is but one reason why Schurr's insistence that it is irrelevant that he shot Patrick in the back of his head as opposed to elsewhere on his body is incorrect. The location of the shot is relevant to Patrick's lack of knowledge that lethal force

23

was imminent, and it is relevant to whether that force was necessary as it speaks to the positioning of the parties' bodies and their respective abilities to cause harm). Despite being the moving party and despite the warning requirement emanating from the seminal case on excessive force (*Garner*), Defendant never once mentions that the requirement exists and was disregarded by Schurr.

Thus, in *Bouggess*, the Defendant officer was denied qualified immunity despite testifying that 1.) he believed the Plaintiff was armed with a concealed weapon (which proved to be true), 2.) the Plaintiff looked like he intended to kill the officer, 3.) the Plaintiff attempted to wrestle the officer's firearm from him and that 4.) the Plaintiff was not complying with orders and was trying to flee during a physical struggle. The lack of evidence regarding the Plaintiff's intent to harm the officer or anyone else, coupled with the officer's failure to provide the constitutionally required warning of his intent to use deadly force, necessitated a trial. The same is true here, and that is evident even before Plaintiff has had access to discovery (unlike the parties in *Bouggess*).

The 6th Circuit's recent opinion in *Palma v Johns*, 27 F.4th 419 (CA 6, 2022), decided just over a month before this shooting, is also instructive. In *Palma*, the Defendant officer went to a home to respond to a family dispute. According to the officer, when he arrived at the home and exited his cruiser, the Plaintiff was already standing outside with a hood on and his hands in his pockets. He began to walk

towards the officer.  Despite the officer repeatedly greeting the Plaintiff, the Plaintiff never responded.  He just continued to walk toward the officer.  The Plaintiff appeared to be "determined" and "aggressive."  *Id*. at 423.  The officer called for backup.  He told the Plaintiff to stop and remove his hands from his pockets.  The Plaintiff did not listen.  The officer then tased the Plaintiff.  Ultimately, he tased him three times.  The Plaintiff persisted.  The officer retreated and warned the Plaintiff that "this is how people get shot."  The officer fell to the ground because of muddy conditions and testified that he thought the Plaintiff's "intention was to physically reach [him], assault [him], and perhaps obtain [his] weapon."  By now, according to the officer, "Palma had a 'crazed look on his face,' and [] Palma's 'appearance, demeanor, and behavior told [him] that [Palma] was not going to stop.'"  *Id*. at 425. Consequently, the officer unholstered his gun while continuing to retreat.  The officer then shot at the Plaintiff's leg, in a hope that it would stop him.  It did not. The Plaintiff continued toward the officer, who then shot at him until he stopped moving.

The 6th Circuit held that the officer in *Palma* was not entitled to qualified immunity, noting that "Throughout the entire encounter, Palma never said anything to Johns, he never reached out towards Johns, and he never verbally threatened Johns. Palma did not raise his fists or make any threatening gestures. But because

Palma did not respond to commands, and kept walking towards Johns, Johns believed the situation 'was more than a friendly encounter.' *Id*. at 425.

In denying qualified immunity, the *Palma* Court noted not only that the Plaintiff had not been violent or aggressive, but also noted that testimony of other witnesses contradicted the account of the officer.  Again, this is an issue decided at the summary judgment stage, not the pleading stage.  There are eyewitnesses to this shooting just like there were in *Palma*. There is evidence to gather and discovery to conduct.  Defendant is filing this motion now to preclude those processes from occurring, because the evidence in this case will not be favorable to him (as evidenced by  the 2nd degree murder charge).

Just as *Bouggess* and *Palma* leave no doubt that the present motion must be denied, other authority likewise shed light on the deficiencies in Defendant's position.  As *Bouggess* noted, the Plaintiff in that case demonstrated no willingness to harm the officer, which prompted the denial of qualified immunity.  In *Murray-Ruhl v Passinault*, 246 F App'x 338, 346 (CA 6, 2007), the Court held similarly and provided some additional guidance, stating that "Here, Passinault did not have a prolonged interaction with Murray in which he demonstrated a willingness to harm an officer or engage in reckless behavior. In fact, examining the plaintiff's statement of the facts, we would have to conclude that Passinault lacked any reason to believe that he would harm anyone in his attempt to drive away from the area." *Murray-*

*Ruhl v Passinault*, 246 F App'x 338, 346 (CA 6, 2007). Thus, the amount of time the officer has to observe the Plaintiff's behavior is relevant. The interaction in this case was fairly prolonged, lasting several minutes in total. Not once in those several minutes did Patrick do anything other than try to flee and protect himself from Schurr. He never demonstrated any willingness to harm anyone.

