UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER LYOYA, Personal Representative  )
for the Estate of Patrick Lyoya,       )
          Plaintiff,          )
v.                                     )     No. 1:22-cv-1160
                            )
                            )     Honorable Paul L. Maloney
CHRISTOPHER SCHURR and                 )
CITY OF GRAND RAPIDS,                   )
          Defendants.         )
                            )

## OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS

     This matter is before the Court on Defendants' motions to dismiss this case (ECF Nos. 17, 18). Because Plaintiff, in his capacity as personal representative for the estate of Patrick Lyoya, has plausibly pleaded his claims for relief against Defendant Schurr but not against the City of Grand Rapids, the Court will deny Schurr's motion to dismiss and grant the City's.

## I.    Facts

     This case arises out of the tragic shooting and killing of Patrick Lyoya on April 4, 2022 ("Patrick"). This incident was captured on video by multiple sources, including Defendant Officer Christopher Schurr's ("Schurr") body and dash cameras, the vehicle passenger's cell phone, and a Ring doorbell camera on a nearby home (ECF No. 2 at PageID.20, ¶ 34). When deciding Rule 12(b)(6) motions to dismiss, courts are typically not permitted to consider materials outside the pleadings. *See Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022). However, courts may consider "exhibits attached [to the complaint],

public records, items appearing in the record of the case[,] and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein," without converting the motion to dismiss to a motion for summary judgment. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Moreover, the Sixth Circuit has confirmed that it is permissible for courts to consider video footage of the alleged incident in qualified-immunity cases. *See Bell*, 37 F.4th at 364; *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017).

The Court may consider the video footage of the incident in this case for two reasons: (1) the video footage is referred to and is central to the claims contained in the amended complaint, *see Bassett*, 528 F.3d at 430; and (2) Schurr has raised the defense of qualified immunity, and the Court should consider whether Schurr should be relieved of the "costs and burdens of suit . . . at the earliest possible stage," especially if the video footage contradicts the claims alleged in the complaint, *see Bell*, 37 F.4th at 364. Further, Plaintiff has not objected to the consideration of the video footage, which was attached to Defendants' motions to dismiss. On the other hand, Plaintiff has referred to and attached alleged "expert affidavits" in his responses to the motions to dismiss (ECF Nos.  26-3, 26-4, 27-3, 27-4). These affidavits—to which Defendants object consideration of in the resolution of their motions—are plainly outside of the four corners of the operative complaint and cannot be considered in the adjudication of the Rule 12(b)(6) motions. Accordingly, the following facts are taken from Plaintiff's amended complaint and the accompanying video footage of the incident on April 4, 2022.

Just after 8:00 a.m. on April 4, 2022, Schurr was patrolling a residential neighborhood in Grand Rapids, Michigan. During that time, Patrick was driving a tan Nissan Altima with a friend, Aime Tuyishme, in the passenger seat (ECF No. 2 at PageID.18, ¶ 11). Both Patrick and Tuyishme are Black males (ECF No. 26 at PageID.385). Plaintiff pleads that his and Schurr's vehicles originally passed each other while going in opposite directions, and when Schurr spotted Patrick's vehicle, he turned his cruiser around and began to follow Patrick's vehicle (ECF No. 2 at PageID.18, ¶ 13). Schurr's dash camera begins with Schurr backing his vehicle up into a driveway, turning around, and following Patrick's vehicle for a short distance before pulling over the vehicle (*see Dash Camera Footage*, ECF No. 18-2 at 0:00-0:35). Patrick complied and pulled his car over to the right side of the road (*Id.* at 0:28-0:36).

Almost immediately after Schurr pulled over Patrick's vehicle, Patrick exited the vehicle (*Id.* at 0:37-0:40). Schurr twice yelled at Patrick to "stay in the car," but he continued to exit the vehicle and shut its door (*Id.* at 0:39-0:48). Schurr proceeded to walk toward the vehicle while continuing to tell Patrick to "stay in the car" (*see Body Camera Footage*, ECF No. 18-3 at 0:43-0:50). Schurr then informed Patrick that he was "stopping" Patrick, and asked if Patrick had a driver's license (*Id.* at 0:48-0:51). Patrick appeared confused and asked several times, "What'd I do?" (*Id.* at 0:51-1:00).[1] Patrick stated that he had a license, and Schurr asked to see it (*Id.* at 1:00-1:03). At that point, Schurr informed Patrick that the license plate on his car did not match the vehicle, which Schurr alleges is the reason he stopped Patrick (*Id.* at 1:06-1:10). The amended complaint alleges that, because Schurr and

---

[1] Schurr also asked Patrick if he spoke English "upon [Patrick's] heavily accented, short questions" (ECF No. 18-3 at 0:58). Patrick, still looking confused, responded that he did (*Id.* at 1:00).

