UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Kelly L. Stephens
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: September 09, 2024

Mr. Christopher Patrick Desmond
Johnson Law Firm
535 Griswold Street
Suite 2600
Detroit, MI 48226

Ms. Kali May Lester Henderson
Mr. T. Joseph Seward
Seward Henderson
210 E. Third Street
Suite 212
Royal Oak, MI 48067

Re: Case No. 23-1887, *Peter Lyoya v. Christopher Schurr, et al*
Originating Case No. : 1:22-cv-01160

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc: Ms. Ann E. Filkins

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0381n.06

Case No. 23-1887

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 09, 2024
KELLY L. STEPHENS, Clerk

| | |
|---|---|
| PETER LYOYA, Personal Representative for the estate of Patrick Lyoya (deceased),<br>   Plaintiff-Appellee,<br><br>v.<br><br>CHRISTOPHER SCHURR,<br>   Defendant-Appellant. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN<br><br>O P I N I O N |

Before: SILER, COLE, and BUSH, Circuit Judges.

COLE, Circuit Judge. Christopher Schurr, then a Grand Rapids police officer, fatally shot Patrick Lyoya during a traffic stop. Lyoya's estate brought a claim against Schurr under 42 U.S.C. § 1983 for violating Lyoya's Fourth Amendment rights. Schurr moved to dismiss, arguing that he is protected by qualified immunity. The district court denied his motion and Schurr appealed. We dismiss Schurr's appeal for lack of appellate jurisdiction.

I.

Our jurisdiction is narrow in this interlocutory appeal. We accept the facts alleged in the complaint as true unless clear video evidence "blatantly contradicts or utterly discredits" the plaintiff's version of events. *Bell v. City of Southfield*, 37 F.4th 362, 366 (6th Cir. 2022); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007).

We begin with the facts alleged in the complaint. On April 4, 2022, just after 8 am, Patrick Lyoya, a 26-year-old Black man, was pulled over by Schurr. Lyoya's friend was riding in the

No. 23-1887, *Lyoya v. Schurr*

passenger seat. Lyoya pulled over, opened his door, and stood next to his car. Before Schurr exited his patrol car, he yelled at Lyoya to get back in the car, but Lyoya did not immediately do so. Schurr then approached Lyoya.

From outside the car, Lyoya attempted to direct his friend to find his driver's license inside the car. Lyoya then began walking towards the front of his car, apparently heading to the passenger side to get his driver's license from the glove compartment. Schurr grabbed Lyoya and told him to put his hands behind his back. Lyoya ran into an adjacent yard.

Schurr chased after Lyoya. When Schurr caught up to Lyoya, he "grabbed, kicked, punched, slapped, and kneed" Lyoya to the ground. (Am. Compl., R. 2, PageID 19, ¶ 23.) Lyoya got back up and "passively tried to free himself." (*Id.* at PageID 19, ¶ 24.) Without warning, Schurr drew and fired his Taser. As the first probe deployed, Lyoya "extended his left arm to deflect the Taser's barrel away from him." (*Id.* at PageID 20, ¶ 28.) "At the same time, the Taser remained firmly within the grip of Schurr's right hand." (*Id.* at PageID 20, ¶ 29.) Schurr stayed within reach, "re-directed the Taser, and deployed the second, and last remaining, probe." (*Id.* at PageID 20, ¶ 30.) At that point, the Taser could no longer be fired and could only be used in drive-stun mode (requiring direct contact).

Lyoya "fell down to the ground with his left arm still extended away from his body in an attempt to aim the Taser's barrel at the ground, and away from him." (*Id.* at PageID 20, ¶ 31.) Schurr "pinned [Lyoya] to the ground using his full body weight on [Lyoya's] back." (*Id.* at PageID 20, ¶ 32.) Schurr "h[eld] [Lyoya] down, grab[bed] his gun, press[ed] it along the base of his skull, and kill[ed] him with one shot to the back of the head." (*Id.* at PageID 20, ¶ 33.)

Throughout the incident, Lyoya never "voiced a threat or returned a physical blow, in any form." (*Id.* at PageID 21, ¶ 35.) Segments of the incident were captured on video by Lyoya's

No. 23-1887, *Lyoya v. Schurr*

friend's cell phone, Schurr's body camera, Schurr's dash camera, and a Ring video doorbell camera at a house across the street.

Lyoya's estate sued Schurr and the City of Grand Rapids under 42 U.S.C. § 1983, alleging that Schurr violated Lyoya's Fourth Amendment rights. The defendants moved to dismiss. The district court granted the city's motion, but denied Schurr's motion, determining that Schurr was not entitled to qualified immunity at this stage. Schurr timely appealed.

II.

Schurr brings an interlocutory appeal from the district court's denial of his motion to dismiss, challenging the district court's denial of qualified immunity. When presented with such an appeal, "[w]e must first determine whether we have jurisdiction." *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020). While the denial of a motion to dismiss is not a final decision, "appellate courts have limited jurisdiction to answer purely legal questions in appeals from the denial of qualified immunity" but "ordinarily lack jurisdiction to wade into factual disputes." *Bell*, 37 F.4th at 365.

