UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**PETER LYOYA,** as the
Personal Representative for
the Estate of **PATRICK LYOYA,**

      Plaintiff,

v.

**CHRISTOPHER SCHURR,**

      Defendant.

Case No. 22-cv-01160
Hon. Paul L. Maloney
Mag. Judge Sally J. Berens

**ORAL ARGUMENT
REQUESTED**

## DEFENDANT SCHURR'S MOTION FOR SUMMARY JUDGMENT
### ORAL ARGUMENT REQUESTED

Defendant, **CHRISTOPHER SCHURR,** by and through his undersigned counsel,

moves this Court under Federal Rule of Civil Procedure 56(a) for summary judgment

on every remaining claim in the Amended Complaint.

The developed record establishes, as a matter of law, that Officer Schurr's

single shot was a constitutionally reasonable response to the imminent threat created

when Patrick Lyoya—at the end of a sustained physical struggle in which every

lower-force option had failed—wrested sole possession of Officer Schurr's TASER,

held it like a firearm with his thumb on the safety switch, and began to turn his body

back toward Officer Schurr. On that record, Officer Schurr is entitled to qualified

immunity on Count I, to governmental and qualified immunity under Michigan law

on Count III, and to entry of judgment limiting any damages claim premised on Dorcas Lyoya's status as a "parent" under the Michigan Wrongful Death Act. In support, Officer Schurr relies upon the accompanying brief, the briefing previously submitted at ECF No. 17, and the exhibits attached hereto.

Pursuant to Local Rule 7.1(d), Defendant sought concurrence in the relief sought herein via an email on Thursday, May 22, 2026. Plaintiff's counsel declined to concur.

Respectfully submitted,

**SEWARD HENDERSON PLLC**

 /s/ Kali M. L. Henderson (P76479)
*Attorneys for Defendant Schurr, only*
210 East 3rd Street, Suite 212
Royal Oak, MI 48067
P: (248) 733-3580
F: (248) 733-3633
Dated:   May 22, 2026        E: khenderson@sewardhenderson.com

2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| **PETER LYOYA,** as the<br>Personal Representative for<br>the Estate of **PATRICK LYOYA,** | Case No. 22-cv-01160<br>Hon. Paul L. Maloney<br>Mag. Judge Sally J. Berens |
| Plaintiff,<br><br>v. |  |
| **CHRISTOPHER SCHURR,** | **ORAL ARGUMENT<br>REQUESTED** |
| Defendant. |  |

## BRIEF IN SUPPORT OF
## DEFENDANT SCHURR'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Index of Authorities ............................................................................................v

Question Presented.......................................................................................... viii

Introduction ......................................................................................................1

Procedural Background......................................................................................2

Statement of Facts .............................................................................................3

    I.    The Encounter...........................................................................................3

        A.     The Non-Matching Plate and Subsequent Stop........................................4

        B.     Lyoya's Flight and the First Ground Struggle..........................................7

        C.     The TASER Deployment and Lyoya's Seizure and "Complete Control" of the Weapon ................................................................................................8

        D.     The Shot..............................................................................................12

           i.    GRPD's Interpretation of TASER Disarmament Danger .......................13

          ii.    The MSP Investigator's Understanding of TASER Disarmament Danger 14

         iii.    The Manufacturer's Understanding of TASER Disarmament Danger 15

         iv.    The Scientific Community's Understanding of TASER Disarmament Danger ..................................................................................................16

    II.    The Damages - Dorcas Lyoya Is Not Patrick Lyoya's Mother for Damages Purposes..................................................................................................17

Standards of Review .........................................................................................18

    I.    Summary Judgment ................................................................................18

    II.    Qualified Immunity.................................................................................19

Law and Argument............................................................................................20

I.    Officer Schurr Is Entitled to Qualified Immunity on Count I Because His Use of Deadly Force Was Objectively Reasonable. ....................................................20

    A.    The *Graham/Garner* Deadly Force Framework.....................................20

        i.    Mullins instructs courts not to second-guess split-second decisions made in the face of serious threats with the benefit of hindsight............................22

        ii.    Livermore instructs that the totality of the circumstances, not just where a weapon is pointed, govern the use of deadly force....................................25

        iii.    Thomas emphasizes that if the totality of the circumstances known to the officer dictates whether deadly force is reasonable.................................25

    B.    Each Graham Factor Favors Officer Schurr on the Developed Record .26

        i.    Factor 1: Lyoya committed at least three crimes of increasing severity, including possessing a dangerous weapon while resisting and obstructing an officer.............................................................................................................26

        ii.    Factor 2: Lyoya's exclusive control of the TASER and close proximity to Schurr posed an immediate threat and all officers in Michigan are trained that way27

        iii.    Factor 3: Lyoya never complied with commands, fled, and never stopped actively resisting...........................................................................28

    C.    The Case Law Supports the Conclusion that Deadly Force was Reasonable Under Graham as Well...................................................................29

II.    Even If a Constitutional Violation Could Be Found, the Right at Issue Was Not Clearly Established as of April 4, 2022.......................................................30

    A.    The Clearly-Established Inquiry Requires Particularized Pre-existing Authority ....................................................................................................30

    B.    No Case, as of April 4, 2022, Placed Beyond Debate That an Officer Could Not Use Deadly Force Against  a Suspect Who Had Obtained Sole Control of the Officer's TASER During an Ongoing Physical Struggle...........31

III.    Officer Schurr Is Entitled to Michigan Governmental Immunity on Count III Because His Conduct Was Not Grossly Negligent or Willful and Wanton Within the Meaning of MCL § 691.1407 ...................................................................32

A.	Willful and Wanton Misconduct is an Intentional Tort that is Barred Because Schurr's Conduct was Reasonable .......................................................32

B.	Plaintiff's Gross Negligence Claim is Improperly Plead and Not Supported by the Evidence ..........................................................................37

   i.	Plaintiff Cannot Transform the Intentional Conduct into a Claim of Gross Negligence ..........................................................................................37

   ii.	Schurr's Conduct Did Not Amount to Gross-Negligence.......................38

IV.	Plaintiff's Damages and Standing Are Independently Limited Under the Michigan Wrongful Death Act Because Dorcas Lyoya Does Not Qualify as a "Parent" Under MCL § 600.2922(3) ....................................................................40

Conclusion .........................................................................................................41

## INDEX OF AUTHORITIES

**Cases**

*Ashford v. Raby*,
  951 F.3d 798 (6th Cir. 2020) ...............................................................................33

*Bletz v. Gribble*,
  641 F.3d 743 (6th Cir. 2011) ...............................................................................43

*Boumelhem v. Bic Corp.*,
  535 N.W.2d 574 (Mich. Ct. App. 1995)...............................................................36

*Brewer v. Perrin*,
  349 N.W.2d 198 (Mich. Ct. App. 1984)...............................................................40

*Burnett v. City of Adrian,*
  326 N.W.2d 810 (1982) ................................................................................. 36, 42

*Chappell v. City Of Cleveland*,
  585 F.3d 901 (6th Cir. 2009) ...............................................................................23

*City and County of San Francisco v. Sheehan,*
  575 U.S. 600 (2015)...............................................................................................34

*City of Tahlequah v. Bond*,
  595 U.S. 9 (2021)................................................................................... 34, 35

*Daher v. Prime Healthcare Services-Garden City, LLC*,
  29 N.W.3d 136 (Mich. 2025)................................................................................47

*Dougherty v. City of Detroit*,
  986 N.W.2d 467 (Mich. Ct. App. 2021)...............................................................44

*Graham v. Connor*,
  490 U.S. 386 (1989)................................................................................. 21, 22, 32

*Gully v. City of Southfield*,
  No. 223080, 2001 WL 1422171 (Mich. Ct. App. Nov. 13, 2001) ............... 45, 46

*Hicks v. Scott*,
  958 F.3d 421 (6th Cir. 2020) .................................................................22

*Jennings v. Southwood*,
  521 N.W.2d 230 (Mich. 1994)................................................... 36, 42

*Kisela v. Hughes*,
  138 S. Ct. 1148 (2018)............................................................ 34, 35

*Latits v. Phillips*,
  826 N.W.2d 190 (2012) ........................................................... 40, 41

*Livermore v. Lubelan*,
  476 F.3d 397 (6th Cir. 2007) ............................................... passim

*Maiden v. Rozwood*,
  597 N.W.2d 817 (1999) .................................................................44

*Mitchell v. Schlabach*,
  864 F.3d 416 (6th Cir. 2017) ........................................................23

