# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PETER LYOYA as the
Personal Representative for
THE ESTATE OF PATRICK LYOYA
(deceased),

Case No. 1:22-CV-1160

*Plaintiff*,

Hon. Paul L. Maloney
Mag. Judge Sally J. Berens

v.

CHRISTOPHER SCHURR and
THE CITY OF GRAND RAPIDS,
    *Defendants*.

---

AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
**JOHNSON LAW, PLC.**
Attorneys for Plaintiff
The Buhl Building
535 Griswold, Ste 2600
Detroit, MI 48226
(313) 324.8300
ahatchett@venjohnsonlaw.com
vjohnson@venjohnsonlaw.com

TIMOTHY S. FERRAND (P39583)
**CUMMINGS, McCLOREY, DAVIS& ACHO, PLC.**
Attorney for the City of Grand Rapids
19176 Hall Road, Ste 220
Clinton Twp., MI 48038
(586) 228.5600
tferrand@cmda-law.com


T. JOSEPH SEWARD (P35095)
KALI M. L. HENDERSON (P76479)
**SEWARD HENDERSON, PLLC.**
210 East. 3rd Street, Ste 212
Royal Oak, MI 48067
(248) 733.3580
jseward@sewardhenderson.com
khenderson@sewardhenderson.com

---

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT SCHURR'S MOTION FOR SUMMARY JUDGMENT

Now comes Plaintiff, Peter Lyoya, as personal representative of the Estate of Patrick Lyoya, deceased, by and through his counsel, Johnson Law, PLC, in response to Defendant Christopher Schurr's Motion for Summary Judgment.  For the reasons fully set forth in the brief in support of this response, Plaintiff respectfully requests that this Honorable Court deny Defendant's motion in all regards.  The developed record establishes the existence of numerous genuine issues of material fact which must be resolved by a jury at the time of trial.

Respectfully submitted,

**JOHNSON LAW, PLC**.

By:  */s/ Ayanna D. Hatchett*
     AYANNA D. HATCHETT (P70055)
     VEN R. JOHNSON (P39219)
     CHRISTOPHER P. DESMOND (P71493)
     Counsel for Plaintiff
     Johnson Law, PLC
     535 Griswold Street, Suite 2600
     Detroit, MI 48226
     (313) 324.8300

Dated: June 22, 2026

ii

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PETER LYOYA as the
Personal Representative for
THE ESTATE OF PATRICK LYOYA
(deceased),

     *Plaintiff*,

v.

CHRISTOPHER SCHURR and
THE CITY OF GRAND RAPIDS,
    *Defendants*.

Case No. 1:22-CV-1160

Hon.  Paul L. Maloney
Mag. Judge Sally J. Berens

---

AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
**JOHNSON LAW, PLC.**
Attorneys for Plaintiff
The Buhl Building
535 Griswold, Ste 2600
Detroit, MI  48226
(313) 324.8300
ahatchett@venjohnsonlaw.com
vjohnson@venjohnsonlaw.com

TIMOTHY S. FERRAND (P39583)
**CUMMINGS, McCLOREY, DAVIS& ACHO, PLC.**
Attorney for the City of Grand Rapids
19176 Hall Road, Ste 220
Clinton Twp., MI  48038
(586) 228.5600
tferrand@cmda-law.com

T. JOSEPH SEWARD (P35095)
KALI M. L. HENDERSON (P76479)
**SEWARD HENDERSON, PLLC.**
210 East. 3rd Street, Ste 212
Royal Oak, MI  48067
(248) 733.3580
jseward@sewardhenderson.com
khenderson@sewardhenderson.com

---

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS RESPONSE IN OPPOSITION
TO DEFENDANT SCHURR'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

QUESTIONS PRESENTED...................................................................................ii

INDEX OF AUTHORITIES.................................................................................iii

MOST APPROPRIATE AUTHORITY ................................................................vi

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS .....................................................................................1

STANDARD OF REVIEW ...................................................................................12

ARGUMENT .......................................................................................................13

    I.      Defendant's use of force was excessive and violated
           Patrick Lyoya's clearly established rights under the
           4th Amendment ................................................................................13

    II.     Defendant is not entitled to governmental immunity
           under Michigan state law...............................................................36

    III.    Defendant's argument regarding distribution of proceeds
           is untimely .......................................................................................38

CONCLUSION.....................................................................................................39

## ISSUES PRESENTED

I.    WHETHER DEFENDANT SCHURR IS ENTITLED TO QUALIFIED IMMUNITY RELATIVE TO PLAINTIFF'S CLAIM THAT HE VIOLATED PATRICK LYOYA'S RIGHTS UNDER THE 4th AMENDMENT WHEN HE FATALLY SHOT PATRICK IN THE BACK OF THE HEAD, WITHOUT WARNING.

II.   WHETHER DEFENDANT IS ENTITLED TO GOVERNMENTAL IMMUNITY UNDER MICHIGAN LAW RELATIVE TO PLAINTIFF'S CLAIMS OF GROSS NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT.

III.  WHETHER DEFENDANT CAN OBTAIN A PREEMPTIVE RULING REGARDING THE RIGHTS OF NONPARTIES TO A DISTRIBUTION OF PROCEEDS IN THE EVENT OF PLAINTIFF'S RECOVERY OF DAMAGES.

# INDEX OF AUTHORITIES

*Barnes v Felix,*
*605 U.S. 73 (2025)* ...................................................................... 31

*Bouggess v Mattingly,*
*482 F3d 886 (CA 6, 2007)* ...................................................... *passim*

*Brandenburg v. Cureton,*
*882 F.2d 211 (6th Cir. 1989)* ...................................................... 34

*Brewer v. Perrin,*
*349 N.W.2d 198 (Mich. Ct.App. 1984)* ........................................ 39

*Briggs v Oakland Co,*
*276 Mich App 369 (2007)* ........................................................... 37

*Brosseau v. Haugen,*
*543 U.S. 194 (2004)* ................................................................... 35

*Cahoo v. SAS Analytics Inc,*
*912 F.3d 887 (6th Cir., 2019)* ..................................................... 35

*Cardona v. City of Cleveland,*
*1997 U.S. App. LEXIS 32113 (6th Cir. Nov. 10, 1997)* ............... 23

*Davenport v Causey,*
*521 F3d 544 (CA 6, 2008)* ...................................................... 27-28

*Estate of Kirby v. Duva,*
*530 F.3d 475 (6th Cir. 2008)* ..................................................... 28

*Graham v. Connor,*
*490 U.S. 386 (1989)* .......................................................... 18, 20, 22

*Grawey v. Drury,*
*567 F.3d 302 (6th Cir. 2009)* ..................................................... 13

*Hagans v Franklin Co Sheriff's Office,*
*695 F3d 505 (CA 6, 2012)* .......................................................... 35

*Harlow v. Fitzgerald,*
*457 U.S. 800 (1982)* ................................................................ 13

*Jacobs v Alam,*
*915 F3d 1028 (CA 6, 2019)* ..................................................... 36

*King v. Taylor,*
*694 F.3d 650 (6th Cir. 2012)* .................................................. 36

*Livermore v Lubelan,*
*476 F.3d 397 (2007)* ............................................................. 32-33

*Logan v. Denny's,*
*259 F.3d 558 (6th Cir 2001)* .................................................. 12