Just as the duration of the interaction is relevant to assessing Patrick's lack of an intent to harm anyone, so too is it relevant to understanding the unreasonableness of Schurr's conduct. In *Davenport v Causey*, 521 F3d 544, 553 (CA 6, 2008), one of the dozen summary judgment cases on which Schurr relies, the Court stated that "[t]he time from Mr. Davenport beginning to strike Officer Causey to Mr. Davenport being shot was, as we noted, merely four seconds. Once Mr. Davenport began his attack, things evolved very rapidly, which provided Officer Causey less time for, and requires us to give more deference to, on-the-spot decision making." *Davenport v Causey*, 521 F3d 544, 553 (CA 6, 2008).

To be clear, even if this interaction had been rapid, lethal force would have still been improper- "the fact that a situation unfolds relatively quickly 'does not, by itself, permit [officers] to use deadly force.'" *Estate of Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)) (alteration in *Kirby*). Unlike *Davenport*, though, this interaction did not take mere seconds. If the *Davenport* Court found it necessary to give *more* deference to the

Officer's decision making because of the short window of time, than the inverse is necessarily true- where, as here, an officer is not making a split-second decision, they have ample opportunity to make sound decisions and their judgment should be afforded *less* deference.  Schurr had every opportunity to take a different course of conduct.  His actions were deliberate, intentional and calculated.  These are not the actions that qualified immunity was intended to shield.

There is yet another aspect of this case on which Defendant is silent but which requires the denial of qualified immunity (and it is once again a proposition contained in the very authority on which Defendant relies).  In *Thomas v City of Columbus*, the 6th Circuit explained that "[s]ometimes, the time or space available to an officer may mean that the reasonable thing to do is monitor the suspect, issue a warning, or take cover." *Thomas*, 854 F.3d at 366-67.  Judge Ludington, in the Eastern District of Michigan, has opined similarly, stating that "[w]hether the Officers had the option of taking a few steps back to address their safety concerns is simply one factual circumstance that must be considered to evaluate whether the use of deadly force was reasonably necessary to protect the Officers and other individuals."  *Scozzari v City of Clare*, 723 F Supp 2d 974, 983 (ED Mich, 2010).  While his opinion is not binding on this Court, it was affirmed by the 6th Circuit.  *Scozzari v Miedzianowski*, 454 F App'x 455 (CA 6, 2012).

28

Here, *at every moment during the interaction,* Schurr had the ability to create space, monitor Patrick or issue a warning. He did none of that, despite binding authority in this circuit establishing it would be appropriate. Patrick was trying to get away from Schurr, who continuously closed that space. At the moment of the shooting, Schurr had Patrick pinned to the ground and was in a dominant position on his back. He had a gun in his hand and Patrick had no weapon. He could have simply stepped back from Patrick, displayed his weapon and issued a warning. His decision to instead use lethal force was unreasonable, particularly where Patrick had demonstrated no intent or ability to harm anyone at any moment and was not suspected of a serious crime.

## II.    Defendant is not entitled to dismissal of the claim of municipal liability

The liability at issue in this motion is commonly referred to as *Monell* liability. *Monell v Dep't of Soc. Servs.*, 436 U.S. 658 (1978). In *Monell*, the United States Supreme Court determined that, contrary to its prior decision in *Monroe v. Pape*, 365 U.S. 167 (1961), local governments are properly classified as "persons" under 42 U.S.C. 1983 and thus are amenable to suit under that legislation. In explaining when such suits are proper, the Court stated as follows:

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action

> that is alleged to be unconstitutional implements or executes a policy
> statement, ordinance, regulation, or decision officially adopted and
> promulgated by that body's officers. Moreover, although the touchstone
> of the § 1983 action against a government body is an allegation that
> official policy is responsible for a deprivation of rights protected by the
> Constitution, local governments, like every other § 1983 "person," by
> the very terms of the statute, may be sued for constitutional deprivations
> visited pursuant to governmental "custom" even though such a custom
> has not received formal approval through the body's official decision
> making channels.  [*Monell*, 436 U.S. at 690.691.]