Patrick were driving in opposite directions, Schurr "did not and could not have seen the back of Patrick's car before he whipped his patrol car around" (ECF No. 2 at PageID.19, ¶ 19).

Patrick informed Schurr that his driver's license was in the vehicle, and Schurr told him to "get it for me" (ECF No. 18-3 at 1:10-1:18). Patrick opened the vehicle's door and asked Tuyishme to retrieve his license for him, and Tuyishme began to search the glove compartment (*Id.* at 1:21-1:30). Tuyishme apparently could not locate Patrick's driver's license, so Patrick shut the driver's side door and said "Alright, let me look" (*Id.* at 1:40-1:44). Patrick then began to walk toward the front of the vehicle as if he was going around to the other side of the car (*Id.* at 1:42-1:46). Schurr immediately told Patrick, "nope, nope, nope," and grabbed Patrick's upper right arm (*Id.* at 1:44-1:47).

At that point, the situation escalated. Schurr attempted to apprehend Patrick, and Patrick resisted Schurr (*Id.* at 1:46-1:50). Patrick broke away from Schurr's grasp and began to run away (*Id.* at 1:51). Schurr radioed, "got one running," and he proceeded to chase Patrick (*Id.* at 1:54). Notably, not once did Patrick verbally or physically threaten Schurr; instead, his goal appeared to be to escape from Schurr as quickly as possible.

Schurr quickly caught up to Patrick and tackled him in the yard of one of the nearby homes (*Id.* at 1:57). Schurr told Patrick to "stop" twice, and they struggled on the ground for several seconds (*Id.* at 1:58-2:05). Schurr repeatedly told Patrick to "stop" and put his hands behind his back (*Id.* at 2:05-2:20). Though Patrick said "okay" multiple times in response to Schurr's commands, Patrick continued to resist Schurr and wrestle with him on the ground (*Id.*). Eventually, they got up from the ground, but Schurr continued to struggle with apprehending Patrick (*Id.* at 2:20-3:05). At this point, Tuyishme had gotten out of the vehicle

and began recording the incident on his cell phone (*see Cell Phone Footage*, ECF No. 18-4).

Though they continued to struggle, whether Schurr was yanking Patrick around or whether Patrick was actively resisting is unclear based on the video footage (*Id.* at 0:37-0:50). Schurr acknowledges that, throughout the struggle, he pushed Patrick's head into the ground, applied knee strikes, struck Patrick on the head, and put his weight on top of Patrick (ECF No. 17 at PageID.215). Schurr claims that these tactics did not deter Patrick from resisting (*Id.*). During the struggle, Tuyishme continued to exclaim that Patrick "is good" and that he was not resisting (ECF No. 18-3 at 0:37-0:53). Eventually, without warning, Schurr deployed his TASER (ECF No. 18-3 at 3:05-3:13). Patrick extended his left arm to deflect the TASER's barrel away from him and momentarily grabbed onto it (*Id.*). The probe did not make contact with Patrick.

Schurr then deployed the TASER again, while still holding onto Patrick. Again, the probe did not make contact with Patrick (ECF No. 2 at PageID.20, ¶ 30). Schurr repeatedly told Patrick to "let go of the TASER" (ECF No. 18-3 at 3:15-3:30). The amended complaint alleges that "Schurr knew that after the second deployment[,] his Taser could only be used as a drive-stun. Yet, he pinned Patrick to the ground using his full body weight on Patrick's back." (ECF No. 2 at PageID.20, ¶ 32). Schurr and Patrick continued to wrestle on the ground, though Tuyishme's cell phone video does not capture the entire struggle (ECF No. 18-4 at 1:00-1:49). However, it does pick up Schurr telling Patrick to let go of the TASER (*Id.*). Tuyishme disagrees, stating that Patrick did not grab the TASER (*Id.* at 1:43).