There are "two exceptions to entertain appeals from denials of qualified immunity that 'may contain some dispute of fact.'" *Id.* (quoting *Adams*, 946 F.3d at 948). These exceptions apply only in "narrow circumstances." *Adams*, 946 F.3d at 948. First, if the defendant is "willing to accept the plaintiff's version of what happened, we can 'overlook' the factual dispute and address the legal dispute based on the plaintiff's account." *Bell*, 37 F.4th at 365 (quoting *Adams*, 946 F.3d at 948). Second, we have jurisdiction over an appeal that challenges the plaintiff's factual allegations where "clear" and "indisputable" video evidence "blatantly contradicts or utterly discredits" the allegations at issue so as to make them "implausible." *Id.* at 364, 366.

No. 23-1887, *Lyoya v. Schurr*

Schurr argues that we have jurisdiction over this appeal under the first exception because it "presents the purely legal question of what was clearly established when an officer loses control of his taser because of the actions of an actively resistant individual." (Appellant Br. 16.) But Schurr does not concede the estate's version of the facts. Schurr characterizes Lyoya as "an actively resistant suspect that [] disarmed him, fought against him to the point of exhaustion, and who, while engaged in close contact with the officer, [was] turning to face the officer with the officer's Taser in hand, which [was] capable of causing serious injury or death." (*Id*. at 69.)

The complaint does not allege that Lyoya disarmed Schurr, and it does not allege that Lyoya took Schurr's Taser. The complaint states that Lyoya first sought to "deflect the Taser's barrel away from him, to protect himself" while "the Taser remained firmly within the grip of Schurr's right hand." (Am. Compl., R. 2, at PageID 20, ¶ 28–29.) Further, when Lyoya fell to the ground, he was still extending his arm "in an attempt to aim the Taser's barrel at the ground, and away from him." (*Id.* at PageID 20, ¶ 31.) Nor does the complaint allege that Lyoya fought Schurr. According to the complaint, "even as he passively resisted . . . [Lyoya] never voiced a threat or returned a physical blow, in any form, to Schurr." (*Id.* at PageID 21, ¶ 35.)

Finally, according to the complaint, Lyoya was not turning to face Schurr with Schurr's Taser in hand when Schurr shot him. The complaint states that Schurr "pinned [Lyoya] to the ground using his full body weight on [Lyoya's] back." (*Id*. at PageID 20, ¶ 32.) Schurr then held Lyoya down, unholstered his gun, "press[ed] it to the base of [Lyoya's] skull, and kill[ed] him with one shot to the back of the head." (*Id.* at PageID 20, ¶ 33.)

Schurr "'applie[s] his own factual conclusions and inferences'" to the estate's claims and his arguments depend on a version of the facts the estate "does not accept." *Anderson-Santos v. Kent County*, 94 F.4th 550, 554–55 (6th Cir. 2024) (alteration in original) (quoting *Barry v.*

- 4 -

No. 23-1887, *Lyoya v. Schurr*

*O'Grady*, 895 F.3d 440, 444 (6th Cir. 2018)). Accordingly, Schurr fails to invoke our jurisdiction under the first exception. *Id*.

The second exception is inapplicable here because the video footage does not blatantly contradict or utterly discredit the estate's version of events. *See Bell*, 37 F.4th at 364–66. Four cameras recorded segments of the incident: (1) a Ring video doorbell camera; (2) Schurr's dash camera; (3) Schurr's body camera; and (4) Lyoya's friend's cell phone camera.

The recording from the Ring video doorbell, positioned across the street from Schurr and Lyoya, has poor video and audio quality. The video shows two blurred figures moving across a yard before going to the ground. (Ring Doorbell Video, Ex. 8, R. 17-9.) Only a muffled gunshot can be heard on the audio feed. (*Id*.) The Ring doorbell recording does not show whether Lyoya fought or disarmed Schurr, or whether Schurr had subdued Lyoya before shooting him. (*Id*.)

Schurr's dash and body cameras did not capture the critical moments leading up to Schurr's use of deadly force. Schurr and Lyoya moved out of the dash camera's view more than a minute before the gunshot. (Dash Camera Video, Ex. 1, R. 17-2; 2:56–4:13.) And the body camera went dark six seconds after Schurr fired the second Taser probe, and it shut down completely 40 seconds before the gunshot. (Body Camera, Ex. 2, R. 17-3, 3:18, 3:32.)