*Mullins v. Cyranek*,
  805 F.3d 760 (6th Cir. 2015) .............................................. passim

*Norris v. Lincoln Park*,
  579; 808 N.W.2d 578 (Mich. Ct. App. 2011)......................................39

*Reichle v. Howards*,
  132 S.Ct. 2088 (2012)....................................................................20

*Rhodes v. McDannel*,
  945 F.2d 117 (6th Cir. 1991) .........................................................23

*Rivas-Villegas v. Cortesluna*,
  595 U.S. 1 (2021)................................................................ 34, 35

*Ross v. Consumers Power Co.*,
  363 N.W.2d 641 (Mich. 1984)........................................................37

*Ruedger v. Bruyneel*,
  No. 243832, 2004 WL 316450 (Mich. Ct. App. Feb. 19, 2004), ........................45

*Rush v. City of Lansing*,
644 F. App'x 415 (6th Cir. 2016)..........................................................................23

*Saucier v. Katz*,
533 U.S. 194 (2001).............................................................................................20

*Scott v. Harris*,
550 U.S. 372 (2007) ............................................................................................19

*Tarlea v. Crabtree*,
687 N.W.2d 333 (2004) ................................................................................. 44, 45

*Taylor v. Barkes*,
135 S. Ct. 2042 (2015).........................................................................................20

*Tennessee v. Garner*,
471 U.S. 1 (1985).................................................................................................22

*Untalan v. City of Lorain*,
430 F.3d 312 (6th Cir. 2005) ...............................................................................27

*VanVorous v. Burmeister*,
687 N.W.2d 132 (Mich. Ct. App. 2004)....................................................... 39, 42, 43

*White v. Pauly*,
580 U.S. 73, 77 (2017).........................................................................................19

**Statutes**

Mich. Comp. Laws § 600.2922(3) ...................................................................... 46, 48

Mich. Comp. Laws § 691.1407(2) .............................................................................43

Mich. Comp. Laws § 691.1407(2)(c)(3)....................................................................37

Mich. Comp. Laws § 691.1407(8)(a). .......................................................................43

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................19

vii

## QUESTION PRESENTED

I.   Whether Officer Schurr is entitled to qualified immunity on Plaintiff's Fourth Amendment excessive-force claim (Count I) where the developed record establishes that Patrick Lyoya had gained sole possession of Officer Schurr's TASER, was holding it like a firearm with his thumb on the safety switch, and was beginning to turn his body toward Officer Schurr in the moments before the single shot was fired?

Officer Schurr answers, "*yes*."

Plaintiff presumably answers, "*no*."

II.  Whether Officer Schurr is entitled to Michigan qualified immunity from the willful-and-wanton-misconduct theory pleaded within Count III, where the record contains no evidence of malicious intent, capricious action, corrupt conduct, or willful and corrupt misconduct, and where Officer Schurr acted reasonably and in good faith in performing a discretionary function?

Officer Schurr answers, "*yes*."

Plaintiff presumably answers, "*no*."

III. Whether Officer Schurr is entitled to governmental immunity from the gross-negligence theory pleaded within Count III, where Michigan law forecloses the recasting of intentional use-of-force conduct as gross negligence and where, in any event, the record cannot support a finding of conduct so reckless as to demonstrate a substantial lack of concern for whether an injury would result?

Officer Schurr answers, "*yes*."

Plaintiff presumably answers, "*no*."

IV.  Whether Plaintiff's recoverable damages must be limited where Plaintiff has admitted that Dorcas Lyoya is not Patrick Lyoya's biological mother and never legally adopted him, such that she is not a "parent" within the meaning of the Michigan Wrongful Death Act, MCL § 600.2922(3)?

Officer Schurr answers, "*yes*."

Plaintiff presumably answers, "*no*."

## INTRODUCTION

In the moments before Officer Christopher Schurr fired the single round at Patrick Lyoya, Lyoya had wrested sole possession of Officer Schurr's TASER, was holding it like a firearm with his thumb blocking the safety switch, and was trying to turn back toward the officer he had been fighting for more than two minutes. That fact, central and undisputed on the developed record, disposes of this case.

Every relevant source reaches the same conclusion: an officer who has lost sole control of his TASER to an actively resisting subject faces an imminent threat of injury, incapacitation, and disarmament of his service firearm, and may constitutionally respond with deadly force. Officer Schurr's training command at the Grand Rapids Police Department, the Michigan State Police detectives who investigated the encounter, the manufacturer of the TASER 7, and the published biomedical scientific literature each confirm it. So does the Sixth Circuit's weapon-control jurisprudence, permitting an officer confronted at close range by a sustained physical threat to use deadly force without cycling back through lower-force options that have already failed.

Officer Schurr's use of force was objectively reasonable and no clearly established law as of April 4, 2022, placed the constitutional question beyond debate. He is entitled to qualified immunity on Count I, to governmental and qualified immunity under Michigan law on the theories pleaded within Count III, and to a

1

ruling limiting damages premised on Dorcas Lyoya's status as a "parent" under the Michigan Wrongful Death Act. Each ground independently warrants summary judgment.

## PROCEDURAL BACKGROUND

Plaintiff Peter Lyoya, as personal representative of the estate of Patrick Lyoya, filed this action pleading three counts: a Fourth Amendment excessive-force claim against Officer Christopher Schurr (Count I); a *Monell* claim against the City of Grand Rapids (Count II) that was dismissed; and a Michigan state-law claim against Schurr for gross negligence (Count III). [ECF No. 2, PageID.21–24] Schurr moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) arguing that he is entitled to qualified immunity because he did not violate Lyoya's constitutional rights, or clearly established law. [ECF No. 17] This Court and the Sixth Circuit denied his motion, and in doing so, framed the questions that discovery had to answer: was Lyoya still resisting, where was the TASER, what did it appear Lyoya was doing with the TASER, did Schurr lose the TASER, and did Schurr ever gain submission from Lyoya? [ECF No. 47, PageID.777] The focus of all of these questions was clear: what happened just before the shooting.

This Court, and the Sixth Circuit, held that the video alone could not answer those questions in light of the facts it had to accept from the pleadings. Now, however, discovery has been conducted and those pleadings cannot defeat the

2

affirmative evidence that establishes that Officer Schurr had not subdued Lyoya, who was still physically resisting him and in sole possession of his TASER, held like a gun, and turning towards him, when Schurr made the decision to shoot, fearing death or serious bodily injury to himself. It is upon these established facts, that Officer Schurr now asks the Court to grant him qualified immunity.

## STATEMENT OF FACTS

### I.    THE ENCOUNTER

On April 4, 2022, Officer Christopher Schurr conducted a lawful traffic stop that escalated, through Patrick Lyoya's accelerating non-compliance, physical resistance, sustained ground struggle, foot pursuit, and ultimate seizure of Officer Schurr's TASER, into a deadly-force encounter. Lyoya gained sole control of the TASER, held it like a firearm, and turned his body toward Officer Schurr in the moment before the single shot was fired. The developed record, including Officer Schurr's testimony, the testimony of the investigating Michigan State Police detectives, the people who trained Ofc. Schurr from the Grand Rapids Police Department, and the technical experts on TASERs, including Axon's own Forensic Manager, and a frame-by-frame review of the video recordings, establishes those propositions affirmatively, and not as one of competing inferences.