*Mullins v Cyranek,*
*805 F.3d 760 (2015)* ............................................................. 30-32

*Murray-Ruhl v Passinault,*
*246 F App'x 338 (CA 6, 2007)* ............................................... 26-27

*Odom v. Wayne County,*
*482 Mich. 459 (Mich. 2008)* ................................................. 37, 39

*Palma v Johns,*
*27 F.4th 419 (CA 6, 2022)* .................................................... 25-26

*Pearson v. Callahan,*
*555 U.S. 223 (2009)* .............................................................. 13

*Sample v. Bailey,*
*409 F.3d 689 (6th Cir. 2005)* ................................................. 20

*Saucier v. Katz,*
*533 U.S. 194 (2001)* .............................................................. 13, 18, 35

*Scott v. Harris,*
*550 U.S. 372 (2007)* .............................................................. 14

iv

*Scozzari v City of Clare,*
*723 F Supp 2d 974 (ED Mich, 2010)* ............................................................. 32

*Scozzari v Miedzianowski,*
*454 F App'x 455 (CA 6, 2012)* ...................................................................... 32

*Shreve v. Jessamine County Fiscal Court,*
*453 F.3d 681 (6ᵗʰ Cir. 2006)* ........................................................................ 35

*Sigley v. Kuhn,*
*2000 U.S. App. LEXIS 1465 (6th Cir. Jan. 31, 2000)* .................................... 23

*Smith v. Cupp,*
*430 F.3d 766 (6th Cir. 2005)* ................................................................... 28, 35

*Sova v. City of Mount Pleasant,*
*142 F.3d 898 (6th Cir. 1998)* ........................................................................ 14

*Tallman v Markstrom,*
*180 Mich App 141 (1989)* ............................................................................. 36

*Tennessee v. Garner,*
*471 U.S. 1 (1985)* ................................................................................. *passim*

*Thomas v City of Columbus,*
*854 F.3d 361 (2017)* ................................................................................. *31-32*

*VanVorous v. Burmeister,*
*262 Mich. App. 467 (2004)* ........................................................................... 37

v

## MOST APPROPRIATE AUTHORITY

*Bouggess v Mattingly*, 482 F3d 886, 896 (CA 6, 2007)

*Graham v. Connor*, 490 U.S. 386, 393-94 (1989)

*Palma v Johns*, 27 F.4th 419 (CA 6, 2022)

*Tennessee v. Garner*, 471 U.S. 1, 7 (1985)

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT SCHURR'S MOTION TO DISMISS**

### INTRODUCTION

Patrick Lyoya ("Patrick") was killed by Defendant Christopher Schurr ("Schurr") on April 4, 2022, during a traffic stop for mismatched plates. Originally, this action was filed on December 7, 2022, against both the City of Grand Rapids and Christopher Schurr. In response to Plaintiff's Amended Complaint, Defendants filed their respective motions to dismiss. This court granted the City of Grand Rapids' motion but denied Schurr's. Ultimately, the Sixth Circuit Court of Appeals dismissed Schurr's appeal for lack of jurisdiction and, three months after, Schurr filed his petition for writ of certiorari, which was denied on April 21, 2025.  Jury selection in Schurr's criminal trial started the next day, April 22nd.  Schurr was charged with murdering Patrick in the second-degree from a traffic stop for mismatch plates that lasted approximately three and half minutes.

### STATEMENT OF FACTS

On April 4, 2022, around 8:00 a.m, Schurr recalled the weather being "cold, wet, rainy, like a rain/snow mix." (Exhibit A, Schurr's Crim Testimony, p. 42) Patrick was driving a 2003 Nissan Altima. His friend, Aime Tuyishme ("Aime") was seated in his front passenger seat.

Schurr was working patrol in a fully marked cruiser when he spotted Patrick

1

and Aime driving slowly through a residential neighborhood, "in the area of Kalamazoo Street and Orville." (Exhibit B, Schurr's Dep, p.33:22-23) Schurr was driving south on Kalamazoo behind Patrick approaching Orville when Schurr decided to run Patick's license plate. (Exhibit A, Schurr's Crim Testimony, p.43) Patrick turned onto Orville. Schurr continued straight on southbound Kalamazoo to enter Patrick's plate into the Secretary of State's (SOS) database in his cruiser. (Exhibit A, Schurr's Crim Testimony, p.43) The database generated a response by the time Schurr had reached Griggs Street, SE, one street south of Orville on Kalamazoo.  (Exhibit B, Schurr's Dep, p.35) The license plate check did not bring up Patrick's Nissan. (Exhibit B, Schurr's Dep, p. 35)   Schurr turned onto Griggs to look for the Nissan.

Shortly thereafter, Schurr drove past Patrick and Aime on Newark. They were headed southbound, in the opposite direction from Schurr. (Exhibit B, Schurr's Dep, p. 36) The cruiser turned around in a driveway to resume following the Nissan. *Id*.

Schurr followed behind the Nissan long enough to watch Patrick make a couple of "suspicious" right turns before he activated his lights. (Exhibit A, Schurr's Crim Testimony, p.87) Patrick had apparently been driving under the posted speed limit of 25 mph through the residential neighborhood. (Exhibit A, Schurr's Crim Testimony, p. 86) Still, Schurr had no suspicion of illegal activity other than a mismatched plate. (Exhibit A, Schurr's Crim Testimony, p.86-87); (Exhibit B,

2

Schurr's Dep, pgs. 44-45) He had never come across Patrick or Aime before that day.

When Patrick turned onto Nelson, Schurr activated his emergency lights and notified dispatch that he was making a traffic stop for mismatched plates with the expectation that one or more of his colleagues would head in his direction. (Exhibit A, Schurr's Crim. Testimony, pgs. 48-50) Patrick immediately pulled over to the nearest available curb. By then, Schurr's body worn and dash cameras had been triggered to start recording.

Aime remained in the front passenger seat, while Patrick--dressed in a green cowl neck sweater, jeans, and flip flops—got out and stood next to Nissan's driver door. (ECF No. 17-2, Dash Cam @ 12:11:46) Having someone exit their vehicle before being directed to, was not an uncommon occurrence for Schurr.  (Exhibit A, Schurr's Crim Testimony, p. 50) Yet Schurr started yelling at Patrick to "stay in the car" from his cruiser and continued yelling until he reached Patrick standing outside of the Nissan looking confused. (ECF No. 17-3, BWC @ 8:11:46)

Patrick mildly asked Schurr to tell him what he had done wrong. Schurr kept repeating that he was "stopping him" and demanded Patrick's driver's license. (ECF No. 17-3, BWC@8:11:56-59) When Schurr finally told Patrick that the license plate did not match his Nissan, Patrick explained that his driver's license was inside his car.  (ECF No. 17-3, BWC @ 8:11:59-8:12:10-19) Schurr directed Patrick to "get it."