Addressing why a municipality could be held liable for its customs and not just its

officially adopted policies, the Court quoted Justice Harlan's words in *Adickes v. S.*

*H. Kress & Co.*, 398 U.S. 144, 167-168 (1970): "Congress included customs and

usages [in § 1983] because of the persistent and widespread discriminatory practices

of state officials . . . . Although not authorized by written law, such practices of state

officials could well be so permanent and well settled as to constitute a 'custom or

usage' with the force of law."

While the *Monell* Court recognized that a municipality could be held liable

for injuries resulting from violations of constitutional rights, it emphasized that such

liability *was not* synonymous with *respondeat superior* liability and that

municipalities were not liable merely because they employed someone who proved

to be a tortfeasor.  Ultimately, the *Monell* Court found that the case before it

"unquestionably involves official policy as the moving force of the constitutional

violation found by the District Court, see supra at 660-662, and n. 2, we must reverse

the judgment below."  *Monell*, 436 U.S. at 694-695.  Yet the Court recognized that

30

future decisions would inevitably have to expound on the scope and margins of such liability, saying "we have no occasion to address, and do not address, what the full contours of municipal liability under § 1983 may be. We have attempted only to sketch so much of the § 1983 cause of action against a local government as is apparent from the history of the 1871 Act and our prior cases, and we expressly leave further development of this action to another day." *Id*. at 695.

Eleven years after *Monell* was decided, the Supreme Court had further opportunity to explain the contours of municipal liability. In *City of Canton v. Harris*, 489 U.S. 378, 380 (1989), the Supreme Court described the issue it faced thusly: "In this case, we are asked to determine if a municipality can ever be liable under 42 U. S. C. § 1983 for constitutional violations resulting from its failure to train municipal employees. We hold that, under certain circumstances, such liability is permitted by the statute."

In *City of Canton*, the Plaintiff was arrested and brought to the Canton Police Department via a patrol wagon. When officers arrived at the station, they discovered that the Plaintiff was sitting on the floor of the wagon and was seemingly incoherent. After taking her into the station, she "slumped to the floor on two occasions." Officers never sought medical attention for the Plaintiff, who was released from custody after approximately one hour. Thereafter, her family had her transported to the hospital where she was diagnosed with emotional conditions that resulted in a

week's hospitalization and a year of outpatient treatment.  *Id.* at 381.

The Plaintiff in *City of Canton* brought suit and alleged that the municipality was liable for the failure to provide her with necessary medical care.  Specifically, the Plaintiff asserted that the municipality had a policy by which the shift commanders in the station had exclusive authority to decide whether a prisoner required medical care and that because those shift commanders did not have inadequate training, unconstitutional deprivation of medical care necessarily resulted.  *Id.* at 382.

In affirming that the municipal defendant could be held liable for its failure to train in *City of Canton*, the Supreme Court explained several points that are crucial to the present action.  First, in recognizing the viability of a "failure to train" theory, the Court stated that "[f]or reasons explained below, we conclude, as have all the Courts of Appeals that have addressed this issue, there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983. Thus, we reject petitioner's [the City of Canton] contention that only unconstitutional policies are actionable under the statute." *Id.* at 387.  Consequently, for the purposes of this case, Plaintiff need not show that the City of Grand Rapids had any policy that was, itself, unconstitutional. To the contrary, Plaintiff only needed to show that a policy or custom was the driving force of the unconstitutional act committed by Schurr.

Next, the Supreme Court explained that where a Plaintiff proceeds on a theory of failure to train, he must demonstrate that the failure to train was motivated by deliberate or conscious indifference of the municipal defendant.  The Court stated that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality -- a 'policy' as defined by our prior cases -- can a city be liable for such a failure under § 1983."  *Id*. at 389.

After explaining a municipality can be held liable for its deliberate failure to train employees, the Court turned to the type of causal connection that had to be shown for liability to attach.  The Court noted "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  Id. at 391.  Thus, "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury."  *Id*. at 391.

Lest there is any doubt, the Supreme Court also made it clear that the causal determination is generally a question of fact for a jury to decide:

> Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task.

33

[*Id*. at 391.]

Taken in combination, *City of Canton* demonstrates that if a jury finds that a municipality's 1.) failure to train is 2.) the product of deliberate indifference and 3.) is closely related to the ultimate injury caused by a constitutional violation, municipal liability under 42 U.S.C. 1983 is appropriate.

*Monell's* progeny in the Sixth Circuit of course confirms all the above principles.  The Sixth Circuit has stated that "[t]o show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015). It has further stated that "[t]o succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Finally, A plaintiff may also establish liability under *Monell* by demonstrating that the municipality ratified the unconstitutional conduct at issue. See *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985).  In *Marchese*, the Court held held that a

34

ratification of an unconstitutional act after that act occurs can form the basis of a municipal liability claim.  See *Marchese*, 758 F.2d at 181.