Eventually, Schurr is able to put his full body weight on top of Patrick (*Id.* at 1:49). Schurr told Patrick one more time to "drop the TASER" before he got his gun out of its holster (*Id.* at 1:53). While on top of Patrick, Schurr forced Patrick's head into the ground, and fired one shot directly into the back of his head (*Id.* at 1:52-1:56). Patrick collapsed and died immediately (*Id.* at 1:57). Schurr, still on top of Patrick, then straddled his back and told Tuyishme to "get back" (*Id.* at 1:57-2:01). Out of breath, Schurr got up from the ground and radioed that he was just involved in a shooting (*Id.* at 2:10-2:20).

Following Patrick's death, the City of Grand Rapids ("the City") requested an investigation and placed Schurr on paid leave (ECF No. 26 at PageID.391). On June 9, 2022, the Kent County Prosecutor charged Schurr with second-degree murder. Schurr was then terminated from the Grand Rapids Police Department (*Id.*). Schurr was bound over for trial, *see People v. Schurr*, No. 2022-FY-000827 (Kent Cty. Dist. Ct. Oct. 31, 2022), and Schurr subsequently filed a motion to quash the district court's finding that probable cause existed to send the case to trial, which was denied, *see People v. Schurr*, No. 22-010260-FC (Kent Cty. Cir. Ct. Feb. 3, 2023). However, Schurr has appealed the denial of the motion to quash, and the Michigan Court of Appeals is scheduled to hear oral argument on the case on September 6, 2023. *See People v. Schurr*, No. 365104 (Mich. Ct. App.).[2]

In December 2022, Plaintiff commenced this case as personal representative of Patrick's estate. Plaintiff raises a Fourth Amendment excessive force claim, via 42 U.S.C. § 1983, and a state-law gross negligence & wanton and willful misconduct claim against

---

[2] Pursuant to Fed. R. Evid. 201, the Court takes judicial notice of the existence and status of Schurr's criminal proceedings in Michigan state court. *See Clark v. Stone*, 998 F.3d 287, 297 n.4 (6th Cir. 2021) ("Courts may take judicial notice of the proceedings of other courts of record.").

Schurr (ECF No. 2 at PageID.21, 24). He also raises a *Monell* municipal liability claim against the City of Grand Rapids (*Id.* at PageID.22). Defendants have now moved to dismiss Plaintiff's amended complaint (ECF Nos. 17, 18).

## II.    Legal Standard

A complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide sufficient factual allegations that, if accepted as true, are sufficient to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, and the "claim to relief must be plausible on its face." *Id.* at 570. "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). If plaintiffs do not "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

7

When considering a motion to dismiss, a court must accept as true all factual allegations, but need not accept any legal conclusions. *Ctr. For Bio-Ethical Reform*, 648 F.3d at 369. The Sixth Circuit has noted that courts "may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011). However, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"; rather, "it must assert sufficient facts to provide the defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Rhodes v. R&L Carriers, Inc.*, 491 F. App'x 579, 582 (6th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

### III.    Schurr's Motion to Dismiss

First, Schurr seeks dismissal of Plaintiff's Fourth Amendment excessive force claim, arguing that he is entitled to qualified immunity.[3] Plaintiff notes that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). Although a public official's entitlement to qualified immunity "is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *See id.* (internal citation omitted). Nevertheless, the Sixth Circuit has recently held that district courts cannot "avoid ruling on the issue" of qualified immunity when raised in a Rule 12 motion. *See Sterling Hotels, LLC v. McKay*, 71 F.4th 463, 466–67 (6th Cir. 2023). Instead, the district court must evaluate the complaint's factual allegations and determine

---

[3] The motion to dismiss does not seek dismissal of Count III of the amended complaint, state-law gross negligence & wanton and willful misconduct, alleged against Schurr (ECF No. 2 at PageID.24).