The body camera does show Lyoya grab the Taser's barrel just after Schurr deployed the first probe, and shows Lyoya's hand on the Taser when Schurr fired the second probe five seconds later. (*Id*. at 3:07–13.) This is consistent, however, with the complaint's allegations; specifically, that "Schurr never gave [Lyoya] a verbal warning before he deployed the Taser," that Lyoya "deflect[ed] the Taser's barrel away from him [] to protect himself" while "the Taser remained firmly within the grip of Schurr's right hand," and that "Schurr re-directed the Taser, and deployed the second, and last remaining, probe." (Am. Compl., R. 2, PageID 20, ¶ 27–30.)

- 5 -

No. 23-1887, *Lyoya v. Schurr*

Lyoya's friend began filming the incident on his cell phone after Schurr tackled Lyoya, just after Schurr delivered two knee strikes. (*Compare* Dash Camera Video, Ex. 1, R. 17-2 *with* Cell Phone Video, Ex. 3, R. 17-4.) The camera is mostly directed at the ground instead of at Lyoya and Schurr, and it does not capture large segments of the incident. (Cell Phone Video, Ex. 3, R. 17-4.) Unlike the other cameras, however, the cell phone captured the seconds leading up to Schurr's use of deadly force.

Like the body camera, the cell phone video shows Lyoya's hand on the barrel of the Taser, while the Taser is still firmly in Schurr's grip. (*Id*. at 0:53.) The video also shows Lyoya continuing to push the Taser away from himself after he falls to the ground. (*Id.* at 0:54, 1:13.) The video does provide a "fuller picture" than the few sentences of allegations in the complaint. (Reply Br. 20 (quoting *Bell*, 37 F.4th at 365).) But, that "fuller picture" does not utterly discredit the complaint, which admits that Lyoya interfered with the Taser from the time Schurr first deployed it. *See Bell*, 37 F.4th at 365–66 (finding no appellate jurisdiction to resolve a factual dispute as to who initiated a struggle where the videos provided a "fuller picture" but were unclear as to the disputed fact and therefore did not "blatantly contradict, [o]r utterly discredit" the plaintiff's account).

The cell phone video also does not indisputably show Lyoya turning to confront Schurr with Schurr's own Taser in hand at the time that Schurr used deadly force. Schurr argues that the video shows both of his hands and does not show the Taser, so he no longer had a hand on the Taser when he used deadly force. The video does show Schurr use one hand to push Lyoya into the ground and simultaneously use the other hand to unholster his firearm and shoot Lyoya in the back of the head. But this is consistent with the complaint—and therefore does not blatantly contradict it. The complaint alleges that after Schurr "pinned [Lyoya] to the ground," Schurr then

No. 23-1887, *Lyoya v. Schurr*

"h[eld] Lyoya down, grabb[ed] his gun, press[ed] it to the base of [Lyoya's] skull, and kill[ed] him with one shot to the back of the head." (Am. Compl., R. 2, PageID 20, ¶ 32–33.)

Schurr points to a "yellow" speck between Lyoya's hands and argues that this shows Lyoya had taken the Taser in the seconds before Schurr shot him. (Appellant Br. 32.) On our review, we cannot clearly identify the Taser in this part of the video. (Cell Phone Video, Ex. 3, R. 17-4, 1:54.) Moreover, even if the video did clearly show the Taser's position, it does not indisputably show whether Lyoya was actually holding the Taser. Nor does the video show if Lyoya grabbed the handle or merely pressed the barrel against the ground, nor whether Schurr voluntarily released the twice-fired Taser to draw his firearm.

Finally, the cell phone video supports—and therefore does not blatantly contradict—the allegation that Schurr had subdued Lyoya prior to using deadly force without warning. The video confirms that Schurr pinned Lyoya, rose to his feet, drew his firearm, shoved Lyoya into the ground, and then, without warning, shot Lyoya in the back of the head. (*Id*. at 1:49–56.)

\*\*\*

Lyoya's "level of resistance and whether he was [subdued] before being [shot]—the facts [Schurr] refuses to concede—are central to this inquiry." *Clay v. Emmi*, 797 F.3d 364, 370 (6th Cir. 2015). As described above, the available video footage does not undermine the factual allegations in the complaint so as to make the complaint implausible. *See Bell*, 37 F.4th at 364. Therefore, "without (1) a concession of [the estate's] version of [events] or (2) video evidence that blatantly contradicts or utterly discredits [its] account, we are left with a factual dispute over which we do not have jurisdiction." *Id*. at 366.

No. 23-1887, *Lyoya v. Schurr*

III.

For the foregoing reasons, we dismiss Schurr's appeal of the denial of qualified immunity for lack of appellate jurisdiction.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-1887

PETER LYOYA, personal representative of the estate of Patrick Lyoya, deceased,

    Plaintiff - Appellee,

v.

CHRISTOPHER SCHURR,

    Defendant - Appellant.

**FILED**
Sep 09, 2024
KELLY L. STEPHENS, Clerk

Before: SILER, COLE, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the appeal is DISMISSED for lack of jurisdiction.

ENTERED BY ORDER OF THE COURT

*Kelly L. Stephens*

Kelly L. Stephens, Clerk