3

### A.    The Non-Matching Plate and Subsequent Stop

Just after 8:00 a.m., Officer Schurr was patrolling the "south service area" or southside neighborhood of Grand Rapids, when he encountered a tan Nissan. [Exhibit 1, Schurr Deposition, p. 32, 34] He was driving the same way as the slow-driving Nissan, which was south on Kalamazoo, when he ran the plate as the Nissan turned west; he continued traveling south, waiting for a response about the plate from his in-car computer. [Exhibit 1, Schurr Deposition, p. 34-35; see also Exhibit 2, Map of Area] He ran the plate because it matched the description of a vehicle reported stolen a couple of weeks prior. [Exhibit 1, Schurr Deposition, p. 38-40] He did not see who was in the car. [Exhibit 1, Schurr Deposition, p. 40]

By the time Schurr reached Griggs Street, with the Nissan out of sight, his computer told him that the plate on the Nissan did not match the registered vehicle. [Exhibit 1, Schurr Deposition, p. 35] So he turned on to Griggs to find the vehicle, and the vehicle just happened to be driving south, towards him, on Newark street. [Exhibit 1, Schurr Deposition, p. 35-36; Exhibit 3, Map of Area with Travel Markings] Schurr drove north on Newark, confirmed it was the same car, and turned around to follow it; this is where the cameras begin recording due to a buffer from the time he turned on his lights. [Exhibit 1, Schurr Deposition, p. 36; see also ECF No. 17-3, Dash-Cam at 0:00]

4

Schurr followed the Nissan down Newark, then right on to Griggs, then right on to Nelson. [Exhibit 1, Schurr Deposition, p. 43-44; see also ECF No. 17-3, Dash-Cam at 0:00-0:28] These two right turns were "suspicious" to him because the car was traveling south then north after seeing his police cruiser; in his words it was "evasive." [Exhibit 1, Schurr Deposition, p. 44; Exhibit 4, Schurr Trial Testimony, p. 41, 87-88] Schurr activated his lights and called out the traffic stop over the radio; this allowed him to confirm that his radio was working and signaled to him that his partners could hear him too. [Exhibit 1, Schurr Deposition, p. 46-47] He was trained that calling his stop over the radio was important because, while he could initiate traffic stops by himself, calling a stop out over the radio would cause other officers to automatically head his way since "you never know what could potentially happen." [Exhibit 1, Schurr Deposition, p. 48] He expected someone would show up "to make sure that everything's cool," and he did not need help. [Exhibit 1, Schurr Deposition, p. 49]

Before Schurr could exit his patrol vehicle, Lyoya opened his door and stepped out. [ECF No. 17-2, Dash-Cam at 0:37] Schurr can be heard twice telling Lyoya to "stay in the car" before the door is heard closing on his vehicle, signaling that he exited, before he can be seen walking towards Lyoya. [ECF No. 17-2, Dash-Cam at 0:41-0:46] The dash-cam video shows Schurr approach Lyoya, pointing to the Nissan, and faint commands were captured inside the cruiser, which are better

5

heard on the body-cam. On the body-cam, the first two loud commands to stay in the car are heard, followed quickly by a third command. [ECF No. 17-3, Body-cam at :41] Schurr then commands Lyoya to "get in the car," before Lyoya asks what he did, while disobeying commands and standing outside the Nissan. [*Id.*, at :41]

Officer Schurr identified the reason for the stop, and asked Lyoya—seven separate times—whether he had a driver's license. [*Id.* at 0:50–1:18] Lyoya answered with confusion, repeating "What did I do?" before eventually acknowledging that he did have a license and directing his passenger, Aime Tuyishime, to look for it in the glove compartment. [*Id.* at 1:13–1:42.] Schurr could not see a weapon, but also could not confirm there was no weapon present and he is trained to assume there might be one present. [Exhibit 1, Schurr Deposition, p. 53]

When neither could produce the license, Schurr, based on his experience, sensed that Lyoya did not have a license. [Exhibit 4, Schurr Trial Testimony, p. 54-55] Schurr testified that he was trained to take Lyoya into custody at that point because he did not have a license, which is a misdemeanor. [Exhibit 1, Schurr Deposition, p. 55-56]

After Tuyishime was unable to locate the license, Lyoya closed the driver's door, said "Alright, let me look," and began to walk away around the front of the vehicle. [*Id.* at 1:42–1:46] Officer Schurr told him "nope, nope, nope," and reached for Lyoya's right arm. [*Id.* at 1:44–1:47.] Lyoya did not submit to Officer Schurr's

grasp, instead Lyoya balled his fists, spun towards Schurr and "shove[d]" him away. [Exhibit 4, Schurr Trial Testimony, p. 55-56; see also ECF No. 17-2, Dash-Cam at 1:48–1:51; ECF No. 17-3, Body-cam at 1:48–1:51] To Schurr, this was an act of aggression. [Exhibit 4, Schurr Trial Testimony, p. 55-56]

When questioned about the less-than-ideal circumstances of leaving the passenger unattended, Schurr explained that Lyoya was the concern; he was asked why he did not let Lyoya run given, that he could have controlled the car and passenger if he stayed put, Schurr explained:

> I would have control of the car and the passenger if that -- if that's what I did. What I wouldn't have control over is Patrick, and I don't know what that could have led to. To me, between -- at that time he was the person that I needed to arrest at that time to keep the public safe, which is our main priority of the department. That's what we've been trained to do.

[Exhibit 1, Schurr Deposition, p. 64]

## B.    Lyoya's Flight and the First Ground Struggle

Schurr radioed "got one running," in order to get his backup there faster, which gave Lyoya time to put distance between himself and Schurr. [Exhibit 1, Schurr Deposition, p. 60-61; ECF No. 17-3, Body-cam at 1:54] Schurr acknowledged that running past the still-unknown passenger was not the safest option, and despite his efforts to do things as safe as possible, it happened in "split seconds" that did not give him time to contemplate where they would end up. [Exhibit 1, Schurr Deposition, p. 61] Schurr explained this turn of events: "[t]he reality is it's a quickly

7

evolving situation no matter what you're doing in law enforcement." [Exhibit 1, Schurr Deposition, p. 61]

Within seconds, Officer Schurr caught up to Lyoya in the front yard of a neighboring residence and brought him to the ground. [ECF No. 17-2, Dash-Cam at 1:56–1:57] From there we know the struggle continues, as thoroughly summarized based on the videos at ECF No. 17, PageID.214-224. In short, Lyoya did not stay down. He repeatedly pushed up off the ground, with none of Schurr's strikes or commands having any impact, and he eventually fought back to a standing position. During this struggle, Schurr got on his radio again, for a third time, "because [he] still couldn't hear anyone coming." [Exhibit 1, Schurr Deposition, p. 71]

Once Lyoya was on his feet again, with Schurr holding his arms behind his back, Lyoya pulled them across the lawn. [Exhibit 1, Schurr Deposition, p. 73] To Schurr, Lyoya was trying to get away, Lyoya did not want to be arrested. [Exhibit 1, Schurr Deposition, p. 72-73]

### C.    The TASER Deployment and Lyoya's Seizure and "Complete Control" of the Weapon

At this point, Schurr was "extremely exhausted." [Exhibit 1, Schurr Deposition, p. 76] And because every lower level of force had been "completely ineffective," Schurr knew he needed a "device that would interrupt the muscle function." [Exhibit 1, Schurr Deposition, p. 76] He knew the OC spray would likely hurt him more than Lyoya, and his baton could be used on him, is hard to put away

once out, and was the same as the knee strikes that had been ineffective. [Exhibit 1, Schurr Deposition, p. 78-79] Because the TASER affects everyone and interrupts the muscles, Schurr drew his TASER while facing Lyoya's back. [Exhibit 1, Schurr Deposition, p. 80, 83]

Schurr intended to deploy the TASER to Lyoya's back. [Exhibit 1, Schurr Deposition, p. 83] Schurr deployed it as quickly as he could in an effort "to gain control as quick as [he] could." [Exhibit 1, Schurr Deposition, p. 83] But Lyoya turned on him as he reached for it; then, once he had the TASER, Schurr could see a dot (a laser from the weapon) on Lyoya so he believe the TASER would discharge safely into Lyoya. [Exhibit 1, Schurr Deposition, p. 83] He made sure to avoid the chest, neck, and eyes because he was trained it could "cause death or serious bodily injury." [Exhibit 1, Schurr Deposition, p. 83]

Schurr described what happened next from his perspective, i.e., the struggle over Lyoya trying to take the TASER away from him:

> I recall Patrick grabbing the TASER. I know we ended up struggling over it on the ground. I wasn't really sure what was going on during that time. **I was just trying to get it back so he wouldn't use it on me.** At some point **he was able to get full control of it**, and I don't know how I ended up behind Patrick, but I did. I saw him holding onto the TASER with his -- had it where his fingers were wrapped around it with his thumb was right about in a position where the safety switch would be, and I tried shutting it off but I wasn't able to. I wasn't really able to get a grip on it. And then I felt him begin to turn towards me, and I was worried that he would use it on me, meaning I was worried that either the probes would be used against me or even the device itself be pressed into my neck, eyes, or even groin area, any area that, I mean, we're

9

> trained that could cause serious bodily injury and/or death just by that. We're also trained that if they were to use it, they'd gain access to our firearm, and to prevent that, I pulled my firearm and I deployed it, meaning I fired it to the upper back, head area of Patrick.