3

(ECF No. 17-3, BWC @ 8:12:21)

Patrick opened his driver's door to direct Aime to retrieve his license inside the car as Schurr looked on. (ECF No. 17-3, BWC@ 8:12:26-8:12:48)  Patrick shut his driver's door and began walking away from Schurr, toward the front end of the Nissan. (ECF No. 17-3, BWC @ 8:12:48)

Again, Schurr chose to escalate through the tenor and volume of his action and his voice. He shouted and physically grabbed Patrick by the arm to turn him around. (ECF No. 17-3, BWC @ 8:12:50) Patrick rotated his body away from Schurr and ran off in his flip flops while trying to keep his pants from falling. (ECF No. 17-3, BWC @ 8:12:54-56) Schurr radioed dispatch that they "got one running" (BWC @ 8:12:58) (Exhibit A, Schurr's Crim Testimony, p. 57) The frame below displayed the initial moment Lyoya turned to run away from Schurr into the front yard seen in parked in the background driveway.



Patrick was not running fast. (Exhibit A, Schurr's Crim Testimony, p. 57) Yet, Schurr continued to engage, instinctively chasing Patrick into a front yard to tackle him. (Exhibit B, Schurr's dep, 59:17). Schurr tackled Patrick to the ground at the edge of a driveway with his back to Aime. *Id*. (ECF No. 17-2, Dash Cam @ 12:13:01) Similarly, Schurr had not noticed that a different Black adult male, Wayne Butler ("Mr. Butler"), had appeared on the scene.    (ECF No. 17-2, Dash Cam @12:13:07) Mr. Butler stood just steps away from Schurr wrestling Patrick to the ground. *Id.*   Around the same time, Aime emerged from the Nissan and began recording with his cell phone. (ECF No. 17-2, Dash Cam @12:13:19)

The dashcam captured Schurr repeatedly striking Patrick on the ground with his knees and forearms (ECF No. 17-2, Dash Cam @12:13:16-18) Schurr shouted at

5

Patrick to put his hands behind his back while he shoved the side of his head into the ground. (ECF No. 17-3, BWC @ 8:13:03-13)

Eventually, Schurr raised Patrick up from the wet soggy grass, and began to walk him across the grass, with Patrick's arms pinned behind him. (ECF No. 17-2, Dash Cam @ 12:13:45)  Aime moved in closer with his cell phone.  (ECF No. 17-2, Dash Cam @ 12:14:09-39) Patrick kept trying to get away but Schurr would not let him go. Schurr followed Patrick's steps from behind, tugging on Patrick to constrain his arms, as they moved to the other side of the same yard. The available views show them going from the first driveway of one home toward the edge of another. (ECF No. 17-2, Dash Cam @12:15:07) Along the way, Schurr delivered an additional knee strike into Patrick's low back. *Id*. Schurr kept up his "hands-on" with Patrick, leaving no room between them, not even to pull the Taser from his holster. *Id*. Though the next camera images suddenly show the yellow Taser pointed at Patrick.

Schurr directed his Taser with one hand and used his other hand to yank up the front of Patrick's sweater, revealing Patrick's bare chest and abdomen. (ECF No. 17-3, BWC @ 8:14:11-16). As Schurr deployed his Taser without warning, Patrick reflexively extended his arm out to deflect the direction of the Taser's probes away from him.  *Id*. Each deployment was supposed to eject two probes. Neither probe from the first deployment landed on Patrick. The same was true with

6

the second deployment when Patrick held the Taser's barrel to point down at the ground. Schurr's hand did not leave the trigger side of the Taser even when Patrick lost his flip flops and his footing and stumbled to the ground on his back. Schurr immediately crashed across Patrick's midsection. The barrel end of the Taser followed Patrick's trajectory straight down into the muddy grass at a 90-degree angle. The two continued to struggle with the Taser in the same position where Patrick initially landed on his back.

The available footage of the entanglement between Schurr and Patrick was patchy. Audio from Aime's cell phone captured his verbal interjections from the sidewalk where the camera is angled toward. Meanwhile, the transition is lost from Patrick on his back and both Schurr's and Patrick's hands are in full view on the Taser to when Patrick is on his stomach and Schurr gets on his back. And the images from Schurr's body worn camera were lost in those same moments. Once the cell phone images recenter on Schurr and Patrick, Schurr is on top of Patrick's back and the Taser is out of view.  The palm of Patrick's left hand appeared planted in the grass throughout. Schurr testified that he was reaching with his left arm underneath Patrick for the Taser "in" Patrick's right hand. No one else saw the Taser "in" Patrick's right hand. But Schurr is heard yelling "Let go of the Taser," to which Aime yelled back, "He ain't got no Taser." Just after Schurr initially drew the Taser from his holster, Mr. Butler headed back inside of his house to retrieve his camera phone. So, Mr. Butler missed the last

7

deadly sections of interaction. After Mr. Butler saw the cell phone images of the moments he missed, the images that showed how Patrick was killed, he described it as an execution.

The fatal shot was in the front yard of another Nelson Avenue resident, just a few feet away from where the defendant first drew and deployed his Taser. In the immediate seconds that led up to the fatal shot, Schurr forced his weight on Patrick's back and straddled his legs on either side of Patrick's body. Schurr's left hand was largely out of view.

Eventually, Patrick began to pick himself off the ground again. From the position of a push up, with his elbows bent and both hands in the mud, Patrick pushed up from the ground with Schurr still on his back.  Schurr's left arm appeared again extended out on the ground for balance when he brought his right hand to his gun in the holster. Because Patrick was face down, on his hands and knees (Exhibit B, Schurr's Dep, p. 91:4) he could not see Schurr reach for his gun. (Exhibit B, Schurr's Dep, p. 102:13-25; 103:1-6) Schurr never announced that he was reaching for his gun or that he intended to shoot. *Id*.  The last thing Patrick heard from Schurr before he died was, "Drop the Taser." *Id.*

Parts of Schurr's written statement were read to him during his deposition. Specifically, the portion in Schurr's statement where he wrote that he "feared that Patrick was going to turn the [T]aser toward" him. (Exhibit B, Schurr's Dep, p. 122:11-12) But

8

when questioned further by Plaintiff's counsel, Schurr clarified that Patrick never turned toward Patrick before he fired his gun into the back of his head. (Exhibit B, Schurr's Dep, p. 122:16-22)  When Schurr took the stand in his criminal trial, he confirmed that he took the time to ensure that he had a clear shot, that there were no people around, before he aimed his gun at the base of Patrick's skull and fired. (Exhibit A, Schurr's Crim Testimony, p. 119: 16-25; 120:1-6)



Schurr was charged with second-degree murder on June 9, 2022. The Grand Rapids Police Department (GRPD) terminated Schurr the next day.