Plaintiff has specifically pled between ¶¶ 48-52 of the Amended Complaint that Grand Rapids has policies, practices, procedures and customs that demonstrate deliberate indifference to Patrick Lyoya's constitutional rights.   The complaint alleges that Grand Rapids has a history of whitewashing claims of excessive force and noted that Grand Rapids only substantiated 2.5% of all excessive force complaints against its officers in a five year period preceding Patrick's murder. Plaintiff alleged that even when Grand Rapids does discipline its officers in rare occasions, it does so insufficiently and that the net result is that officers are encouraged to use excessive force because they know there will not be consequences.

In addition to the allegations relating to use of force in Grand Rapids, Plaintiff's Amended Complaint alleges in ¶¶ 53-54 that Grand Rapids is also liable because it ratified Schurr's unconstitutional conduct by not timely firing him and instead waiting until he was formally charged with 2nd degree murder, despite having access to all the same evidence as the Prosecutor's Office.  Then, at his preliminary examination after those charges were filed, Schurr's supervising officer testified that the unconstitutional acts here were reasonable.  And, as is stated above, Defendant Grand Rapids is still maintaining in this motion, despite not needing to, that Schurr's

conduct was constitutional and reasonable.  The ratification continues to this day, despite Schurr being terminated and facing murder charges.  Each of Plaintiff's police procedures experts have opined in their affidavits that these acts of ratification encourage officers to use unconstitutional force.

Finally, ¶¶ 55-58 explain that Grand Rapids also has a history of complaints regarding officers unreasonably pulling their firearms when interacting with minorities, as is explained in the article linked below.  As Plaintiff's Complaint alleges, which again must be accepted as true, the City has an ongoing practice of racial discrimination in which black drivers are twice as likely to be pulled over as white drivers.  The Michigan Department of Civil Rights has received over 60 complaints relating to racial profiling and disparate treatment of minorities by the Grand Rapids Police Department and has announced that it is conducting an investigation into the allegations.

All of the above allegations must be accepted as true at this stage.  When accepted as true, there is no basis on which this action can be dismissed.  Plaintiff has alleged that Defendant's policies, practices, procedures and customs are the product of deliberate indifference, result in officers stopping minorities a disproportionate amount of time, result in officers using excessive force and directly resulted in Schurr's murder of Patrick Lyoya.  Nothing more is required under *Monell* and its progeny.  However, Plaintiff further notes that having now reviewed

36

additional materials, his retained experts have also opined that Schurr's conduct demonstrates that he is not adequately trained or supervised, as his conduct here deviated so grossly from accepted practices.  Plaintiff should further be permitted, therefore, to incorporate such allegations into an amended complaint in the event that this Court believes the current allegations are insufficient.

CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that Defendant Schurr's motion to dismiss be denied in all regards.  Plaintiff adequately stated a claim for excessive force pursuant to 42 U.S.C. § 1983.  While the video footage currently available only serves to demonstrate that the use of force here was unreasonable, the law of this Circuit establishes that qualified immunity is generally improper at the pleading stage.  That is particularly true here, where the available evidence demonstrates that Patrick Lyoya never posed a threat of harm to any individual and where multiple reasonable actors have already concluded that there is probable cause to believe not only that Schurr's conduct was unreasonable, but was criminal.  Defendant's motion is entirely without merit and the parties must be permitted to proceed to discovery.

Respectfully submitted,

**JOHNSON LAW, PLC**.

By:  */s/ Christopher P. Desmond*
CHRISTOPHER P. DESMOND (P71493)
VEN R. JOHNSON (P39219)
AYANNA D. HATCHETT (P70055)
Counsel for Plaintiff
Johnson Law, PLC
535 Griswold Street, Suite 2600
Detroit, MI 48226
(313) 324.8300

Dated: April 7, 2023

38

## CERTIFICATE OF COMPLIANCE

I hereby affirm that this brief is in compliance with LCivR7.2(b)(i) and contains <u>8,768</u> words in the Times New Roman Font, 14 point, and generated in Microsoft Word processing software, version 2012.

*/s/ Christopher P. Desmond*

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 7, 2023, a copy of the forgoing document was served upon the attorneys of record in the above cause, by efiling it on the Court's ECF system.

*/s/ Christopher P. Desmond*