whether the official is entitled to qualified immunity. *See id.* at 467. "If so, the case is over; if not, the denial of immunity is provisional, since the court may revisit the issue on summary judgment—where the court will take as true only the facts as to which the plaintiff has created a 'genuine issue.'" *Id.* In sum, although it is generally more appropriate to dismiss a claim against a public official based on qualified immunity at the summary judgment stage rather than the Rule 12 stage, "a district court must adjudicate a motion to dismiss on grounds of qualified immunity." *Id.*

Qualified immunity is an affirmative defense that protects public officials from liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The defendant "bears the burden of pleading the defense, but the plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). In other words, "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Id.* When assessing whether a law enforcement officer is entitled to qualified immunity, the Court must perform a two-tiered inquiry: (1) whether the officer violated the plaintiff's constitutional rights, and (2) whether that constitutional right was clearly established. *See Pearson*, 555 U.S. at 232. If there was no violation of a constitutional right, or even if there was a violation of a constitutional right but the right at issue was not clearly established at the time of the incident,

then the law enforcement officer is entitled to qualified immunity. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

### A. Constitutional Violation

Individuals have the right to be free from excessive police force pursuant to the Fourth Amendment. *See Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006). Excessive force claims are analyzed under a "reasonableness" standard. *See Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010). Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "While it is not always clear just when minimal police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (internal citation omitted). For an officer's use of deadly force to be reasonable, he must have "acted reasonably during the shooting itself and the few moments directly preceding it." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)). The court's primary assessment is to ask whether "the officer ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. The Sixth Circuit has "authorized the use of deadly force 'only in rare circumstances.'" *Palma v. Johns*, 27 F.4th 419, 432 (6th Cir. 2022) (quoting *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019)).

To assess objective reasonableness, even in deadly force cases, the Sixth Circuit follows the three-factor test laid out in *Graham. See Estate of Hill v. Miracle*, 853 F.3d 306,

312-13 (6th Cir. 2017); *see also Bouggess*, 482 F.3d at 889. That is, "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 397) (internal quotation marks omitted). "These factors are not an exhaustive list because the ultimate question is whether the totality of the circumstances justifies the particular sort of seizure that took place." *LaPlante v. City of Battle Creek*, 39 F.4th 572, 579 (6th Cir. 2022) (cleaned up). Using these three factors, it is this Court's job to "determine whether [Schurr] had an objectively reasonable belief that [Patrick] posed an imminent threat of serious physical harm to him or to others. If [Schurr] did not have such a belief, then his use of deadly force violated the Fourth Amendment." *Bouggess*, 482 F.3d at 890.

Beginning with the first *Graham* factor, the severity of the crime at issue, Schurr likely had probable cause to suspect Patrick had committed two crimes: a license plate violation and resisting and obstructing. Schurr claims that the license plate on Patrick's vehicle did not match the vehicle, but as Plaintiff correctly asserts, this fact has not yet been proven given the lack of discovery (*see* ECF No. 26 at PageID.403). But even assuming *arguendo* that the license plate on Patrick's vehicle did not belong to the vehicle, it is only a misdemeanor to "carry or display upon a vehicle any . . . registration plate not issued for the vehicle. . . ." Mich. Comp. Laws § 257.256(1), (2). Thus, this crime was minimal in severity. *See, e.g.*, *Carrico v. Knox Cty. Sheriff's Office*, No. 2:16-cv-502, 2018 WL 3193217, at *6 (S.D. Ohio June 28, 2018) (holding that the crime at issue, a misdemeanor, was "minimal" in severity);

*D'Angelo v. Clinton Twp.*, No. 10-12195, 2011 WL 4888904, at *7 (E.D. Mich. Oct. 13, 2021) ("[T]he severity of the crime at issue only amounts to a misdemeanor.").

Conversely, resisting and obstructing a police officer is a felony. *See* Mich. Comp. Laws § 750.81d. True, felonies are severe crimes, but resisting and obstructing is lower on the severity scale than many other felonies. *See Jackson v. Dupuis*, No. 15-10678, 2018 WL 1122004, at *6 (E.D. Mich. Mar. 1, 2018) (finding that committing a carjacking at gunpoint is a serious felony); *cf. Blakemore v. City of Alpena*, No. 20-cv-10248, 2021 WL 8323655, at *3 (E.D. Mich. June 10, 2021) ("Disorderly person and resisting and obstructing are not severe crimes that would require slamming Plaintiff's head and shoulder into the wall when he was being cooperative.").