[Exhibit 1, Schurr Deposition, p. 84-85] Schurr said Lyoya "had full control of the TASER, meaning that he was holding it like a firearm with his thumb in a position that was blocking the safety switch, the on/off switch." [Exhibit 4, Schurr Trial Testimony, p. 76] Schurr also testified that in the video, he can recognize that Lyoya had control of the TASER. [Exhibit 1, Schurr Deposition, p. 85] Schurr did not know his TASER had deployed a second time, but he knew Lyoya was within arm's length of him, close enough to drive stun before he could get away. [Exhibit 1, Schurr Deposition, p. 85-86, 93; Exhibit 4, Schurr Trial Testimony, p. 76-77]

Michigan State Police ("MSP") Detective Aaron Tubergen, who served as the officer in charge of MSP's investigation from its Special Investigations Section that primarily investigates conflict cases and officer use of force cases, examined the video of the shooting "many times." [Exhibit 5, Tubergen Deposition, p. 5, 28] He was asked by Plaintiff's counsel if anyone measured the distance between the TASER and Lyoya at the time of his death. [Exhibit 5, Tubergen Deposition, p. 63] He explained that scene measurements were taken, but by the time those were taken, Lyoya's body had been moved, so any measurements had to come from the video that captured the shooting. [Exhibit 5, Tubergen Deposition, p. 80-81]

10

From that video, Detective Tubergen was able to see "intermittently" where the TASER was in the moments leading up to Lyoya's death. [Exhibit 5, Tubergen Deposition, p. 81] He saw it in Lyoya's hands, and sometimes he could not see it at all because the view is obstructed. [Exhibit 5, Tubergen Deposition, p. 82-83] When Plaintiff's counsel asked again, if any measurements were taken from the video, Detective Tubergen answered, "I don't believe I recorded any measurements based on the video, but to -- **to note that somebody is touching a TASER would imply that the distance is zero.**" [Exhibit 5, Tubergen Deposition, p. 83] Upon counsel further questioning, he emphasized this point: "I believe he -- I know he's touching it, which, again, if you asked me the distance between two objects and they're touching, I would say zero." [Exhibit 5, Tubergen Deposition, p. 84-85]

Ofc. Schurr was asked why he could not have gotten up, gained some space, and pointed his firearm at Lyoya; Schurr did not believe that was an option at the time under the circumstances. He explained that a "multitude of things" lead him to believe that:

> I mean, I was completely exhausted. I -- and I felt just like I did before. Every time I gave him an ounce of space, he took a mile, if you will. I -- he was able to advance position further every time I gave him every ounce of space. I didn't feel like I could -- with the amount of energy that I had left at that time, I didn't think I could safely get off of him without it resulting in death or serious bodily injury to me.

[Exhibit 1, Schurr Deposition, p. 92]

11

**D.    The Shot**

When Schurr drew his firearm, he gave Lyoya a verbal warning—"Drop the TASER"—as he was trained to do. [Exhibit 1, Schurr Deposition, p. 89-90] Lyoya did not drop the TASER. Instead, he pushed himself up further, turned his body, and brought his arm into a position consistent with rising from the ground. [ECF No. 17-4, Cell Phone Video at 1:52–1:54]

The geometry of the shot is consistent with Officer Schurr's account. The autopsy results demonstrated that Lyoya's head was positioned consistent with him turning. Dr. Stephen Cole, the Kent County Medical Examiner, performed the autopsy and testified that the trajectory of the wound was from "back of the head in the midline…[to] the right side of the head beneath the scalp." [Exhibit 6, Cohle Testimony, p. 235] Essentially, the bullet entered the center back of the head and traveled up and to the right. Dr. Cohle said this was consistent with either the gun being at an angle or **with someone who is turning to the left.** [Exhibit 6, Cohle Testimony, p. 235] Dr. Cohle has also attested that there is no evidence the gun was pressed to the back of Lyoya's head. [Exhibit 7, Cohle Declaration]

Schurr understood, consistent with his Grand Rapids Police Department ("GRPD") training, that an officer who has been disarmed of his TASER is at imminent risk of being incapacitated and then disarmed of his service firearm. [Exhibit 1, Schurr Deposition, p. 85] His testimony is buttressed by that of the

12

individuals that oversee training at the Grand Rapids Police Department, the Michigan State Police Investigators that investigated the shooting, and the training from the manufacturer Axon, as well as those who study the device, like Defendant's Expert, Dr. Mark Kroll.

### i.  GRPD's Interpretation of TASER Disarmament Danger

GRPD Captain David Siver, who oversees the training and engagement division for the GRPD, testified that if "somebody disarms the officer of a weapon, that's deadly force." [Exhibit 8, Siver Trial Testimony, Day 2, p. 6] Captain Siver confirmed that the central concern with disarming an officer of their TASER is precisely the concern Officer Schurr identified: incapacitation followed by access to the officer's service firearm. [Exhibit 8, Siver Trial Testimony, Day 2, p. 30] Captain Siver further testified that an officer who has been engaged in a sustained physical struggle and disarmed of his TASER is entitled to use deadly force and is not required to cycle back through the lower-force options that have already failed. [Exhibit 8, Siver Trial Testimony, Day 2, p. 44]

Captain Chad McKersie, the GRPD's Master TASER instructor and the former commander of both the GRPD Training Unit and Internal Affairs Unit, testified to the same proposition. [Exhibit 9, McKersie Trial Testimony, p. 57-58] Captain McKersie confirmed that under the department's training, the TASER is taught as a serious weapon "at all times," and that expressly includes the moments

13

after both cartridges have been deployed. [Exhibit 9, McKersie Trial Testimony, p. 90] Captain McKersie further confirmed, under the GRPD use-of-force training, that the disarming of an officer of his weapon can constitute deadly force under the totality of the circumstances. [Exhibit 9, McKersie Trial Testimony, p. 112]

### ii. *The MSP Investigator's Understanding of TASER Disarmament Danger*

Michigan State Police Investigator Jacquelyn Stasiak, also assigned to the specialized unit of Detective Tubergen that investigated the shooting, said that, based on everything she saw in the investigation, Schurr did what he and "every single one of us [law enforcement officers] are – were trained to do…We were all trained that if somebody takes your TASER away from you, that they could use it on you and that would be considered deadly force." [Exhibit 10, Stasiak Deposition, p. 29]. While Investigator Tubergen testified that,

> Michigan recognizes that TASERs are dangerous weapons and possession of one without the proper licensing and training is a felony. To use one could be considered assault with a dangerous weapon. And through our training specifically with a TASER, we know that it can cause serious injury or death, which, again, is explicitly -- I can picture a slide on the PowerPoint that we see every year at our defensive tactics training.

[Exhibit 5, Tubergen Deposition, p. 41-42]

14

### iii. *The Manufacturer's Understanding of TASER Disarmament Danger*

Bryan Chiles is the senior manager of Axon Forensics for Axon Enterprise, which manufactures the TASER. [Exhibit 11, Chiles Report, p. 2] He confirmed that the TASER 7, the model used by Schurr, is capable of causing serious bodily injury and death, and such point is stressed to officers during training. [Exhibit 9, Chiles Report, p. 14] He opined that:

> When the TASER 7 is accessed or utilized by an untrained individual, or by a person intending to inflict harm, the probability of hazardous or lethal outcomes increases. Improper use may include deployment under unsafe environmental conditions, targeting of high-vulnerability anatomical zones, or intentional incapacitation of an individual to assault them or prevent them from being able to defend themselves or their equipment. Such misuse can result in serious injury or death.

[Exhibit 11, Chiles Report, p. 15] Mr. Chiles concluded that Schurr faced danger of serious injury or death from his own TASER both after the first cartridge was deployed and, critically, after the second cartridge was deployed.

After the deployment of the first cartridge, Schurr was in danger of serious injury or death when Lyoya attempted to gain control of the TASER due to potential contact (direct, arcing, or through water) with cartridge 1's probes or wires, a drive-stun, or the deployment of cartridge 2 toward him. [Exhibit 11, Chiles Report, p. 55] That same danger remained after the deployment of the second cartridge. [Exhibit 11, Chiles Report, p. 55] Mr. Chiles further opined that, even after both cartridges of the TASER had been spent, Schurr was in danger of serious bodily injury if Lyoya

15

were able to activate the weapon while applying it to a "sensitive area of Officer Schurr's body (i.e., eyes, head, throat, groin)." [Exhibit 11, Chiles Report, p. 27] The manufacturer's analysis is therefore congruent with what Officer Schurr was trained to recognize: in Lyoya's hand, the weapon remained capable of incapacitating him and capable of causing serious injury or death.