When Schurr was on the stand for second-degree murder, he testified to what he knew and took time to consider before he killed Patrick.  For instance, Schurr knew from his training that it was important for officers to "allow a safe distance" between themselves and a suspect and the inherent dangers that come with "chasing an armed or potentially armed suspect." (Exhibit A, Schurr's Crim Testimony,

9

p.109:21-25;110:1-5) Likewise, Schurr acknowledged  that "hands-on or tackling" put him at risk and that his goal to "effect an arrest" would not have "prevented him from disengaging." (Exhibit A, Schurr's Crim Testimony, p.110:6-15) Schurr was single-focused on Patrick, even though he was outnumbered (Exhibit A, Schurr's Crim Testimony, p.107:1-4) and surrounded by "multiple" bystanders in the vicinity from the moment he first pulled the Nissan over up through to the time when he fired his weapon. (Exhibit A, Schurr's Crim Testimony, p. 112:22-24)

Moreover, Schurr knew that during the "entire incident [Patrick] was trying to get away" from him, "up until the end." (Exhibit A, Schurr's Crim Testimony, p.120:18-19) Patrick had never threatened Schurr or pointed the Taser at him. (Exhibit A, Schurr's Crim Testimony, p.120:7-17) Mr. Butler agreed that Patrick was "just resisting" and "trying to get away. . .trying to get out of [Schurr's] hold . . .I don't even remember [Patrick] throwing any punches." (Exhibit C, Butler's Dep, , p.122:9-12,18-25) Patrick never put Mr. Butler in fear for his life.(Exhibit C, Butler's Dep, p.124:19-25,125:1-2)

Schurr was a 31-year old college graduate. (Exhibit A, Schurr's Crim Testimony, p. 10) Before he joined GRPD, Schurr attended Sienna Heights University on an athletic scholarship and graduated with a degree in accounting and a minor in criminal justice. (Exhibit A, Schurr's Crim Testimony, p.12) Schurr was a sprinter (Exhibit A, Schurr's Crim Testimony, p.13) and All American in the

heptathlon and pole vaulting. (Exhibit B, Schurr's Dep, p.7) In 2022 Schurr was still in "pretty good shape." (Exhibit A, Schurr's Crim Testimony, p. 105:13-14) and had just tried out for GRPD's Special Response Team (SRT). (Exhibit A, Schurr's Crim Testimony, p. 104:19-25;105:1-17)

The MCOLES training reinforced by GRPD taught Schurr that "volatile situations" were a part of his essential duties and that failing to perform those duties could subject him to accusations of "cowardice" by his department. (Exhibit A, Schurr's Crim Testimony, p.18:3-15) Not performing "essential functions" as a police officer meant that his department could find that Schurr had shown signs of "cowardice." (Exhibit A, Schurr's Crim Testimony, p.18) Plaintiff's experts, as former chiefs of police, Andrew J. Scott and Thomas J. Tiderington, each speak to the corrupting and dangerous influences the "cowardice" philosophy can have on law enforcement. (Exhibit D, Scott's Report)(Exhibit E, Tiderington's Report)

As described above, Defendant previously moved to dismiss this action. Following the denial of Defendant's motion to dismiss, he filed an interlocutory appeal in the 6th Circuit. That appeal was dismissed, following full briefing and oral argument, for lack of jurisdiction as a result of Defendant's improper factual arguments on appeal. However, the Court thoroughly analyzed the video evidence and concluded that evidence does *not* show what Defendant continues to contend- that Patrick had disarmed him of his taser and was preparing to use it against him.

11

The Court stated that "[t]he Ring doorbell recording does not show whether Lyoya fought or disarmed Schurr, or whether Schurr had subdued Lyoya before shooting him." *Lyoya v Schurr*, ___F App'x___; 2024 U.S. App. LEXIS 23052, at *7 (CA 6, Sep. 9, 2024). Similarly, "[t]he cell phone video also does not indisputably show Lyoya turning to confront Schurr with Schurr's own Taser in hand at the time that Schurr used deadly force." *Id*. at *9. Instead, the Court found that

> the cell phone video supports—and therefore does not blatantly contradict—the allegation that Schurr had subdued Lyoya prior to using deadly force without warning. The video confirms that Schurr pinned Lyoya, rose to his feet, drew his firearm, shoved Lyoya into the ground, and then, without warning, shot Lyoya in the back of the head. (Id. at 1:49-56.)

### STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is only proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In determining whether summary judgment is proper under Fed. R. Civ. P. 56(a), the court looks to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" Fed. R. Civ. P. 56(c)(1)(a). "As the party moving for summary judgment, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of Plaintiff's claim." *Logan v. Denny's*, 259

12

F.3d 558, 566 (6th Cir 2001).  The trial court "must accept Plaintiff's evidence as true and draw all reasonable inferences in her favor . . . viewing all facts and inferences drawn therefrom in the light most favorable to Plaintiff."  *Id*. (internal citation omitted).

<strong>LAW AND ANALYSIS</strong>

**I.       Defendant Schurr is not entitled to qualified immunity**

Defendant's first two issues within his motion each relate to the applicability of qualified immunity, and Plaintiff combines those issues for ease of organization. Government officials may invoke qualified immunity as a defense only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Questions of qualified immunity are determined resolved by a two-step inquiry (which are addressed in Defendant's Issues I and II): "viewing the facts in the light most favorable to the plaintiff, determines whether: 1) the violation of a constitutional right has occurred; and 2) the constitutional right at issue 'was clearly established at the time of the defendant's alleged misconduct.'" *Grawey v. Drury*, 567 F.3d 302, 308 (6th Cir. 2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Plaintiff will address those prongs in turn below.

13

Defendant's motion depends on his interpretation or characterization of pieces of evidence, including video footage of these events.  The Supreme Court emphasized "the importance of drawing inferences in favor of the nonmovant" when addressing questions of qualified immunity for purposes of summary judgment. *Tolan*, 134 S. Ct. at 1866.  When addressing either prong of the qualified immunity test, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.*; *Sova v. City of Mount Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). Rather, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion[,]'" which, "[i]n qualified immunity cases[,]…usually means adopting the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### a.  The use of force was unreasonable and in violation of Patrick Lyoya's rights under the 4th Amendment

When requesting he be granted qualified immunity relative to his act of killing Patrick Lyoya, Defendant first addresses whether his conduct amounted to a constitutional violation. Plaintiff will do the same.

### i.  Defendant's arguments regarding the video evidence have already been rejected by the 6th Circuit

Before delving into the legal standards that apply to this question, an immediate deficiency in Defendant's motion must be addressed.  On numerous occasions throughout his brief, Defendant asserts that a close examination of the

14

video footage available to the Court demonstrates that Patrick had disarmed Defendant and was in possession of the Taser, which he allegedly held like a gun as he prepared to use it against Defendant, in the moments prior to the fatal shot. Defendant urges this Court to rely on that video to reach that conclusion and also asks the Court to rely on the testimony of witnesses that claim the video depicts the events in that manner. For example, Defendant asserts that both Schurr and MSP Detective Aaron Tubergen each testified that they could tell from the video that the Taser was in Patrick's hand prior to the shot (See Defendant's Brief, pp 10-11). Likewise, defense counsel, after stating that "Lyoya gained sole control of the TASER, held it like a firearm, and turned his body toward Officer Schurr in the moment before the single shot was fired" claims that "a frame-by-frame review of the video recordings, establishes those propositions affirmatively…" (See Defendant's Brief, p 3).

The Sixth Circuit unequivocally rejected the precise characterization of the video evidence that Defendant asking this Court to accept, and surely that rejection came after the type of "close" examination Defendant requests. The 6th Circuit discussed each of the four videos that were available and explained that *none* of them demonstrated Patrick had gained control of the Taser and was preparing to use it in the moments prior to the shot.  As the Court explained, the only video that could

15

have arguably captured that moment was the cell phone video.  Here is how the

Court described that video, demonstrating the level of attention it paid:

> Schurr points to a "yellow" speck between Lyoya's hands and argues that this shows Lyoya had taken the Taser in the seconds before Schurr shot him. (Appellant Br. 32.) On our review, we cannot clearly identify the Taser in this part of the video. (Cell Phone Video, Ex. 3, R. 17-4, 1:54.) Moreover, even if the video did clearly show the Taser's position, it does not indisputably show whether Lyoya was actually holding the Taser. Nor does the video show if Lyoya grabbed the handle or merely pressed the barrel against the ground, nor whether Schurr voluntarily released the twice-fired Taser to draw his firearm.