Nevertheless, given that Schurr had probable cause to believe that Patrick committed one minor crime and one severe crime, the Court finds that the first *Graham* factor is neutral.

Moving onto the second *Graham* factor, whether the suspect posed an immediate threat to the safety of the officers or others, the Court declines to make a determination as to this factor at this early stage in the case. At the outset, based upon the Court's review of the video footage as well as the pleaded allegations, it appears that Patrick—who was unarmed—was attempting to run *away* from Schurr before Schurr tackled him (*see Dash Camera Footage*, ECF No. 18-2 at 1:49-1:57); (ECF No. 2 at PageID.19, ¶ 22). Unlike other deadly force cases where courts have found that the suspect posed a threat to the officers, Patrick was not running *toward* Schurr, nor was he pointing a weapon at Schurr. *See, e.g.*, *Thomas v. City of Columbus*, 854 F.3d 361, 365-67 (6th Cir. 2017) (finding that an officer acted reasonably when he fatally shot an individual—who turned out to be the victim of a

burglary and had disarmed the real perpetrator—running toward him with a gun in hand);

*Hicks v. Scott*, 958 F.3d 421, 435-37 (6th Cir. 2020) (finding that an officer acted reasonably

when she fatally shot an individual who suddenly appeared behind a door with a rifle pointed

at her in close proximity). Based on these facts alone, the Court would be inclined to find

that it was not reasonable for Schurr to believe that Patrick imposed an immediate threat.

*See, e.g.*, *Bouggess*, 482 F.3d at 890 ("After Newby had broken free from Mattingly's custody

and had run about ten feet from Mattingly, did Mattingly have probable cause to believe that

Newby posed an imminent danger of serious physical harm to him or to others? Examining

the information available to Mattingly at the time, precedent binding on this court, and

viewing the facts in the light most favorable to the Bouggess, it is clear that Mattingly did not

have probable cause sufficient to open fire."); *Garner*, 471 U.S. at 11 ("The use of deadly

force to prevent the escape of all felony suspects, whatever the circumstances, is

constitutionally unreasonable. It is not better that all felony suspects die than that they

escape."); *Palma*, 27 F.4th at 430 ("Palma's mere failure to follow orders would not lead a

reasonable officer to believe that Palma posed a danger.").

However, as the parties are well aware, the incident did not end there. Schurr

contends that Patrick imposed an immediate threat to Schurr because he "armed himself

with the Taser" (ECF No. 17 at PageID.250). But this conclusion is far too premature. The

video footage is all but clear as to whether Patrick ever "armed himself" with Schurr's

TASER, let alone if he ever even gained temporary possession of it. Although the video

footage shows both Schurr and Patrick's hands on the TASER at the same time, the Court

cannot definitively conclude, based on the video footage, that Patrick "grabbed" or "armed

himself" with the TASER (*see* ECF No. 18-4 at 1:00-1:49). Nor can the Court conclude that Patrick *did not* grab the TASER. Indeed, Plaintiff's amended complaint pleads that Patrick "reflexively extended his left arm to deflect the Taser's barrel away from him to protect himself" while "the Taser remained firmly within the grip of Schurr's right hand" (ECF No. 2 at PageID.20, ¶¶ 28-29). The Court must accept this allegation as true if it does not contradict the video footage, but as the Court has indicated, the video footage is unclear as to the issue of Patrick's control or grabbing of the TASER. Further, right before Schurr fatally shot Patrick, he appeared to have control over Patrick by sitting on top of him and forcing his head into the ground (*see* ECF No. 18-4 at 1:52-1:56). If Schurr had control over or had subdued Patrick in "the few moments directly preceding" the shooting, then Patrick likely was not a threat to Schurr. *See Bouggess*, 482 F.3d at 889.

Therefore, at this preliminary stage in the case and prior to discovery, the Court cannot make a determination as to whether Patrick posed a threat to Schurr nor a determination as to the weight of the second *Graham* factor.