### iv. *The Scientific Community's Understanding of TASER Disarmament Danger*

Dr. Mark Kroll[1] analyzed the record in this case from the perspective of the biomedical scientific community. [Exhibit 12, Kroll Report, pp. 3–5] Drawing on the published scientific literature, Dr. Kroll opined that even after both cartridges had been deployed and no functioning probes remained, the TASER could still be used to control Schurr: by drive-stun in conjunction with a connected probe, causing muscle lockup; by drive-stun alone, causing pain focused enough to allow an adversary to take the officer's firearm; and by drive-stun to a nerve area such as the carotid baroreceptors, which could "cause the blood pressure to be reduced enough to cause fainting and loss of control." [Exhibit 12, Kroll Expert Report, p. 9]

---

[1] Dr. Kroll holds a Ph.D. in electrical engineering from the University of Minnesota, who served on Axon Enterprise, Inc.'s corporate board and on its Scientific and Medical Advisory Board for twenty-one years from 2003 to 2024, who has authored or co-authored approximately one hundred peer-reviewed papers, books, and book chapters on conducted electrical weapons, and who holds the "Fellow" designation in the American College of Cardiology, the Heart Rhythm Society, the IEEE Engineering in Medicine and Biology Society, and the American Institute for Medical and Biological Engineering.

16

From Schurr himself, to those who trained him on how to be a police officer, to the Michigan State Police investigators who examined the incident, to the manufacturer of the weapon, to the biomedical scientific community, the conclusion is uniform: an officer who has lost control of his TASER to an actively resisting subject faces an imminent risk of incapacitation and disarmament of his service firearm, and is reasonable in responding with deadly force.

## II. THE DAMAGES - DORCAS LYOYA IS NOT PATRICK LYOYA'S MOTHER FOR DAMAGES PURPOSES

Plaintiff plead that he is seeking damages under Michigan's Wrongful Death Act, MCL 600.2922. [ECF No. 2, PageID.26, ¶d] Plaintiff is seeking, among other things, "loss of [Lyoya's] financial support; loss of services; loss of gifts or other valuable gratuities society; [sic] and companionship." [ECF No. 2, PageID.26, ¶d] In Initial Disclosures and Answers to Interrogatories, Plaintiff represented that Lyoya's Mother was Sami Bora Dorcas, also listed as Dorcas Lyoya, and she will provide information about damages. [Exhibit 13, Initial Disclosures, p. 2; Exhibit 14, ATI, p. 4] Sami Dorcas was deposed and offered testimony about the support and gifts Lyoya used to provide her, as well as her relationship with him and his death's impact on her.

It was not until the deposition of Lyoya's friends that Defendant learned Dorcas is not *actually* Lyoya's mother. She is his step-mother and he lived with her from the age of about 6 or 7 onward until he moved out in 2015 or 2016, following

17

their immigration here in 2014. [Exhibit 15, Thomas Deposition, p. 9; Exhibit 16, Dorcas Deposition, p. 5] Dorcas is not even currently with Lyoya's father, the Plaintiff Peter Lyoya, having separated from him in 2019. [Exhibit 16, Dorcas Deposition, p. 9] After the revealing depositions, Defendant served Requests for Admissions. Plaintiff admitted that Dorcas is not biologically related to Lyoya and she never legally adopted him. [Exhibit 17, Admissions]

## STANDARDS OF REVIEW

### I.    SUMMARY JUDGMENT

Summary judgment is proper when the evidence, viewed in the light most favorable to the non-movant, reveals no genuine issue of material fact and establishes the movant's entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the nonexistence of genuine issues of material fact. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Once the movant satisfies this burden, the burden shifts to the non-movant to show more than "some metaphysical doubt as to the material facts." *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.*

When qualified immunity is raised as a defense, the court reviewing a motion for summary judgment must consider "only the facts that were knowable to the defendant officer[]." *White v. Pauly*, 580 U.S. 73, 77 (2017).

18

## II.    QUALIFIED IMMUNITY

Qualified immunity protects government officials from civil liability to the extent that their conduct does not violate clearly established statutory or constitutional rights. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012). There are two parts to a qualified immunity analysis: (1) whether a constitutional right was violated, and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194 (2001); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A plaintiff bears the burden of demonstrating an officer is not entitled to immunity once the defense is raised. *Livermore v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

Officer Schurr now re-raises the defense of immunity, asserting that he is entitled to it under both parts of the analysis, i.e., that he committed no constitutional violation and that the law governing his response to Lyoya being in full possession of his TASER did not tell every reasonable officer in his position that deadly force was unreasonable. The evidence in this case, as explored below, establishes why Plaintiff cannot prove otherwise.

19

## LAW AND ARGUMENT

I.  **OFFICER SCHURR IS ENTITLED TO QUALIFIED IMMUNITY ON COUNT I BECAUSE HIS USE OF DEADLY FORCE WAS OBJECTIVELY REASONABLE.**

A.  **The *Graham/Garner* Deadly Force Framework**

Fourth Amendment excessive-force claims are analyzed under an objective-reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The Court considers the totality of the circumstances confronting the officer, with particular attention to the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id*. at 396. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the standard makes "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97.

When deadly force is involved, the analysis requires an evaluation of the "whether the suspect presented an immediate danger to the officers or others." *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020) (citing *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015)). When applying this analysis, the Sixth Circuit holds that "[d]eadly force is objectively reasonable when an officer 'has probable cause to believe that the suspect poses a significant threat of death or serious physical injury

20

to the officer or others.'" *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).

The Sixth Circuit has applied this principle to scenarios directly instructive here, particularly weapon-control encounters arising from officer-suspect physical struggles. Defendant briefed these authorities at length in his motion to dismiss and incorporates them herein. See ECF No. 17, PageID.230-48. Cases such as *Mullins v. Cyranek*, 805 F.3d 760, 765–67 (6th Cir. 2015), *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007), and *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017), are illustrative of what the Courts have told officers about deadly force scenarios. *See also Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017), reh'g denied (Aug. 3, 2017) (holding deadly force reasonable against unarmed suspect who disobeyed commands to drop and rapidly advanced in threatening manner); *Rush v. City of Lansing*, 644 F. App'x 415, 417 (6th Cir. 2016) (holding deadly force reasonable where officer fired two rapid shots at knife-wielding suspect because the speed of the encounter left no time to reassess the threat); *Chappell v. City Of Cleveland*, 585 F.3d 901 (6th Cir. 2009) (holding deadly force reasonable against suspect who advanced toward officers from five to seven feet with a raised knife and refused commands to drop it); *Rhodes v. McDannel*, 945 F.2d 117 (6th Cir. 1991) (holding deadly force reasonable against knife-wielding

21

suspect who ignored commands to drop the weapon and advanced to within four to six feet of the officer).

>  i.  *Mullins instructs courts not to second-guess split-second decisions made in the face of serious threats with the benefit of hindsight*

In *Mullins*, a police officer was sued for excessive force after firing two shots and fatally wounding sixteen-year-old Davon Mullins during a stop and frisk. 805 F.3d at 762-63. The officer, Cyranek, was providing security outside of a family reunion when he was told that young African American males were throwing guns over a fence to people inside the reunion. *Id.* at 763. Cyranek and other officers approached the men but the men took off running. *Id.* Cyranek was then moved to a different area to provide security. *Id.* At this new location, Cyranek spotted two of the runners with a third, Mullins, who he did not recognize. *Id.*

Cyranek believed Mullins had a weapon based on his movements and body positioning. *Id.* Cyranek came across Mullins while walking and ordered him to stop. *Id.* Mullins complied and Cyranek grabbed his wrists to prevent him from grabbing a weapon, fighting, or running away. *Id.* Cyranek testified that Mullins resisted, so he pushed him into a corner, but the only witness, Mullins' friend Ricardo Sims, said Cyranek started the tussle. *Id.* Security footage showed Cyranek push Mullins to the ground and end up behind him. *Id.* Cyranek checked Mullins' pants pocket and Mullins told him he had not done anything. *Id.* Cyranek was holding Mullins on the ground when Mullins yelled to Sims; Sims walked over and asked Cyranek what

22

was happening. *Id.* Cyranek told Sims to step away. *Id.* Cyranek then "saw that Mullins had a weapon in his right hand with the finger on the trigger. …Cyranek told Mullins to drop the gun and, in response, Mullins threw it over Cyranek's left shoulder." *Id.* Cyranek stood up quickly and fired two shots. *Id.*

The video footage showed that "at most, five seconds elapsed between when Mullins threw his firearm and when Cyranek fired his final shot." *Id.* at 764. The footage was not precise enough to show exactly when the shots were fired and the Court based its timing on when bullet casings could be seen, which it noted was not conclusive nor precise. *Id.* Cyranek then retrieved the thrown gun, placed it by Mullins' feet, and handcuffed Mullins. *Id.* Mullins was taken to a hospital where he was pronounced dead. *Id.* The autopsy revealed that Mullins "was shot in the back of his left shoulder." *Id.*

To evaluate whether Cyranek acted reasonably, the Sixth Circuit evaluated the totality of the circumstances, using the "non-exhaustive" list of Graham factors. *Id.* at 765-66. The Court held that two factors weighed in favor of Cyranek: severity of the crime and resistance. *Id.* at 766. The "severity-of-the-crime" weighed in Cyranek's favor because the "removal of a handgun in Cyranek's presence without Cyranek's permission constituted a much more serious offense" than the initial misdemeanor of possessing a firearm without a permit. *Id.* As to the resistance,

23

Cyranek struggled with Mullins for well over one minute and then Mullins produced a firearm. *Id*.