Defendant's reliance on videos that the 6th Circuit has already explained are

insufficient to secure qualified immunity is a massive problem for the structure of

its argument.  Defendant asks this court to rely on the interpretations of that video

that are being offered by defense counsel, Defendant himself, and witnesses like

Tubergen.   But those interpretations represent nothing more than one possible

interpretation that a juror could accept *or* reject.  In other words, Defendant is merely

highlighting one of the central areas of dispute for a jury to resolve.

Defendant uses that disputed evidence to essentially build a house of cards.

After beginning with the failed premise that the video shows that Patrick disarmed

Schurr, Defendant introduces testimony from numerous officers for the proposition

that the act of disarming an officer is tantamount to deadly force that justified the

shooting.  Similarly, when Defendant attempts to frame the constitutional right that

Plaintiff must clearly establish to overcome immunity, Defendant defines that right

16

with reference to the disputed allegation that Patrick had disarmed Schurr and was preparing to use the Taser against him.

While the 6th Circuit could *not* conclude that Defendant's account of the video evidence was accurate, it did set forth its own conclusions regarding what the video showed. Defendant ignores that portion of the opinion because it is damning. Here it is:

> Finally, the cell phone video supports—and therefore does not blatantly contradict—the allegation that Schurr had subdued Lyoya prior to using deadly force without warning. The video confirms that Schurr pinned Lyoya, rose to his feet, drew his firearm, shoved Lyoya into the ground, and then, without warning, shot Lyoya in the back of the head. (Id. at 1:49-56.)

In the wake of that ruling, this case is destined for trial. The 6th Circuit has concluded that the video shows Defendant shooting an unarmed, subdued individual in the back of the head *without any warning*. To avoid liability now, Schurr must show why that act was legally justified. His arguments in that effort are all fully reliant on credibility determinations. Defense counsel may watch the video evidence and come away convinced that the use of force was reasonable. The undersigned counsel reaches the exact opposite conclusion. That was also the case at the criminal phase where, despite the fact that Schurr benefitted from a far more favorable burden of proof, the jury also could not come to agreement regarding the legal justification of the shooting. It is cases such as this that are the very purpose behind our civil jury

system and trial.  Not every case can be resolved at the summary judgment stage. This one certainly cannot be.

### ii.  The legal standards that apply to a use of lethal force

The first inquiry of the qualified immunity analysis examines whether "the facts alleged show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  It is well established that the right to be free from excessive force is guaranteed by the Fourth Amendment's protections against unreasonable seizures. *See* U.S. Const. amend. IV; *see also Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  The Supreme Court in *Tennessee v. Garner* established that a police officer's use of deadly force is a "seizure" within the meaning of the Fourth Amendment and that claims alleging the use of such force are evaluated under the Fourth Amendment's "reasonableness standard." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Under that standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Graham*, 490 U.S. at 397.  Like *Garner*, the present case of course includes an application of deadly force.  The *Garner* Court set forth that the use of deadly force is objectively reasonable *only* where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Garner*, 471 U.S. at 11.

This interaction, of course, began with Schurr determining that he would not let Patrick leave the scene of the traffic stop, no matter what steps were needed to accomplish that self-determined goal. "The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 US at 11.  "[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12.

It is entirely undisputed that Schurr never warned Patrick regarding either the taser or his firearm, and there is not even an attempt to argue that a warning was not feasible (and Defendant would apparently like to gloss over that legal requirement, never once mentioning it in his brief). Further, Schurr testified at his criminal trial that Patrick never struck him or physically or verbally threatened him. And Patrick was not being investigated for a felony at the time Schurr began to pursue him.  This case is the absolute picture of what *Garner* prohibited.

19

Determining whether the use of force is reasonable requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Garner*, 471 U.S. at 8.  The Supreme Court instructed that courts should weigh "[1.] the severity of the crime at issue, [2.] whether the suspect pose[d] an immediate threat to the safety of the officers or others, [3.] and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9).

The test for reasonableness under the Fourth Amendment "is not capable of precise definition or mechanical application" and "its proper application requires careful attention to the facts and circumstances of each particular case[.]" *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9)).  The factors set forth above do not constitute an exhaustive list and the ultimate inquiry is "whether the totality of the circumstances justifies a particular sort of seizure." *Id*.  In analyzing claims involving deadly force, the 6th Circuit has adhered to the tenet that "only in rare instances may an officer seize a suspect by use of deadly force." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005).

### iii.  Controlling precedent demonstrates qualified immunity is unavailable here

The reason why Defendant is trying to portray Patrick as being armed with, and prepared to use, a taser is to create the impression that Schurr had no choice but

to use lethal force.  That effort fails automatically because there is no evidence that Patrick possessed any weapon, including the taser, but for Schurr's testimony that is subject to the jury's credibility determinations.  Importantly though, Defendant also fails to appreciate that an individual's possession of a weapon, if that was what occurred here, does *not* create a right to use deadly force, by itself.  Instead, as the 6th Circuit has said, "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is not justified." *Bouggess v Mattingly*, 482 F3d 886, 896 (CA 6, 2007).

In *Bouggess*, the Defendant officer was operating undercover in a sting operation in which he was planning on buying narcotics from the Plaintiff.  The Defendant testified that when he arrived at the scene of the buy, the Plaintiff got out of a vehicle and lifted his shirt.  Defendant understood that gesture to be an indication that the Plaintiff was armed with a concealed weapon.  *Id*. at 888, n 1.  It appears that the drug purchase never occurred, because several of the suspects reached into the Defendant's car, stole money and fled.

When the Defendant tried to see which direction the suspects ran in, he observed the Plaintiff picking up money from the ground.  *Id*. at 888.  He then tried to arrest the Plaintiff and a struggle ensued.  The officer testified that during the struggle, the Plaintiff "had this look in his eyes like, he just had this look in his eyes

21

like, man I'm going to kill you." *Id*. at 888, n 2.  After seeing that look, the Defendant pulled his firearm and testified that the Plaintiff "was trying to take it from him during the struggle and that one shot was fired toward the ground during the struggle." *Id*.  He testified that when the shot was fired into the ground, he believed at the time that he had been shot in the foot.  *Id*.  The struggle then apparently ended and the Plaintiff again began to flee.  The Defendant then shot the Plaintiff three times in the back.  *Id*. at 889.  He died shortly after and it was subsequently discovered that he was indeed carrying a concealed pistol.  *Id*.

When analyzing whether the Defendant was entitled to qualified immunity, the 6th Circuit began by setting forth the *Graham* factors.  It stated that "[u]sing those factors and other relevant facts, it is our task to determine whether Mattingly had an objectively reasonable belief that Newby posed an imminent threat of serious physical harm to him or to others. If Mattingly did not have such a belief, then his use of deadly force violated the Fourth Amendment." *Id*. at 890.