Finally, the third *Graham* factor, whether Patrick was actively resisting arrest or attempting to evade arrest by flight, weighs slightly in favor of reasonableness. Plaintiff does not dispute that Patrick "passively resisted" Schurr's commands (ECF No. 2 at PageID.21, ¶ 35). Notably though, "Patrick never voiced a threat or returned a physical blow, in any form, to Schurr" (*Id.*). The video footage is clear that Patrick resisted Schurr's lawful commands and attempted to flee. But despite his resistance, "[a] suspect's flight on foot, without more, cannot justify the use of deadly force." *Bouggess*, 482 F.3d at 892. Therefore,

given Patrick's resistance, but also given that this resistance was met with deadly force, the Court finds that this factor slightly weighs toward reasonableness.

Looking at the totality of the circumstances, the Court finds that the amended complaint, coupled with the video footage, plausibly pleads a constitutional violation. True, Schurr had probable cause to believe that Patrick may have committed at least one crime, and it appears that Patrick attempted to flee. However, Patrick was initially unarmed and appeared to be confused by the situation. *See Garner*, 471 U.S. at 11 ("It is not better that all felony suspects die than that they escape."). And at this stage in the case, questions of fact remain as to whether Patrick "grabbed" Schurr's TASER. *See Jacobs*, 915 F.3d at 1040 ("Whether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances."). With, that outstanding question, Patrick's behavior, accepting the facts as pled and as shown in the video footage, may not have justified the use of deadly force. *See Garner*, U.S. at 11; *Palma*, 27 F.4th at 432 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.").

Based on the balancing of the *Graham* factors and the totality of the circumstances, the Court finds that Plaintiff has plausibly pleaded a violation of Patrick's Fourth Amendment rights.

### B. Clearly Established Right

Despite the plausibly alleged violation of Patrick's constitutional rights, Schurr is still entitled to qualified immunity if, at the time the incident occurred, the right at issue was not clearly established. *See Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) ("Public officials are entitled to qualified immunity from suits for civil damages if *either* the official's conduct

did not violate a constitutional right or if that right was not clearly established at the time of the conduct.") (emphasis added). "To defeat qualified immunity, the plaintiff must [also] show that the defendant had notice that the manner in which the force was used had been previously proscribed[.]" *Livermore v. Lubelan*, 476 F.3d 397, 403-04 (6th Cir. 2007). To conclude that a constitutional right is "clearly established," under the second prong of the qualified immunity analysis, the plaintiff must show that "[t]he contours of the right [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

In 1985, the Supreme Court held that "[deadly] force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. Admittedly, the Supreme Court has warned that *Garner* does not, by itself, "create clearly established law outside an obvious case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (internal quotation marks omitted). However, *Garner* triggered the establishment of clear case law in the Circuit Courts of Appeals, which followed the general holding of *Garner*. *See, e.g., Jacobs*, 915 F.3d at 1040 (quoting *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012)) ("It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others."); *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) ("It is axiomatic that individuals have a clearly established right not to be shot absent probable cause to believe that they pose a threat of serious physical harm, either to the officer or to others.") (cleaned up). Further, it is also clearly established that officers may not use "lethal force merely

because someone disobeys the officer's orders." *Palma*, 27 F.4th at 443 (citing *Wright v. City of Euclid*, 962 F.3d 852, 868 (6th Cir. 2020)).

For the reasons explained above, prior to discovery, the Court declines to determine whether Patrick posed a threat to Schurr. The amended complaint pleads that Patrick was not a threat (*see* ECF No. 2 at PageID.20, ¶¶ 28-33), and the video footage is unclear as to this issue (*see* ECF No. 18-4 at 1:00-1:49). But if Patrick did not pose a threat, then Schurr was certainly not entitled to use deadly force, and in turn, is not entitled to qualified immunity.

In sum, at this stage in the case, the Court cannot find that Schurr is protected by qualified immunity. Because Plaintiff has plausibly pleaded a violation of Patrick's Fourth Amendment rights that were clearly established at the time of his death, the Court will deny Schurr's motion to dismiss.[4]

## IV.    The City's Motion to Dismiss

Count II of the amended complaint alleges a *Monell* municipal liability claim against the City (ECF No. 2 at PageID.22). To properly allege a municipal liability claim under § 1983, the plaintiff must demonstrate that the alleged federal violation occurred because of a municipal custom or policy. *See Monell v. Dept' of Social Servs.*, 436 U.S. 658, 694 (1978); *Gambrel v. Knox Cty.*, 25 F.4th 391, 408 (6th Cir. 2022) ("When a municipal employee harms a private party, . . . that party must connect the employee's conduct to a municipal

---

[4] The City also argues that Plaintiff has failed to plead a constitutional violation, noting that "[a] municipality 'can only be held liable if there is a showing of an underlying constitutional violation by' its officials." (ECF No. 18 at PageID.287) (quoting *S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 452 (6th Cir. 2021)). However, for the reasons explained in this Section, the Court finds that Plaintiff has plausibly pleaded violation of Patrick's Fourth Amendment rights, and therefore, the Court rejects the City's argument as well.