The "crux" of the issue was whether Cyranek reasonably believed "Mullins posed a significant threat at the time Mullins was shot." *Id*. Cyranek conceded that he fired after Mullins had thrown the gun. *Id*. He argued that because the events unfolded so quickly, "he did not have a chance to realize that a potentially dangerous situation had evolved into a safe one." *Id*. The Court wrote that quickly unfolding events, alone, do not automatically justify deadly force; but qualified immunity does shield officers who are forced to "make split-second decisions in the face of serious physical threats to themselves and others." *Id*. The Court noted its previous holding, in *Untalan v. City of Lorain*, 430 F.3d 312 (6th Cir. 2005), that officers may use deadly force within a few seconds of "reasonably perceiving a sufficient danger… even if in hindsight the facts show that the persons threatened could have escaped unharmed." *Id*. (quoting *Untalan*, 430 F.3d at 315-16).

The Court concluded that both of Cyranek's shots were reasonable. *Id*. at 769. This was based on a finding that no "jury could conclude that [Cyranek] was not in any danger in the first place." *Id*. at 767.  The Court cautioned,

> While Cyranek's decision to shoot Mullins after he threw his weapon may appear unreasonable in the sanitized world of our imagination, Cyranek was faced with a rapidly escalating situation, and his decision to use deadly force in the face of a severe threat to himself and the public was reasonable.

24

*Id.* (internal quotations and citations omitted).

> *ii. Livermore* instructs that the totality of the circumstances, not just where a weapon is pointed, govern the use of deadly force

In *Livermore,* the Sixth Circuit said it did not matter whether the suspect aimed his rifle at an officer because the totality of the circumstances indicated the **suspect was violent**, **intent on evading arrest**, and **an officer was exposed to his potential violence**. *Livermore*, 476 F.3d at 404-05. The Court summarized how the suspect contributed to a standoff with officers that led to his co-conspirator's death, had set fire to buildings, was present when his co-conspirator shot at officers, had wired his home with explosives, was in close proximity to a vulnerable officer, and "rather than surrender as agreed upon—he exited his burning residence armed with a rifle." *Id.* at 404-05. Under the totality of these circumstances, the Court found the use of deadly force was reasonable regardless of where the weapon was pointed. *Id.* at 405.

> *iii. Thomas* emphasizes that if the totality of the circumstances known to the officer dictates whether deadly force is reasonable

In *Thomas*, an officer responded to a reported burglary and saw two men running towards him from the reported apartment, one holding a gun. *Thomas*, 854 F.3d at 363. The officer, without determining who the men were, or seeing anything else, shot and killed the man holding the gun, who was getting closer and approximately ten feet away. *Id.* It turned out that the man killed was actually the

victim of the crime who had wrestled the gun away from the burglar; but still the Sixth Circuit said the officer's use of deadly force was reasonable. The Court relied on the following factors in reaching that determination: the officer "responded to a dangerous call in a high-crime area," the **officer was alone**, and the **suspects were in close proximity** having quickly closed a 40-foot separation to 10 feet. *Id.* at 365-66. The Court stated that "[a]t this range, a suspect could raise and fire a gun with little or no time for an officer to react;" therefore, the use of deadly force was reasonable. *Id.* at 366.

**B.      Each *Graham* Factor Favors Officer Schurr on the Developed Record**

   i.  *Factor 1: Lyoya committed at least three crimes of increasing severity, including possessing a dangerous weapon while resisting and obstructing an officer*

First, as to the severity of the crime. Officer Schurr had probable cause to believe Patrick Lyoya had committed two offenses at the outset of the encounter and a third within the first two minutes of it. The vehicle Lyoya was driving displayed a license plate that did not belong to it. Lyoya did not produce a driver's license when asked seven times, a misdemeanor. When Officer Schurr reached for Lyoya's arm to effect that arrest, Lyoya balled his fists, spun, shoved Officer Schurr, ran, and then resisted Officer Schurr's efforts to control him, conduct constituting resisting and obstructing a police officer, a felony under Mich. Comp. Laws § 750.81d. This Court found at the pleading stage that the first *Graham* factor was neutral on the offenses

26

then alleged. ECF No. 39, PageID.652. The developed record demonstrates why that conclusion should change. The severity of Lyoya's resisting and obstructing was high: he did not just refuse to comply, he actively fought against and took control of the TASER. As Detective Tubergen noted, a TASER is a dangerous weapon in Michigan, so not only did Lyoya resist, but he did so with a dangerous weapon. This factor weighs in Schurr's favor.

> ii. *Factor 2: Lyoya's exclusive control of the TASER and close proximity to Schurr posed an immediate threat and all officers in Michigan are trained that way*

As to the second factor, whether the suspect posed an immediate threat to the safety of the officer, this factor also now weighs in favor of Schurr. At the moment Schurr discharged his firearm, Lyoya was in sole physical possession of Schurr's TASER, with his fingers wrapped around the grip like a firearm, and his thumb blocking the safety switch. It should be noted that Lyoya had moved the TASER from his left hand that first grabbed it in the video, to his right hand. The cell-phone recording, the body-worn camera recording, and Officer Schurr's contemporaneous account all corroborate the same fact. The Michigan State Police lead investigator confirmed, after watching the recording "many times," that the TASER was in Lyoya's hand in the moments before his death— the only meaningful distance that could be measured from the video, he testified, is "zero," because Lyoya was touching the device. [Exhibit 5, Tubergen Deposition, pp. 81–85]

27

In the seconds preceding the shot, Lyoya was not subdued. He was pushing himself up off the ground, with Officer Schurr on his back; his legs had shifted from a face-down to a side-facing position; and he was beginning to turn his body toward Officer Schurr. [Exhibit 18, McFarlane Screenshot] Officer Schurr was exhausted, the lower-force options he had attempted (verbal commands, soft-hand controls, a tackle, head strikes, and knee strikes) had been ineffective, and he could not, on the developed record, safely disengage without creating the very risk he was attempting to defeat: the use of the TASER against him to incapacitate him and access his service firearm. [Exhibit 1, Schurr Deposition, pp. 76, 91–92]

The danger Officer Schurr perceived in that moment is corroborated by every relevant source: by the Grand Rapids Police Department's master TASER instructor and use-of-force training command, by the two Michigan State Police investigators who examined the encounter, by the manufacturer's forensic analysis of the TASER 7 device itself, and by the published biomedical scientific community. On the developed record, a reasonable officer in Officer Schurr's position had probable cause to believe that Patrick Lyoya posed a threat of serious physical harm; this factor weighs in Schurr's favor.

 iii. _Factor 3: Lyoya never complied with commands, fled, and never stopped actively resisting_

As to the third factor, resistance and flight, this factor must weigh in Schurr's favor. This factor is unrebutted on the developed record. Lyoya broke free of Officer

28

Schurr's grasp, ran, was tackled to the ground, refused to submit to repeated verbal commands, broke holds, pushed up off the ground, regained his feet, and continued to physically resist for the entire encounter.

### C.    The Case Law Supports the Conclusion that Deadly Force was Reasonable Under Graham as Well

The *Graham* factors are not exclusive, and the Sixth Circuit's analysis in the above discussed cases demonstrate as much. Based on those cases, and the circumstances considered there, Schurr's use of deadly force falls squarely within the constitutional bounds the Sixth Circuit has previously drawn. Like Officer Cyranek in *Mullins*, Schurr faced a rapidly escalating situation and he perceived a severe threat to himself. Like the *Livermore* officer, Schurr faced a suspect that was intent on evading arrest and he was now exposed, in the closest proximity, to Lyoya's possession of a dangerous weapon. And like in *Thomas*, Schurr was alone with an armed suspect in dangerously close proximity. As Schurr explained, it does not take long to turn to him with the TASER; he did not even have time to back away safely. Thus, this Court should hold that Schurr's use of deadly force was constitutional, and grant him qualified immunity under prong one of the analysis.