The Court held that the Defendant was not entitled to qualified immunity.  It concluded that while the officer testified that the Plaintiff was armed, "[t]oo much evidence throws doubt on Mattingly's bare assertion that he suspected that Newby had a weapon." *Id*. at 890-891.  In casting doubt on the officer's account that he was fearful for his life, the Court noted that the officer never communicated those concerns over the radio.  Of course, the same is true here.  Schurr never told anyone

22

on the radio that he feared Patrick, that Patrick was trying to take his taser or that he believed lethal force was needed.  The *Bouggess* Court noted that even if it was true that Plaintiff had his own weapon, deadly force would only be appropriate if it was reasonable to believe that the Plaintiff was going to *use* that weapon against the officer or others, and that amounted to a question of fact.  There's no such evidence in this case.

Like here, the Defendant in *Bouggess* also cited the Plaintiff's acts of resisting and fleeing as demonstrating that force was proper.  Again, the Court rejected the argument: "[i]t cannot reasonably be contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, and without evidence of any intention on the suspect's part to seriously harm the officer, could constitute probable cause that the suspect poses an imminent danger of serious physical harm to the officer or to others."  *Id*. at 891.  The Court cited numerous cases where qualified immunity was denied in the face of a contention that a suspect intended to wrestle away an officer's weapon and use it against him.  *Id*. at 891-892. (*Sigley v. Kuhn*, Nos. 98-3977, 99-3531, 2000 U.S. App. LEXIS 1465, at *2-3, *15 (6th Cir. Jan. 31, 2000) (denying summary judgment on qualified immunity grounds when deadly force was employed after a suspect tackled an officer and wrestled him to the ground because there was a disputed issue of fact as to whether the suspect tried to take away the officer's gun); *Cardona v. City of Cleveland*, No. 97-3037,

23

1997 U.S. App. LEXIS 32113, at *9-14 (6th Cir. Nov. 10, 1997) (denying qualified immunity where officer and suspect struggled, and the suspect was shot during the struggle, where there was a disputed issue of fact as to whether the officer and suspect struggled over a gun).

Of additional relevance, the Defendant in *Bouggess* was also denied qualified immunity because, "Mattingly never warned Newby that he might shoot, as required by *Garner* when feasible under the circumstances. Nothing indicates that a warning was infeasible." *Id*. at 892.  That is of course true here.  Schurr never warned Patrick that he drew his firearm and was preparing to use it despite it being entirely feasible to do so.  Uttering the simple phrase "stop or I'll shoot" takes no effort whatsoever. Patrick, while facedown on the ground, would not have been able to see or perceive Schurr's weapon, making a warning all the more imperative.

Despite being the moving party and despite the warning requirement emanating from the seminal case on excessive force (*Garner*), Defendant never once mentions that the requirement exists and was disregarded by Schurr, just like in his initial motion to dismiss.  That failure alone precludes a grant of summary judgment in a lethal force case.

Thus, in *Bouggess*, the Defendant officer was denied qualified immunity despite testifying that 1.) he believed the Plaintiff was armed with a concealed weapon (which proved to be true), 2.) the Plaintiff looked like he intended to kill the

24

officer, 3.) the Plaintiff attempted to wrestle the officer's firearm from him and that 4.) the Plaintiff was not complying with orders and was trying to flee during a physical struggle.  The lack of evidence regarding the Plaintiff's intent to harm the officer or anyone else, coupled with the officer's failure to provide the constitutionally required warning of his intent to use deadly force, necessitated a trial. The same is true here.

The 6th Circuit's opinion in *Palma v Johns*, 27 F.4th 419 (CA 6, 2022), decided just over a month before this shooting, is also instructive.  In *Palma*, the Defendant officer went to a home to respond to a family dispute.  When he arrived at the home and exited his cruiser, the Plaintiff was already standing outside with a hood on and his hands in his pockets.  He began to walk towards the officer.  Despite the officer repeatedly greeting the Plaintiff, the Plaintiff never responded and continued to walk toward the officer.  The Plaintiff appeared to be "determined" and "aggressive." *Id*. at 423.  The officer called for backup.  He told the Plaintiff to stop and remove his hands from his pockets.  The Plaintiff did not listen.  Ultimately, the officer tased him three times.  The Plaintiff persisted.  The officer retreated and warned the Plaintiff that "this is how people get shot."  The officer fell to the ground because of muddy conditions and testified that he thought the Plaintiff's "intention was to physically reach [him], assault [him], and perhaps obtain [his] weapon." According to the officer, "Palma had a 'crazed look on his face,' and [] Palma's

'appearance, demeanor, and behavior told [him] that [Palma] was not going to stop.'" *Id*. at 425.  The officer unholstered his gun while continuing to retreat.  The officer then shot at the Plaintiff's leg, in a hope that it would stop him.  It did not.  The Plaintiff continued toward the officer, who then shot at him until he stopped moving.

The 6th Circuit held that the officer in *Palma* was not entitled to qualified immunity, noting that "Throughout the entire encounter, Palma never said anything to Johns, he never reached out towards Johns, and he never verbally threatened Johns. Palma did not raise his fists or make any threatening gestures. But because Palma did not respond to commands, and kept walking towards Johns, Johns believed the situation 'was more than a friendly encounter.'"  *Id*. at 425.  The Plaintiff in *Palma* engaged in far more threatening conduct than Patrick and ignored direct warnings of impending lethal force.  If qualified immunity was denied there, so too must it be here.

Just as *Bouggess* and *Palma* leave no doubt that the present motion must be denied, other authorities likewise shed light on the deficiencies in Defendant's position.  As *Bouggess* noted, the Plaintiff in that case demonstrated no willingness to harm the officer, which prompted the denial of qualified immunity.  In *Murray-Ruhl v Passinault*, 246 F App'x 338, 346 (CA 6, 2007), the Court held similarly and provided some additional guidance, stating that "Here, Passinault did not have a

26

prolonged interaction with Murray in which he demonstrated a willingness to harm an officer or engage in reckless behavior. In fact, examining the plaintiff's statement of the facts, we would have to conclude that Passinault lacked any reason to believe that he would harm anyone in his attempt to drive away from the area." *Murray-Ruhl v Passinault*, 246 F App'x 338, 346 (CA 6, 2007).  Thus, the amount of time the officer has to observe the Plaintiff's behavior is relevant.  The interaction in this case was fairly prolonged, lasting several minutes in total.  Not once in those several minutes did Patrick do anything other than try to flee and protect himself from Schurr.

Just as the duration of the interaction is relevant to assessing Patrick's lack of an intent to harm anyone, so too is it relevant to understanding the unreasonableness of Schurr's conduct.  In *Davenport v Causey*, 521 F3d 544, 553 (CA 6, 2008), one of the dozen summary judgment cases on which Schurr previously relied, the Court stated that "[t]he time from Mr. Davenport beginning to strike Officer Causey to Mr. Davenport being shot was, as we noted, merely four seconds. Once Mr. Davenport began his attack, things evolved very rapidly, which provided Officer Causey less time for, and requires us to give more deference to, on-the-spot decision making." *Davenport v Causey*, 521 F3d 544, 553 (CA 6, 2008).