'policy' or 'custom.'"). A plaintiff can make this showing by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Importantly, a municipality cannot be liable via *respondeat superior* simply because its employees or agents violated a federal right. *See id.* at 478 (quoting *Monell*, 436 U.S. at 694) ("A municipality 'may not be sued under § 1983 for an injury inflicted solely by its employees or agents.'").

Plaintiff alleges that the City (1) failed to train, supervise, and discipline its officers on the use of excessive force, and (2) had an ongoing practice or custom of racial discrimination within the police department (ECF No. 2 at PageID.23, ¶ 55). The City argues that the amended complaint "broadly and conclusively" alleges the City's failure to train and unconstitutional custom, which is insufficient to plead proper *Monell* claims (ECF No. 18 at PageID.299). Although Plaintiff has sufficiently pleaded factual allegations to support the first three elements of these two types of *Monell* claims, Plaintiff has not alleged any facts to support the causation element. Thus, the Court will grant the City's motion to dismiss.

### A.  Failure to Train or Supervise

First, Plaintiff argues that the City failed to adequately train its law enforcement officers on the use of force (ECF No. 2 at PageID.22-23). To properly bring a failure-to-train claim under *Monell*, the plaintiff must plead (1) a clear and persistent pattern of illegal activity, (2) which the municipality knew or should have known about, (3) yet remained

deliberately indifferent to, and (4) that the municipality's custom was the cause of the deprivation of the plaintiff's constitutional rights. *Bickerstaff v. Lucarelli*, 830 F.3d 388, 402 (6th Cir. 2016); *see also Gambrel*, 25 F.4th at 408 (explaining that a plaintiff bringing a failure-to-train *Monell* claim must prove "demanding elements").

With respect to the first element, a clear and persistent pattern of activity, municipal liability arises from a history of misconduct that created "notice that the training in this particular area was deficient and likely to cause injury." *Burgess*, 735 F.3d at 478. The Sixth Circuit has found that sufficient evidence of a clear and persistent pattern of illegal activity existed where at least fourteen similar incidents had occurred, *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989), but that a county's knowledge of only three similar incidents could not establish notice of habitually unconstitutional conduct, *D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014). Here, Plaintiff alleges that from June 1, 2015, until May 21, 2020, the City received seventy-nine citizen complaints for use of excessive force by Grand Rapids Police Department ("GRPD") officers (ECF No. 2 at PageID.23, ¶ 51). The Court must accept this allegation as true for purposes of resolving the motion to dismiss. Seventy-nine instances of verified excessive force would certainly be sufficient to constitute a "clear and persistent pattern of illegal activity." *See Leach*, 891 F.2d at 1248. Moreover, Plaintiff pleads that these are just the complaints that the City *received.* In any event, this allegation is sufficient to establish both a pattern of illegal activity as well as that the City knew about or should have known about such illegal activity.

Moving onto the third element of a *Monell* failure-to-train claim, "[t]o show this deliberate indifference, a plaintiff must prove that the violation of a clearly established right

was a 'known or obvious consequence' of the lack of training or supervision." *Gambrel*, 25 F.4th at 408 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). At this stage in the case, Plaintiff must merely plead that the GRPD's use of excessive force was a known or obvious consequence of the department's lack of training. In the Court's judgment, paragraph 52 of the amended complaint sufficiently meets this pleading requirement (ECF No. 2 at PageID.23, ¶ 52). Plaintiff pleads that the City merely gives a "slap on the wrist" to officers who use excessive force—if the City even decides to punish these officers (*Id.*). According to Plaintiff, this failure to sufficiently supervise and discipline officers when necessary does not "discourage future violations of department policies and constitutional rights" (*Id.*). Thus, failing to discourage the use of excessive force will likely lead to the "known or obvious consequence" of GRPD officers using excessive force. For purposes of this motion to dismiss, the Court finds that Plaintiff's amended complaint sufficiently pleads deliberate indifference by the City.