29

## II.   EVEN IF A CONSTITUTIONAL VIOLATION COULD BE FOUND, THE RIGHT AT ISSUE WAS NOT CLEARLY ESTABLISHED AS OF APRIL 4, 2022

### A.   The Clearly-Established Inquiry Requires Particularized Pre-existing Authority

A right is clearly established if it was "so clear that *every* reasonable officer…would have recognized that the force used was excessive—and not just in the abstract but in the *precise* situation [the officer] was facing." *Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020). The Sixth Circuit recently provided a clear summary of the Supreme Court's recent clarifications of this prong's requirements:

> Except in an obvious circumstance, it's not enough for a plaintiff to offer cases that merely stand for the general proposition that the Fourth Amendment bars the use of excessive force. Instead, when it comes to excessive force, the [Supreme] Court has repeatedly told us that specific cases are especially important. **The unlawfulness of the officer's acts must be so well defined that no reasonable officer would doubt it.**
>
> In addition, a plaintiff cannot point to unpublished decisions to meet this burden. Basic logic tells us at least this much. After all, the qualified-immunity inquiry looks at whether a right has been clearly established. For a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. Yet how can an unpublished case place a question beyond debate when it doesn't even bind a future panel of this court? It can't. So at a minimum, [the plaintiff] must provide on-point caselaw that would bind a panel of this court.

*Bell v. City of Southfield, Michigan*, 37 F.4th 362, 367–68 (6th Cir. 2022) (cleaned up with quotes from *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5-6 (2021) (per curiam), *City of Tahlequah v. Bond*, 595 U.S. 9, 12-13 (2021) (per curiam); *Kisela*

*v. Hughes*, 584 U.S. 100, 104-105 (2018), and other citations omitted) (emphasis added). Defendant further directs the Court to the discussion of the clearly established principles found in his original motion, ECF No. 17 at PageID.252-258, which clearly lays out just how specifically the United State Supreme Court has required pre-existing cases to outline the contours of a right before declaring the law clearly established. *See* ECF No. 17, PageID.252-258 *discussing City and County of San Francisco v. Sheehan,* 575 U.S. 600, 602 (2015); *Kisela*, 584 U.S. 100; *Bond*, 595 U.S. 9; and *Rivas-Villegas*, 595 U.S. 1.

> **B.    No Case, as of April 4, 2022, Placed Beyond Debate That an Officer Could Not Use Deadly Force Against  a Suspect Who Had Obtained Sole Control of the Officer's TASER During an Ongoing Physical Struggle**

The right at issue, defined at the specificity required, is the right not to be shot when, after a sustained physical struggle, the suspect has obtained sole control of the officer's TASER, is holding it like a firearm, and is turning his body toward the officer. No Supreme Court decision and no Sixth Circuit decision held, as of April 4, 2022, that such a use of force violated the Fourth Amendment. The closest Sixth Circuit authority pointed in the other direction: the Sixth Circuit recognizes that a suspect's effort to gain control of a weapon during a physical struggle authorizes the officer's use of deadly force.

31

Plaintiff cannot point to any authority that placed Officer Schurr on notice that the use of deadly force in these specific circumstances would be unconstitutional, and the burden on the clearly-established prong is Plaintiff's to carry.

**III.  OFFICER SCHURR IS ENTITLED TO MICHIGAN GOVERNMENTAL IMMUNITY ON COUNT III BECAUSE HIS CONDUCT WAS NOT GROSSLY NEGLIGENT OR WILLFUL AND WANTON WITHIN THE MEANING OF MICH. COMP LAWS § 691.1407**

Michigan law provides various forms of immunity to government actors. For intentional torts, case law provides qualified immunity for objectively reasonable conduct undertaken without malice. For tort liability, the statute provides immunity for everything but grossly negligent conduct. Officer Schurr is entitled to both forms of immunity, and Count III—Plaintiff's claim for gross negligence and willful and wanton misconduct—must be dismissed.

**A.      Willful and Wanton Misconduct is an Intentional Tort that is Barred Because Schurr's Conduct was Reasonable**

Willful and wanton misconduct is not a heightened form of negligence under Michigan law; it is intentional-tort-equivalent. The Michigan Supreme Court in *Jennings v. Southwood* expressly rejected the view that willful and wanton conduct is "a high degree of carelessness." *Jennings v. Southwood*, 521 N.W.2d 230, 236-37 (Mich. 1994). Such conduct is "in the same class as an intentional wrong" *Boumelhem v. Bic Corp.*, 535 N.W.2d 574, 579 (Mich. Ct. App. 1995). "[W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to

32

harm *or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." Jennings*, 521 N.W.2d at 237 (*quoting Burnett v. City of Adrian,* 326 N.W.2d 810, 812 (1982) (emphasis added)).

Because the willful-and-wanton component of Count III sounds in intentional-tort territory, the analysis is governed not by Section 1407's gross-negligence carve-out but by the qualified-immunity framework that Michigan applies to intentional torts.

### 1. Qualified immunity under Michigan law provides protection of police officers acting reasonably and in good faith

Michigan law provides governmental employees with qualified immunity from intentional torts. Mich. Comp. Laws § 691.1407(2)(c), (3); *Odom v. Wayne Cty.*, 760 N.W.2d 217, 219 (Mich. 2008); *Ross v. Consumers Power Co.*, 363 N.W.2d 641 (Mich. 1984). A governmental employee is entitled to qualified immunity if:

1. the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority,
2. the acts were undertaken in good faith, and
3. the acts were discretionary rather than ministerial, in nature.

*Odom*, 760 N.W.2d at 228.

The "good faith" element is subjective in nature. *Id*. at 229. "It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id*. A lack of good

33

faith is defined as "malicious intent, capricious action or corrupt conduct or willful and corrupt misconduct. *Id*. at 224-25. For example, a police officer would be entitled to immunity if he acted in good faith and honestly believed that he had reasonable suspicion to detain a suspect, even if he later learned that he was mistaken. *Id*.

For the challenged act to satisfy the "discretionary" element, it must be the product of personal deliberation, judgment, and decision. *Id*. at 226. An officer uses his judgment to determine whether there is reasonable suspicion to investigate or probable cause to arrest. *Id*. This also applies to use of force decisions. *Id*. These determinations are, therefore, protected by immunity. *Id*. An officer's determination as to how to proceed in any given situation is likewise protected by immunity:

> A police officer's determination regarding the type of action to take, whether an immediate arrest, the pursuit of a suspect, or the need to wait for backup assistance, constitutes discretionary action entitled to immunity. . . . A police officer's decisions regarding how to respond to a citizen, how to safely defuse a situation, and how to effectuate the lawful arrest of a citizen who resists are also clearly discretionary.

*Norris v. Lincoln Park* 808 N.W.2d 578, 582 (Mich. Ct. App. 2011).

Michigan law acknowledges and accepts that police officers "may find it necessary – and are permitted – to act in ways that would, under different circumstances, subject them to liability for an intentional tort." *VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004), *abrogated on other*

34

*grounds by Odom v. Wayne Cnty.*, 760 N.W.2d 217 (Mich. 2008). Thus, to hold an officer liable for their intentional conduct, the plaintiff must demonstrate that his conduct was "not justified because [it was] not objectively reasonable under the circumstances." *Id.* at 142 (citing *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984) (holding that "intentional torts are protected by governmental immunity if those actions are justified"), *abrogated on other grounds by Odom v. Wayne Cnty.*, 760 N.W.2d 217 (Mich. 2008).

### 1. Schurr is entitled to qualified because he acted reasonably and in good faith

Officer Schurr is entitled to qualified immunity because his actions were reasonable and he acted in good faith in performing a discretionary act. An analysis of good faith requires the Court to evaluate the subjective belief of the officer as to whether he was acting properly. *Latits v. Phillips*, 826 N.W.2d 190, 195 (Mich. Ct. App. 2012). This is done by looking at the statements and conduct of the officer. *Id*. In *Latits*, the court rejected the plaintiff's argument that unreasonable force showed malice. *Id*. The court held that the plaintiff had failed to present evidence of malice, and the only evidence showed that the actions were in good faith. *Id*. That evidence included the officer's statement that he fired his weapon to protect himself and those around him and that he was aware the plaintiff had previously threatened the safety of officers. *Id*. The police reports and testimony of other officers also supported the

35

reasonableness of his belief. *Id*. The defendant was entitled to qualified immunity. *Id*.