To be clear, even if this interaction had been rapid, lethal force would have still been improper- "the fact that a situation unfolds relatively quickly 'does not, by

27

itself, permit [officers] to use deadly force.'" *Estate of Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)) (alteration in *Kirby*). Unlike *Davenport*, though, this interaction did not take mere seconds.  If the *Davenport* Court found it necessary to give *more* deference to the Officer's decision making because of the short window of time, than the inverse is necessarily true- where, as here, an officer is not making a split-second decision, they have ample opportunity to make sound decisions and their judgment should be afforded *less* deference.  Schurr had every opportunity to take a different course of conduct.  His actions were deliberate, intentional and calculated.  These are not the actions that qualified immunity was intended to shield.

### iv.  Defendant's authority does not change the analysis

In asserting that he is entitled to qualified immunity, Defendant relies heavily upon three different opinions of the 6th Circuit.  Each of those decisions (which each involve a Plaintiff who was armed with a gun) are highly distinguishable from the present case and will be discussed in turn, beginning with the opinion in *Mullins v Cyranek*, 805 F.3d 760 (2015).

Defendant relies on *Mullins* for the notion that courts should not second guess split second decisions of officers.  In *Mullins*, which Defendant fails to accurately describe, the Plaintiff was shot and killed after fleeing with a gun to the Fountain Square neighborhood- a busy square in the heart of downtown Cincinnati that

28

neighbors a federal courthouse.  The events began at a family reunion at a nearby park.  The Plaintiff and a friend of his were observed standing outside the fence of the family reunion and were suspected of throwing firearms over the park fence to attendees of the reunion.  When police confronted the Plaintiff, he fled to the Fountain Square/Government Square neighborhoods.  The Court noted that it was "a populated city square with shops, restaurants, hotels, and offices in downtown Cincinnati." *Id*. at 767.  Further, that square was apparently busy at the time of these events, as the Court described how "surveillance footage shows patrons at a crowded patio bar nearby visibly reacting to the events at this time." *Id*. at 764. The Court explained that

> Here, it is undisputed that within a five-second span, Mullins removed a previously concealed firearm without any direction from Cyranek to do so, threw the weapon over Cyranek's shoulder after being commanded to drop it, and was then shot at twice and struck once by Cyranek. Importantly, all of these events transpired in the early evening hours in a breezeway leading onto Fountain Square, a populated city square with shops, restaurants, hotels, and offices in downtown Cincinnati.  [*Id*. at 767.]

And unlike Patrick, the Plaintiff in *Mullins* was demonstrating a likely intent to use his firearm, thus posing a threat to many:

> Mullins had his finger on the trigger of a gun, and at that time, he posed a serious threat to Cyranek and the general public at Fountain Square, including Sims, Mullins's friend…  [*Id*.]

Not only does Defendant omit the fact that the Court was considering the danger posed to the Fountain Square crowd, but Defendant also creates the

29

impression that the officer was entitled to immunity even where the Plaintiff was unarmed. But the opinion stresses that the officer may not have known the Plaintiff had thrown his weapon-"Because only a few seconds passed between when Mullins brandished his firearm and when Cyranek shot Mullins, a reasonable officer in the same situation could have fired with the belief that Mullins still had the gun in his hand." *Id*.

The facts of *Mullins* are materially different from the present case. However, it should be noted that the *Mullins* Court explained that while it was critical of certain actions of the Defendant officer that preceded the shooting, that fact was irrelevant under the controlling jurisprudence, which only allowed the Court to consider the moment that lethal force was used. That constraint no longer exists. Defendant's brief is notably silent regarding the most recent Supreme Court jurisprudence on qualified immunity in the 4th Amendment context. In *Barnes v Felix*, 605 U.S. 73 (2025), the Supreme Court rejected the notion that an where an officer is alleged to have created a dangerous situation tha ultimately necessitated force, the pre-shooting conduct of the officer is irrelevant. Instead, the Supreme Court explained that the officer's conduct was part of the totality of the circumstances of the interaction. *Id*. at 79-80. Here, of course, Plaintiff has presented expert testimony about the variety of ill-advised acts that Schurr committed prior to the shooting, which directly led to the chain of events that occurred.

If Defendant's reliance on *Mullins* is notably misplaced, his reliance on *Livermore*, 476 F.3d 397, is shockingly misplaced.  Defendant asks this Court to rely on *Livermore* for the notion that whether a weapon was pointed at an officer is not dispositive of the question of reasonableness of force, as the totality of the circumstances is what controls.  And while it is true that the *Livermore* Court held that the officer was entitled to qualified immunity even if the Plaintiff was not pointing his rifle at the officer when he was shot, the remaining facts of the case demonstrate why the Court so held.  As the Court explained:

> Several factors compel a finding that Rohm posed a serious threat: Rohm helped cause the standoff that led to Crosslin's death by (along with Crosslin) setting fire to the buildings on Rainbow Farms, he was present when Crosslin fired shots at a news helicopter, and -- rather than surrender as agreed upon -- he exited his burning residence armed with a rifle. In addition, Michigan State Police officers were told that Rohm and Crosslin had wired their residence with explosives. [*Id*. at 404-05.]

That Defendant in any way compares Patrick Lyoya with the Plaintiff in *Livermore* is befuddling at best.  Patrick was driving a vehicle that apparently had a mismatched license plate. The Plaintiff in *Livermore* was a source of havoc not often seen in the opinions of our courts.

Finally, Defendant directs this Court to *Thomas v City of Columbus*, 854 F.3d 361 (2017) for the idea that the relevant consideration is the totality of the circumstances *known to the officer* at the time of the use of force.  Thomas, while a tragic case, is not helpful to Defendant.  There, the officer was responding to an

31

active crime scene when the Plaintiff came running toward him while holding a gun. The officer did not know the Plaintiff was a victim, and not a suspect, and had no opportunity to make that determination when faced with a perceived threat of harm.

While the facts of Thomas again differentiate from the present case, there is one another aspect of that opinion that requires the denial of qualified immunity. In *Thomas*, the 6th Circuit explained that "[s]ometimes, the time or space available to an officer may mean that the reasonable thing to do is monitor the suspect, issue a warning, or take cover." *Id.* at 366-67. The Eastern District of Michigan has opined similarly, stating that "[w]hether the Officers had the option of taking a few steps back to address their safety concerns is simply one factual circumstance that must be considered to evaluate whether the use of deadly force was reasonably necessary to protect the Officers and other individuals." *Scozzari v City of Clare*, 723 F Supp 2d 974, 983 (ED Mich, 2010), affirmed by *Scozzari v Miedzianowski*, 454 F App'x 455 (CA 6, 2012). Once again, each of Plaintiff's police procedures experts have likewise opined that Schurr was obligated to create space from Patrick before determining if lethal force was required.

Here, *at every moment during the interaction,* Schurr had the ability to create space, monitor Patrick or issue a warning. He did none of that, despite binding authority in this circuit establishing it would be appropriate. Patrick was trying to get away from Schurr, who continuously closed that space. At the moment of the

32

shooting, Schurr had Patrick pinned to the ground and was in a dominant position on his back.  He had a gun in his hand and Patrick had no weapon.  He could have simply stepped back from Patrick, displayed his weapon and issued a warning.  His decision to instead use lethal force was unreasonable, particularly where Patrick had demonstrated no intent or ability to harm anyone at any moment and was not suspected of a serious crime.