Finally, Plaintiff must plead causation between the City's failure to train or supervise and Schurr's use of alleged excessive force on Patrick. *See Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019) ("In order to show that a municipality is liable for a failure to train its employees, a plaintiff must establish that . . . the inadequacy was closely related to or actually caused the injury.") (internal quotation marks omitted); *Gambrel*, 25 F.4th at 408-09 (explaining that the causation element of a *Monell* failure-to-train claim requires a showing of both but-for and proximate causation). This is where Plaintiff's amended complaint falls short. The complaint conclusively alleges that the City's failure to train its law enforcement officers on the proper use of force "was the cause and moving force behind the violations

20

and harm suffered" by Patrick (*Id.* at PageID.22, ¶ 49). However, it does not explain how the City's inadequate training regarding use of force caused Schurr to allegedly use excessive force on Patrick, nor that the City could reasonably foresee Schurr using excessive force due to a lack of training. *See Gambrel*, 25 F.4th at 409. In other words, the amended complaint fails to allege specific *facts* supporting causation. The complaint instead focuses on the City's treatment of Schurr *after* he allegedly used excessive force, not before (*see* ECF No. 2 at PageID.23, ¶ 53-54). Indeed, the complaint fails to identify any connection between the lack of training and Schurr's specific use of force on Patrick.

Because Plaintiff has failed to plead sufficient facts supporting the conclusion that the City's lack of training was the cause of the deprivation of Patrick's constitutional rights, the Court finds that Plaintiff's *Monell* claim for failure to train does not survive the City's motion to dismiss.

### B. Custom or Tolerance of Federal Rights Violations

Second, Plaintiff also raises a *Monell* claim for the City's ongoing practice or custom of racial discrimination within the GRPD (ECF No. 2 at PageID.23-24). Specifically, Plaintiff alleges that Black drivers are more than twice as likely to be stopped by GRPD officers, that the Michigan Department of Civil Rights ("the Department") has announced an investigation into complaints of racial discrimination by GRPD officers, and that the Department has received over sixty complaints related to racial profiling and disparate treatment by GRPD officers (*Id.* at PageID.24, ¶¶ 56-57).

The elements of this type of *Monell* claim are essentially the same as the elements discussed above for a *Monell* failure-to-train claim: "(1) the existence of a clear and persistent

pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the 'moving force' or direct causal link in the constitutional deprivation." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

For the same reasons discussed above, Plaintiff has failed to plead sufficient facts supporting the causation element of this *Monell* claim. Despite properly alleging a pattern, as well as notice to the City, of racial discrimination—the practice to pull over twice as many Black drivers as white drivers in addition to the Department receiving sixty complaints related to racial profiling by the GRPD—and the City's deliberate indifference to this policy, the complaint lacks facts supporting causation (ECF No. 2 at PageID.24). The complaint fails to plead any link between this alleged custom of racial discrimination and Schurr's allegedly discriminatory actions toward Patrick. Instead, it perfunctorily states, "Tragically and predictably, [the] City's unconstitutional policies, procedures, protocols, and customs, are the moving force behind the constitutional violations complained of here and Patrick's death" (*Id.* ¶ 58). This allegation contains no facts regarding causation—which the Court would accept as true—in order to allow this claim to proceed. Thus, the Court will dismiss the entirety of Count II, Plaintiff's *Monell* claim, alleged against the City.

## V.    Conclusion

The Court finds that Plaintiff's operative complaint plausibly pleads sufficient facts supporting his claims for relief against Schurr, but not the City. Accordingly,

**IT IS HEREBY ORDERED** that Defendant Schurr's motion to dismiss (ECF No. 17) is **DENIED**.

**IT IS FURTHER ORDERED** that the City's motion to dismiss (ECF No. 18) is **GRANTED**.

**IT IS SO ORDERED**.

Date:  August 28, 2023                                         /s/ Paul L. Maloney
                                                               Paul L. Maloney
                                                               United States District Judge