The evidence in this case is similar to that in *Latits*. Schurr testified that he feared serious bodily injury or death because Lyoya had taken his TASER, was holding it like a firearm with his thumb on the safety, was within arm's length of him, and was beginning to rise and turn toward him; Schurr fired a single round to protect himself. Schurr was aware that Lyoya had been actively resisting his lawful arrest for over two minutes, had broken free of his grasp, had run from him, had fought back to a standing position after being taken to the ground, and had refused repeated verbal warnings to let go of the TASER. The reasonableness of his belief is corroborated by the Michigan State Police investigators who examined the encounter, by the Grand Rapids Police Department's training command and master TASER instructor, and by the manufacturer's forensic analysis of the TASER 7. As discussed above in Argument I, under these circumstances Schurr's use of force was reasonable, and there is no evidence it was done with malicious intent, capricious action, corrupt conduct, or willful and corrupt misconduct. He is entitled to qualified immunity, under Michigan law, on Plaintiff's willful-and-wanton-misconduct allegation in Count III.

To the extent any court would instead treat willful and wanton misconduct as a heightened-culpability variant under Mich. Comp. Laws § 691.1407 rather than as

36

intentional-tort-equivalent under *Jennings*, the same developed record forecloses the theory under that framework as well. Schurr did not act with "intent to harm" or with "indifference to whether harm will result." *Jennings*, 521 N.W.2d at 236 (*quoting Burnett,* 326 N.W.2d at 812. He acted to defend himself against a deadly-force threat after every lower-force option had failed, while adhering to his training at every decision point. The willful-and-wanton theory fails under either framework.

### B. Plaintiff's Gross Negligence Claim is Improperly Plead and Not Supported by the Evidence

#### i. *Plaintiff Cannot Transform the Intentional Conduct into a Claim of Gross Negligence*

Michigan courts reject a plaintiff's attempt to transform elements of an intentional tort into a claim of gross negligence. *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004). In *VanVorous*, the court found that a gross-negligence cause of action was fully premised on a claim of excessive force and therefore was an intentional tort, not a gross-negligence cause of action. *Id*. The court relied on previous Michigan Court of Appeals holdings which found that there is no tort of assault and battery by gross negligence. *Id*. (*citing Sudul v. City of Hamtramck*, 562 N.W.2d 478 (Mich. Ct. App. 1997)); *see also Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011). Plaintiff's allegations of gross-negligence are all based upon the intentional actions Schurr took during the stop to seize Lyoya. Excessive force is in substance an intentional tort. The intentional actions cannot be

37

transformed into a gross-negligence cause of action. *Id*. Dismissal of this claim is required as a matter of law.

### ii. *Schurr's Conduct Did Not Amount to Gross Negligence*

By statute, government actors are immune from tort liability when the officer is acting or reasonably believes he is acting within the scope of his authority; the governmental agency is engaged in the exercise or discharge of a governmental function; and the officer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. Mich. Comp. Laws § 691.1407(2). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8)(a).

When evaluating whether an officer acted in a grossly negligent manner, the officer's actions themselves, and not the resulting consequences, must be the focus of the evaluation. *Maiden v. Rozwood*, 597 N.W.2d 817, n. 10 (Mich. 1999). Similarly, "alleging that an actor could have done more is insufficient [to show gross negligence] under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Tarlea v. Crabtree*, 687 N.W.2d 333, 339 (Mich. Ct. App. 2004). To support a claim of gross negligence, a plaintiff must show "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Dougherty v. City of Detroit*, 986 N.W.2d 467, 475 (Mich. Ct. App. 2021) (citation

38

omitted). "It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea*, 687 N.W.2d at 339-40.

Michigan courts have examined whether an officer's conduct will rise to the level of gross negligence. In *Ruedger v. Bruyneel*, No. 243832, 2004 WL 316450, at *1 (Mich. Ct. App. Feb. 19, 2004), the court held that it was not grossly negligent for officers to push the plaintiff where the evidence showed he had charged at the officers. The court held that the conduct was not grossly negligent "in light of plaintiff's threatening and dangerous conduct," and affirmed dismissal. *Id*. Similarly, in *Gully v. City of Southfield*, No. 223080, 2001 WL 1422171, at *1 (Mich. Ct. App. Nov. 13, 2001), the court held that an officer twisting a plaintiff's arm behind his back and trying to throw him to the concrete was not grossly negligent under the circumstances. Those circumstances identified by the court included "a highly charged incident" where several of the plaintiff's family members were around and siding with the plaintiff. *Id*. The court stated that "[a]t most, the alleged actions . . . involved poor judgment." *Id*. The actions did not amount to gross negligence.

Plaintiff alleges Officer Schurr was grossly negligent because he fired a single shot at Lyoya after Lyoya had taken sole control of Schurr's TASER, was holding it like a firearm, and was rising and turning his body toward him at the end of a sustained physical struggle. Officer Schurr was facing a serious and dangerous threat

39

to himself, including a reasonable fear of imminent incapacitation by his own TASER and a follow-on disarmament of his service firearm, and he acted in self-defense. This conduct does not rise to the level of gross negligence. This claim should be dismissed accordingly.

**IV. PLAINTIFF'S DAMAGES AND STANDING ARE INDEPENDENTLY LIMITED UNDER THE MICHIGAN WRONGFUL DEATH ACT BECAUSE DORCAS LYOYA DOES NOT QUALIFY AS A "PARENT" UNDER MCL § 600.2922(3)**

The Michigan Wrongful Death Act enumerates the persons who may recover under the act. Mich. Comp. Laws § 600.2922(3). The Act specifically states that the people who may recover are "limited" to the listed individuals. *Id.* Eligible beneficiaries include the deceased's "parents," together with the categories of relatives and inheritors specifically identified in the statute. *Id.* The statute does not extend recovery to stepparents or to functional parents who lack a biological or legal parental relationship absent a formal adoption.

The Michigan Supreme Court recently confirmed the limited and exact reading of the Wrongful Death Act in *Daher v. Prime Healthcare Services-Garden City, LLC*, 29 N.W.3d 136 (Mich. 2025). There, the Court also gave a primer on how it construes statutes: if the language is clear and unambiguous, that is how it will be read; terms are given their ordinary meaning unless they have a special meaning in the law; statutes are read as a whole; and context, and history, matter. *Daher*, 29 N.W.3d at 142. The *Daher* Court held that the list of damages available was

40

exhaustive, such that other related damages items could not be read into it. *Id.* at 150. In short, the Court read the statute to allow only exactly what it said, and nothing more.

The 'parent' provision should be read the same way. Only parents, under its ordinary meaning, should be permitted to recover under the Wrongful Death Act. Because Plaintiff has admitted that Dorcas Lyoya is not Patrick Lyoya's biological mother and never legally adopted him, she is not a "parent" within the meaning of MCL § 600.2922(3). Any claims for damages Plaintiff has pled on her behalf should be dismissed and/or excluded as a matter of law.

## CONCLUSION

For the foregoing reasons, Officer Christopher Schurr respectfully requests that this Court grant his Motion for Summary Judgment, enter judgment in his favor on Count I and Count III with prejudice, hold that Plaintiff's recoverable damages do not include any claim premised on Dorcas Lyoya's purported status as a "parent" under the Michigan Wrongful Death Act, and grant such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

**SEWARD HENDERSON PLLC**

 /s/ Kali M. L. Henderson (P76479)
*Attorneys for Defendant Schurr, only*
210 East 3rd Street, Suite 212
Royal Oak, MI 48067
P: (248) 733-3580
Dated:   May 22, 2026          E: khenderson@sewardhenderson.com


## LCIVR 7.3(b)(ii) CERTIFICATION

I hereby certify that the above brief contains 10, 614 words and was prepared in Microsoft Word 365 which generated the word count as displayed below. This count is in compliance with LCivR 7.3(b)(i), LCivR 7.2(b)(i), as well as the name and version of the word processing software that was used to generate the word count. The word count provided by the word processing software used to create the brief may be relied upon for purposes of the certificate of compliance.

/s/Kali M. L. Henderson
**SEWARD HENDERSON PLLC**


## CERTIFICATE OF SERVICE

I hereby certify that on **Friday, May 22, 2026,** I electronically filed the foregoing document with the Clerk of the Court via the CM/ECF system, which will send notice to all parties and attorneys of record.

/s/Lillian Nelson
**SEWARD HENDERSON PLLC**