In short, Defendant's authority largely confirms that whether his use of force here was reasonable is a question that must be submitted to a jury and one that cannot be decided at the summary judgment stage.

### b.  The constitutional right at issue was clearly established

Defendant also argues that qualified immunity is proper because the constitutional right at issue was not clearly established.  That argument fails.

First, it must be noted that Defendant is attempting to define the clearly established right in an improper manner.  First, Defendant's proposed definition of the established right asks this Court to require Plaintiff to present a published opinion involving an officer shooting the Plaintiff who had secured sole control of the officer's Taser after a prolonged struggle.  But that description is based on *Defendant's* characterization of the facts.  As the 6th Circuit has explained, "[w]hen 'the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury,' the 'jury becomes the final arbiter of a claim of

33

immunity.'" *Bouggess*, 482 F.3d at 896 (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989)).

Further, while Defendant is correct that courts have cautioned against utilizing to broad of a view of a clearly established right, Defendant is guilty here of doing the opposite- asking the Court to provide too narrow of a view of a right.  As Judge Sutton has explained, "it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)." *Hagans v Franklin Co Sheriff's Office*, 695 F3d 505, 508-09 (CA 6, 2012).

The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The Supreme Court has emphasized that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151).

"[A]n official can be on notice that his conduct violates established law even in novel factual situations." *Cahoo v. SAS Analytics Inc,* 912 F.3d 887, 898 (6th Cir., 2019) (quotations and citation omitted). "As this Court has stated, the 'sine qua non' of the clearly established inquiry is fair warning." *Id*. (quotations and citation

34

omitted). "There does not need to be a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Id*.

As the 6th Circuit has explained, "[c]ases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006).   More directly, the 6th Circuit has stated that "It is clearly established constitutional law that an officer cannot shoot a non-dangerous fleeing felon in the back of the head." *Smith v Cupp*, 430 F3d 766, 775-76 (CA 6, 2005).  The *Smith* Court additionally noted that "[t]he absence of any *Garner* preconditions to the use of deadly force makes this an 'obvious' case..."  *Id*. at 776 (CA 6, 2005). Similarly, the 6th Circuit has stated that it has "authorized the use of deadly force only in rare instances."  *Jacobs v Alam*, 915 F3d 1028, 1040 (CA 6, 2019) (internal citation omitted).   "It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012) (internal quotation marks omitted).

Simply stated, if no reasonable officer would have concluded that Patrick Lyoya posed a deadly threat to either the officer or a member of the public (which is precisely the case here), the above case law unequivocally holds that it was clearly established that he had a right to be free from lethal force.  Consequently, Defendant

35

violated Patrick's clearly established constitutional right to be free from excessive force under these precise circumstances and is not entitled to qualified immunity.

## II. Defendant is not entitled to summary disposition relative to Plaintiff's claims under state law

### a. Gross Negligence

Defendant next argues that he cannot be held liable under Michigan law as a result of governmental immunity. To the contrary, Defendant remains liable for the injuries in this case pursuant to the terms of MCL 691.1407(2)(c). Pursuant to that provision, a government employee is not subject to tort liability if "The officer's, employee's, member's, or volunteer's conduct does not amount to [1.] gross negligence that is [2.] the proximate cause of the injury or damage." Gross negligence has been defined by statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(7)(a). The Court of Appeals has held on multiple occasions that the question of whether particular conduct rises to the level of gross negligence is generally a question of fact that is reserved for a jury. *Briggs v Oakland Co*, 276 Mich App 369, 374 (2007); *Tallman v Markstrom*, 180 Mich App 141 (1989).

When understanding Defendant's contention that Plaintiff is merely placing a gross negligence label on an assault allegation, it is essential to consider the authority Defendant relies upon- *VanVorous v. Burmeister*, 262 Mich. App. 467, 480; 687 N.W.2d 132 (2004), overruled on other grounds by *Odom*. In *VanVorous*, the

36

Defendant officers shot the Plaintiff eleven times at the close of a protracted pursuit. *Id*. at 470-472. The dispute regarded whether that use of force was proper under the circumstances.  In light of that, the Court of Appeals held that to the extent that the Plaintiff's complaint included a count labeled gross negligence, the Plaintiff failed to actually set forth such a claim because the case solely involved intentional acts. *Id*. at 483-484.

Here, Schurr committed numerous acts of gross negligence that preceded, and resulted in, the use of lethal force. Schurr was the initiator and sole source of needless physical aggression. He chased after Patrick, while assaulting him, despite there being a passenger in Patrick's vehicle. Schurr pulled his Taser while in close confines to the Plaintiff, rendering the Taser both ineffective and an additional source of worry. He failed to create distance between himself and Patrick when it was possible to do so, never communicated his alleged fear for his life over the radio and never provided a warning despite it being feasible to do so.  Nothing in *VanVorous* states that an officer who ultimately uses lethal force is per se immune for all of his distinct acts of gross negligence that occurred prior to that force.

### b.  Willful and Wanton Misconduct

In support of their argument that he is entitled to governmental immunity on the willful and wanton misconduct claim, *Defendant* must "establish that (1) the employee's challenged acts were undertaken during the course of employment and

37

that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature." *Odom v. Wayne County*, 482 Mich. 459, 461 (Mich. 2008). Here, Defendant has not, and cannot, show that the first two prongs of his asserted defense are satisfied.

Plaintiff takes no issue with Defendant's ultimate argument regarding liability for willful and wanton misconduct, in which Defendant cites the idea that Plaintiff must show that the use of force was "not justified because [it was] not objectively reasonable under the circumstances." *Id.* at 142 (citing *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct.App. 1984). That reasonableness standard is the precise standard that applies in the 4th Amendment context, as discussed throughout this brief. Just as there are genuine issues of material fact requiring denial of qualified immunity, those same issues necessitate the denial of governmental immunity under state law at this stage.

### III.    Defendant's argument regarding distribution of damages is improper at this stage

Lastly, Defendant asks this Court to conclude that Dorcas Lyoya, Patrick's mother, is not entitled to any damages in the event of a recovery because she was not biologically related to Patrick. This does not appear to be a proper subject of a motion for summary judgment, and Defendant presents no authority to the contrary. Dorcas Lyoya is not a party to this case. When the time comes for a distribution of

38

proceeds arising from the final judgment in this case, it will be for this Court to decide, under the probate laws of the state of Michigan, how those proceeds are to be divided.  That determination cannot be made at this stage on the basis of this record.

### CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that Defendant Schurr's motion to dismiss be denied in all regards.

Respectfully submitted,

**JOHNSON LAW, PLC**.

By:  */s/ Ayanna D. Hatchett*
AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
CHRISTOPHER P. DESMOND (P71493)
Counsel for Plaintiff
Johnson Law, PLC
535 Griswold Street, Suite 2600
Detroit, MI 48226
(313) 324.8300

Dated: June 22, 2026

## CERTIFICATE OF COMPLIANCE

I hereby affirm that this brief is in compliance with LCivR7.2(b)(i) and contains 9,421 words in the Times New Roman Font, 14 point, and generated in Microsoft Word processing software, version 2012.

*/s/ Ayanna D. Hatchett*

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 22, 2026, a copy of the forgoing document was served upon the attorneys of record in the above cause, by efiling it on the Court's ECF system.

*/s/ Ayanna D. Hatchett*