UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER LYOYA, Personal Representative )
for the Estate of Patrick Lyoya, )
      Plaintiff, )
  )     No. 1:22-cv-1160
v. )
  )
  )     Honorable Paul L. Maloney
CHRISTOPHER SCHURR, *et al.*, )
      Defendants. )
  )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on a motion for summary judgment by the remaining Defendant, Christopher Schurr (ECF No. 117). This case involves the death of Mr. Patrick Lyoya[1] when Defendant shot him on April 4, 2022. Defendant argues that the record, even when viewed in the light most favorable to Plaintiff, cannot overcome his claim of qualified immunity from the constitutional claim and cannot sustain a claim under Michigan law. He also argues that Dorcas Lyoya, who is not a party to this case, should not be able to claim any part of damages that may be awarded once distribution proceedings begin. The foundational problem for Defendant is that he fails to view the record in the light most favorable to Plaintiff. The video evidence in this case would allow the jury to conclude that Defendant shot Lyoya in the back of the head even though Defendant had already subdued him and had no reason to think he was a threat. And if the jury so concluded, then

---

[1] Because this case involves multiple people with the last name Lyoya, the Court will use "Lyoya" to refer to the decedent, Patrick Lyoya, and use the full name of other individuals sharing the last name Lyoya.

Defendant would have obviously violated Lyoya's constitutional rights and acted in a way not covered by governmental tort immunity under state law. Defendant's citation of evidence beyond the videos does not make it irrational for a jury to reach that conclusion based on what is in the videos. With respect to damages distribution, Defendant's argument is premature. But Defendant does accurately observe that Michigan law does not allow for negligence liability in cases involving the intentional use of allegedly excessive force. Defendant's motion will thus be granted in part to dismiss Plaintiff's negligence claims but denied with respect to Defendant's other arguments.

## I.

Courts grant summary judgment on an issue when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable finder of fact could find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Courts make all "reasonable inferences" in favor of the nonmovant when reviewing the record. *Malick v. Croswell-Lexington Dist. Schs.*, 148 F.4th 855, 861 (6th Cir. 2025).

The Fourth Amendment to the United States Constitution, as incorporated against the states by the Fourteenth Amendment, protects individuals from the use of excessive force by law enforcement during an arrest. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Courts adopt the perspective of a "reasonable officer on the scene" to determine whether the particular use of force was objectively reasonable in the context the officer confronted. *Id.* at 396-97. At the summary judgment stage, courts determine the contours of that context by construing the facts in the light most favorable to the nonmovant. *Tolan v. Cotton*, 572

U.S. 650, 657 (2014). But, when there is video footage of undisputed veracity which blatantly contradicts the nonmovant's version of the facts, courts must adopt a view of the facts consistent with what the video shows. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007). When, as here, an officer claims entitlement to qualified immunity, courts may address the questions of the existence of a constitutional violation or of clearly established law in either order. *Pearson v. Callahan*, 555 U.S. 223, 241 (2009).

II.

The operative facts relate to the encounter between Defendant and Lyoya on April 4, 2022. There are several videos showing different angles and different time periods: Defendant's dash camera video, (ECF No. 17-2 [hereinafter Dash Cam Video]), Defendant's body camera video, (ECF No. 17-3 [hereinafter Body Cam Video]), a video recorded on Mr. Aime Tuyishime's cell phone, (ECF No. 17-4 [hereinafter Cell Phone Video]), and two videos recorded on doorbell cameras across the street, (ECF Nos. 18-5, 18-6).

On April 4, 2022, Lyoya had been driving his car with his friend, Mr. Tuyishime, in the passenger seat. Defendant, driving in his marked police vehicle, decided to enter the license plate number on the vehicle Lyoya was driving into the Secretary of State database. The license plate did not match the vehicle. So, Defendant decided to pull the car over to get information about the situation, which he understood could signal either criminal activity or a simple mistake. (ECF No. 119-2 at PageID.2439). Defendant turned on the emergency lights on his car and radioed dispatch that he was making a stop for the mismatched license plate. Lyoya immediately pulled over.

Before Defendant said anything, Lyoya exited the driver's side of his vehicle. (Dash Cam Video at 0:00:40). Drivers exiting their vehicles during stops is not especially uncommon. (ECF No. 119-1 at PageID.2167). Defendant exited his vehicle and told Lyoya four times to "stay in the car" or "get in the car," but Lyoya was already standing outside the car. (Body Cam Video at 00:40). Lyoya shuts the door and asks "what'd I do?" (*Id.* at 00:48). Defendant responds, "dude, I'm stopping you. Do you have a license?" (*Id.* at 00:49). Lyoya interjects after "I'm stopping you" with "for what?" (*Id.* at 00:50). Defendant again asks, "do you have a license?" and Lyoya responds, "for what?" (*Id.* at 00:53). Defendant then says, "I'm stopping you, do you have a license?" (*Id.* at 00:54). Lyoya again asks, "what'd I do?" (*Id.* at 00:56). Defendant asks, "do you have a drivers' license, do you speak English?" and makes a motion with his hand to represent speaking. (*Id.* at 00:57). Lyoya pauses for a moment before saying yes. (*Id.* at 01:00). Defendant asks, "can I see your license?" (*Id.* at 01:01). Lyoya looks away from Defendant for a moment before asking, "what did I do wrong?" (*Id.* at 01:02). Defendant says, "the plate doesn't belong on this car" before asking, "do you have a license or no?" (*Id.* at 01:05). Lyoya turns toward his car, and Defendant again asks whether he has a license; he responds that he does, Defendant asks where it is, and Lyoya responds that it is in the car. (*Id.* at 01:10). Defendant then says, "get it for me." (*Id.* at 01:16). Lyoya moves to open the driver's side door before asking again, "what did I do wrong?" (*Id.* at 01:19). Defendant points at the license plate and responds, "the plate does not belong on this car" as Lyoya opens the driver's side door. (*Id.* at 01:20). Lyoya has a brief exchange with Mr. Tuyishime, still in the passenger seat, who then begins looking for Lyoya's license. (*Id.* at 01:23). After about twenty seconds of searching, Mr. Tuyishime says

4

something to Lyoya, and Lyoya closes the driver's side door. (*Id.* at 01:42). Lyoya then slowly turns toward the front of the car and begins walking, apparently toward the passenger's side. (*Id.* at 01:44). Defendant three times says "no," then grabs Lyoya and says "stop" before Lyoya had passed the hood of the car. (*Id.* at 01:45).

Defendant gets behind Lyoya and says, "put your hands behind your back" while grabbing Lyoya's arms. (*Id.* at 01:47). Lyoya walks toward the opposite side of the street while attempting to get out of Defendant's grip, turns around, breaks out of Defendant's hold, shoves him away, then turns to run behind his car. (Dash Cam Video at 00:01:48). Defendant chases him around the car before tackling him on the driveway of a nearby residence. (*Id.* at 00:01:56). Defendant struggles to get physical control of Lyoya, and the two briefly get up from the ground before Defendant takes Lyoya to the ground again. (*Id.* at 02:07). Defendant rises to strike Lyoya with his arms, a kick, and his knee. (*Id.* at 02:13). Mr. Tuyishime exits the vehicle to begin recording during the struggle, which lasts about forty seconds before Lyoya is standing again. Before tackling Lyoya, Defendant said into his radio, "1915, got one running." (Body Cam Video 01:54). Near the beginning of this struggle, Defendant twice says "stop," then when Lyoya starts to get up, Defendant shoves Lyoya's head into the ground and Lyoya says "okay." (*Id.* at 02:07). Defendant continues shouting "stop" before saying "get your hands behind your back." (*Id.* at 02:15). Lyoya again says "okay." (*Id.* at 02:17). This exchange repeats a few times; then Defendant radios "1915, send more cars." (*Id.* at 02:34). Lyoya again says "okay" before Defendant lifts him to his feet. (*Id.* at 02:39). Lyoya's clothing had ridden far up his back, so his bare back was visible on the body camera footage as Defendant and Lyoya began walking, with Defendant's arms locked around Lyoya's to

keep Lyoya's arms behind his back. (*Id.* at 02:42). Defendant says "stop," and Lyoya again says "okay." (*Id.* at 02:49). Defendant says, "stop resisting." (*Id.* at 02:52). Once Lyoya is on his feet, Defendant walks him to the yard of a different residence; ten seconds later, they are no longer visible on the dash camera. (Dash Cam Video at 02:40-50).

After Defendant says "stop resisting," Defendant delivers another knee strike to Lyoya. (Cell Phone Video at 00:36). Lyoya then tries to break free from Defendant's grasp by turning his body around. (*Id.* at 00:40). Defendant manages to keep his arms around Lyoya, though not in the initial arm-lock configuration; after Lyoya's twist away, Defendant has an arm around Lyoya's neck. (*Id.* at 00:43). Lyoya says, "yo, come on man." (*Id.*). Defendant attempts to attain firmer control of Lyoya and draws his Taser at some point before Lyoya's face is visible on the body camera footage at three minutes and five seconds. (Body Cam Video at 03:05). The Taser is visible on the body cam in Defendant's hand a second later, with a predominantly yellow barrel, with the yellow coloration extending to part of the handle, whereas the handle is predominantly black. (*Id.* at 3:06). Lyoya says, "what did you do?" (*Id.* at 03:07). Lyoya extends his hand toward the Taser and blocks it from hitting him when Defendant discharges it. (*Id.* at 03:08). Lyoya's hand is mostly around the Taser's barrel, though he does have one finger reaching near the end of the handle. (*Id.* at 03:09). Defendant and Lyoya fall to the ground while Lyoya's hand is still on the Taser. (*Id.* at 03:14). Defendant says, "let go of the Taser." (*Id.* at 03:16). The body camera footage cuts out approximately fifteen seconds later.

When Defendant initially says "let go of the Taser," Lyoya is face up on the ground, with his knees slightly raised and his feet off the ground. (Cell Phone Video at 00:59).

Defendant is on top of Lyoya, on his knees, perpendicular to him with his torso over Lyoya's midsection. (*Id.*). Defendant maintains his grip on the handle of the Taser. Several seconds later, Defendant's position on top of Lyoya has changed, as he is no longer supported on his knees, but his grip on the Taser has not. (*Id.* at 01:08). As Defendant starts to say "let go of the Taser" again, the Taser discharges again. (*Id.* at 01:11). With the Taser discharged twice, its only offensive functionality is in "drive stun" mode, something that untrained individuals might not even be aware exists. (ECF No. 119-2 at PageID.2450). Defendant and Lyoya visibly continue to have their hands on the Taser until Mr. Tuyishime points his cell phone camera toward the ground rather than toward Defendant and Lyoya. (Cell Phone Video at 01:11-16).

The cell phone briefly points toward Defendant and Lyoya again a few seconds later. (*Id.* at 01:18). Defendant's and Lyoya's hands are still on the Taser, in substantially the same positions as before. (*Id.*). The cell phone camera then points away for almost twenty seconds. When the camera is back on Defendant and Lyoya, Defendant is using his knees to drive Lyoya onto his side, and Defendant is on top of him, face down, with his left arm around Lyoya. (*Id.* at 01:35). There is a small speck of yellow on the ground, visible between Lyoya's legs and Defendant's. (*Id.*). The camera points away again. During this period, Defendant says, "let go of the Taser." (*Id.* at 01:41). Mr. Tuyishime says, "he ain't got no Taser." (*Id.* at 01:43). Defendant again says, "let go of the Taser." (*Id.* at 01:47). The next clear image of Defendant and Lyoya shows Lyoya face down on the ground, with his left shoulder visibly slightly off the ground, but with his right foot on the ground and his left knee slightly bent, so

his left foot is slightly raised. (*Id.* at 01:48). Defendant is on top of him, with his torso on Lyoya's and his legs over Lyoya's. (*Id.*). The Taser is not visible and is not seen again.

Lyoya moves to support himself with his hands and knees. (*Id.* at 01:49-50). Defendant remains on top of him, with his left hand planted on the ground beneath Lyoya's head, and he uses his right hand to draw his gun. (*Id.* at 01:50). While Defendant draws his gun, he plants a knee on the ground on Lyoya's left side. (*Id.* at 01:51). Lyoya gets onto his hands and knees, and he visibly starts to fall toward the right; whether this is a voluntary movement or a push from Defendant is unclear. (*Id.*). Defendant's left arm is no longer on the ground and is instead around Lyoya's neck; Defendant has his gun drawn and pointed at Lyoya. (*Id.* at 01:52). Defendant says nothing about drawing his gun, and Lyoya would have no way of knowing that Defendant drew his gun. Defendant says, "drop the Taser." (*Id.*). Defendant takes his arm out from around Lyoya's neck and grabs the back of Lyoya's body, then shoves Lyoya's head into the ground. (*Id.* at 01:52-54). A second after Lyoya's head hits the ground, Defendant fires his gun into the back of Lyoya's head, killing him. (*Id.* at 01:55).

## III.

### A. Interpreting the Record in the Light Most Favorable to Plaintiff, Defendant Violated Lyoya's Constitutional Rights.

Law enforcement officers may constitutionally use some force to make an arrest. *Graham*, 490 U.S. at 396. When a plaintiff claims the officer used excessive force, courts assess whether the officer's actions were objectively reasonable "in light of the facts and circumstances confronting them" from the perspective of a "reasonable officer on the scene." *Id.* at 396-97. This analysis must recognize "that police officers are often forced to make

8

split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation" and not evaluate police actions "with the 20/20 vision of hindsight." *Id.* Courts must evaluate all relevant circumstances, "including facts and events leading up to the climactic moment," *Barnes v. Felix*, 605 U.S. 73, 76 (2025), and *Graham* directs attention to three factors in particular: first, the "severity of the crime at issue;" second, "whether the suspect poses an immediate threat to the safety of the officers or others;" and third, whether the suspect is "actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396.

Officers need not have arrived at "a single, rigid right answer" or have used "the best technique available," but the degree of force must have been reasonable under the circumstances. *Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020). Deadly force is only "constitutionally reasonable" if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Driscoll v. Montgomery Cnty. Bd. of Cnty. Comm'rs*, 173 F.4th 794, 800 (6th Cir. 2026) (citing *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). Officers may not use deadly force "simply because a suspect has a weapon, even a gun, in hand. There must be additional indicia that the safety of the officer or others is at risk." *Romero v. City of Lansing*, 159 F.4th 1002, 1011 (6th Cir. 2025) (citation modified) (citation omitted).

Because Defendant used deadly force, the key question is whether the facts, viewed in the light most favorable to Plaintiff, could lead a reasonable officer to conclude that Lyoya posed a significant threat of death or serious physical injury at the time Defendant shot him.

9

Defendant's arguments falter because they either fail to consider the facts in the light most favorable to Plaintiff or because they justify use of some force, but not deadly force.

Defendant argues that the "severity of the crime at issue" factor favors him. *Graham*, 490 U.S. at 396. He gestures toward Lyoya's car having the wrong license plate, Lyoya's failure to produce a driver's license upon request (despite Lyoya's attempts to comply with that request captured on the body camera video), and Lyoya's resistance to Defendant's attempts to arrest him. While the existence of any offense can provide support to an officer using *some* force, the analysis changes in the context of *lethal* force. In that context, the severity of the crime factor serves as an indication of whether officers are encountering a "dangerous situation[]" where officers "have reason to fear for the safety of themselves and others." *Driscoll*, 173 F.4th at 801. Defendant makes no argument that the mismatched license plate or the failure to produce a driver's license would cause a reasonable officer to fear for anyone's safety, nor would such an argument have any record support.

It is possible that resistance could indicate a serious threat of serious injury or death, but the facts do not do so here when viewed in the light most favorable to Plaintiff. A reasonable jury could conclude that Lyoya's resistant actions were only attempts to wrest out of Defendant's control and would not give any reason to fear violence from him. Throughout the encounter, Lyoya never made any threats, (ECF No. 119-2 at PageID.2446), and the only physical strike Lyoya tried to land on Defendant was a "shove" when Defendant initially grabbed him, (*id.*), which was before Lyoya would have known he was under arrest, *cf. Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015) (explaining that "officers cannot use force" if a detainee "is not told he is under arrest, or is not resisting arrest"). After

10

Lyoya ran, nothing suggests he was doing anything other than attempting to avoid Defendant's strikes and control. Even Defendant testified at his criminal trial that he thought Lyoya's intention, up to the end, was to get away from Defendant. (ECF No. 119-1 at PageID.2237).

The core of Defendant's theory is that Lyoya had "sole physical possession of Schurr's TASER" at the time Defendant shot him. (ECF No. 117 at PageID.1773). But in proceeding from that premise, Defendant fails to view the record in the light most favorable to Plaintiff. *See Tolan*, 572 U.S. at 657 (explaining that in "qualified immunity cases . . . courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions"). A reasonable jury could conclude from video footage that Lyoya no longer held the Taser at that point. Undoubtedly, Lyoya had a hand on the Taser before then: both the body camera footage and the cell phone video confirm that his hand was on it. But when the Taser is visible, a jury could reasonably conclude that Lyoya was only directing the Taser away from himself rather than trying to grab it for himself or to disarm Defendant. When Lyoya is on the ground and the Taser is visible, the jury could conclude that he is attempting to prevent Defendant from moving the Taser to a position where Defendant could use it on him. Given that context, the jury could then conclude that when the Taser is no longer visible, Lyoya no longer had a hand on it. *See Lyoya v. Schurr*, No. 23-1887, 2024 WL 4120236, at *4 (6th Cir. Sep. 9, 2024), *cert. denied*, 145 S. Ct. 1925 (2025) ("[E]ven if the video did clearly show the Taser's position, it does not indisputably show whether Lyoya was actually holding the Taser."). After the last moment in the video where the Taser is visible, (Cell Phone Video at 01:37), Defendant says "let go of the Taser," (*id.* at 01:41), and the passenger

holding the phone says "he ain't got no Taser," (*id.* at 01:43).[2] The next time the camera is focused on Defendant and Lyoya, the Taser is not visible.

Defendant's deposition testimony indicates that Lyoya was "holding onto the taser" and that he "had it where his fingers were wrapped around it with his thumb . . . where the safety switch would be." (ECF No. 119-2 at PageID.2449). But this conclusion conflicts with a rational interpretation of the video and with the passenger's statements. A rational jury could thus decide to credit the video and discount Defendant's testimony.

Defendant cites the testimony of Aaron Tubergen to argue that Lyoya held the Taser in his hand at the moment Defendant shot him. (*See, e.g.,* ECF No. 117 at PageID.1773, ECF No. 120 at PageID.2578). First, this argument is of limited utility, as Mr. Tubergen was only testifying in the cited portions as to *his interpretation* of the video footage. Jurors could reach different conclusions based on watching the videos themselves. Second, Defendant misrepresents this testimony. Mr. Tubergen testified that the Taser was only visible in the video footage "intermittently" and that "at some point" he saw the Taser in Lyoya's hands. (ECF No. 117-7 at PageID.1889). He also clarified that he could not "see the Taser 100 percent of the time," (*id.* at PageID.1890), or say at what specific times Lyoya was holding the Taser, (*id.* at PageID.1890, 1892). Mr. Tubergen's testimony thus does not establish that Lyoya had the Taser in his hand at the time Defendant shot him.

---

[2] Defendant argues that this statement should be disregarded because the passenger, Mr. Tuyishime, was intoxicated, (ECF No. 117-7 at PageID.1875-76), and said in his deposition that he did not see a Taser at all, (ECF No. 120-2 at PageID.2598-99). But these are attacks on Mr. Tuyishime's credibility. Courts "may not make any credibility determinations" against the non-movant at the summary judgment stage. *Helphenstine v. Lewis Cnty.,* 60 F.4th 305, 315 (6th Cir. 2023) (citing *Anderson,* 477 U.S. at 255). Additionally, the video itself could lead a rational jury to conclude that Lyoya was not holding the Taser when Defendant fired his gun, so even absent Mr. Tuyishime's statement, there would be sufficient record evidence to rationally conclude that Lyoya was not holding the Taser.

If Lyoya was not holding the Taser when Defendant shot him, then a reasonable jury could conclude that no reasonable officer in Defendant's position would have reason to think that Lyoya posed a threat of death or serious injury to Defendant or anyone else. Even if Defendant were correct that the record indisputably demonstrated that Lyoya *did* have the Taser in his hand at the time, there would still be a genuine dispute of material fact about whether a reasonable officer would have perceived a serious threat. Even when a suspect is armed with a gun, there must be "additional indicia" that the suspect poses a serious threat to make deadly force reasonable. *Romero*, 159 F.4th at 1011. The "earlier facts and circumstances" of the encounter "bear on how a reasonable officer would have understood and responded to later ones." *Barnes*, 605 U.S. at 80. Here, a rational jury could conclude from Lyoya's behavior after he started running that he had no violent intentions and only wanted to avoid Defendant, suggesting that any "ambiguous conduct" on Lyoya's part should not have been perceived by a reasonable officer as "threatening." *Id.*

Defendant's argument that Lyoya posed a threat—if he was holding the Taser—is that Lyoya was "beginning to turn his body toward" Defendant, consistent with Lyoya attempting to use the Taser on him. (ECF No. 117 at PageID.1774). But the video footage would allow the jury to reasonably conclude that Defendant had control over Lyoya in the seconds preceding the fatal shot. (Cell Phone Video at 01:53-01:56).[3] While Lyoya did get on to his hands and knees, it is not clear whether Lyoya turned at all afterward, or if he did, whether

---

[3] Defendant presents a still image taken from the video to support his interpretation of events. (ECF No. 117-20). That image does not unequivocally demonstrate that Lyoya was turning or that he was not under Defendant's control. To the extent it supports Defendant's position, it does not rule out competing interpretations, particularly when viewed with the video it was taken from.

13

he did so voluntarily or because Defendant pushed him. And if Lyoya was turning of his own accord, the jury could conclude that a reasonable officer would not have thought the turn represented a serious threat given Lyoya's prior behavior and that Defendant had reasserted control by pinning Lyoya to the ground after he started turning, obviating any need for deadly force.

Defendant argues that testimony from the Kent County Medical Examiner, Dr. Cohle, supports his conclusion that Lyoya was turning in the way Defendant describes. (ECF No. 117 at PageID.1758). But Dr. Cohle's testimony was, in relevant part, "either the gun's at an angle or he's - - Mr. Lyoya's head may have been turning as he was shot." (ECF No. 117-8 at PageID.1897). A reasonable jury could thus find that Defendant's gun was at an angle when he fired it and that Lyoya was not turning.[4]

Even if Lyoya did turn voluntarily, other evidence undercuts Defendant's narrative that his doing so represented a serious threat. For one thing, even if Lyoya had a hand on the Taser, it is far from clear *how* he was holding the Taser or whether it was reasonable to believe he could have used it. If he was merely holding the barrel to prevent Defendant from using it, for example, then a jury could conclude that his turning would not represent a possible threat of using the Taser. Further, the video makes clear that the Taser was fired twice, meaning its only use as a weapon would have been the drive stun mode. (ECF No. 119-2 at PageID.2450). Defendant said in his deposition that it would not be reasonable to

---

[4] Defendant also argues that Dr. Cohle "attested that there is no evidence the gun was pressed to the back of Lyoya's head." (ECF No. 117 at PageID.1758). To the extent that this is relevant, Dr. Cohle's testimony contradicts that conclusion, meaning a reasonable jury could conclude either way. When asked "you're suggesting that the gun, you believe, probably was right against the head," Dr. Cohle answered, "[p]robably." (ECF No. 117-8 at PageID.1897).

14

assume that Lyoya had training on how to use a taser and that it was possible Lyoya would not even have known what the drive stun mode was. (*Id.*). Defendant's evidence that a Taser is potentially deadly and could be used to disarm an officer of a gun is only relevant if a reasonable officer would have thought Lyoya could have used the Taser. Here, there is evidence sufficient for a reasonable jury to conclude that Lyoya could not have used the Taser even if he were so inclined.

Additionally, the jury could consider the other options available to Defendant. "Sometimes, the time or space available to an officer may mean that the reasonable thing to do is monitor the suspect, issue a warning, or take cover." *Thomas v. City of Columbus*, 854 F.3d 361, 366-67 (6th Cir. 2017). The jury could find that Defendant's order to "drop the Taser," (Cell Phone Video at 01:53), was insufficient, given that Lyoya could not see him draw his gun and he had given previous similar orders without threatening deadly force as a consequence of disobedience. When feasible, an officer must warn a suspect "that he might shoot" before shooting. *Bouggess v. Mattingly*, 482 F.3d 886, 892 (6th Cir. 2007). The jury could find that a reasonable officer would have used the available space to disengage and issue warnings rather than immediately escalate to deadly force. The jury could even find that the reasonable thing to do here, given Lyoya's prior behavior, was to take a risk that Lyoya might run away rather than kill him. *See Garner*, 471 U.S. at 11 ("It is not better that all felony suspects die than that they escape."). While officers need not have chosen the best possible course of action in hindsight, *Ashford*, 951 F.3d at 801, the jury could find that the available alternatives here made Defendant's resort to deadly force unreasonable under the circumstances.

15

The record here is insufficient to lead all reasonable jurors to conclude that Defendant's choice to shoot Lyoya in the back of the head was a reasonable one. Defendant's version of events rests on a series of factual assumptions, all of which the video of the encounter would allow a rational jury to reject: that Lyoya was holding the Taser, that it was reasonable to assume he could and would use it, that he turned on his own in a way consistent with using the Taser, and that Defendant did not have viable alternatives that reasonable officers would have resorted to first. The evidence Defendant presents beyond the video is either insufficient to support the claims Defendant makes or insufficient to force a jury to accept it rather than its own conclusions from the video. It is possible that a jury could conclude that Defendant's choice was reasonable at trial, but at this stage, the Court must construe the record as a whole in the light most favorable to Plaintiff. When viewed that way, the record suggests that Defendant shot a man who posed no threat of violence, held no weapon, and who was under Defendant's physical control. That violates the Fourth Amendment right to be free from unreasonable seizures. *See Garner*, 471 U.S. at 11; *Driscoll*, 173 F.4th at 800. The Court now considers whether it was clearly established as of April 4, 2022, that the Constitution did not permit Defendant's choice to shoot Lyoya under these circumstances.

### B. Mr. Lyoya's Right Not to Be Shot When He Did Not Present a Threat of Serious Injury or Death Was Clearly Established at the Time.

Officers' actions are protected by qualified immunity unless "in light of pre-existing law the unlawfulness" is "apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In short, existing law must be sufficient to give "fair notice" to officers that their conduct, in the

16

circumstances they find themselves, is unlawful. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). In excessive force cases, "the scope of the right is highly fact-dependent," so outside of obvious cases, "controlling precedent" must have facts "specific enough" to give that fair notice. *Heeter v. Bowers*, 99 F.4th 900, 915 (6th Cir. 2024). This does not require an exact match of factual circumstances, but a "particularized description of the right" the officer allegedly violated; "just as a court can generalize too much, it can generalize too little." *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508-09 (6th Cir. 2012).

But in "an obvious case," general excessive force standards "can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). "[A]ny reasonable officer" is "on notice of a constitutional violation" in "'particularly egregious' circumstances." *Driscoll*, 173 F.4th at 807 (quoting *Taylor v. Riojas*, 592 U.S. 7, 9 (2020)). "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. When the facts are such that no reasonable officer would find the suspect dangerous, it is "an obvious case." *Driscoll*, 173 F.4th at 807.

With the facts as the jury could reasonably find them, this is an obvious case. The jury could find that Lyoya was not holding the Taser and posed no threat of violence, and that Defendant was in physical control of Lyoya at the time Defendant fired his gun. In those circumstances, where Lyoya was an unarmed, nondangerous, subdued person, it would have been obvious to any reasonable officer that shooting Lyoya was unlawful. *See Driscoll*, 173 F.4th at 807; *Bouggess*, 482 F.3d at 895; *Sigley v. Kuhn*, 205 F.3d 1341, *1 (6th Cir. 2000) (table).

17

Even if this were not an obvious case and the record were more favorable to Defendant, Lyoya's rights would have been sufficiently well defined as of April 4, 2022, to put Defendant on notice that shooting him was unconstitutional. "It has been clearly established in this circuit for some time that 'individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.'" *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006)). "[M]erely possessing a weapon is not enough[.] . . . Our caselaw is replete with instances in which we have denied officers qualified immunity when the facts suggest . . . that the suspect did not pose a serious threat to the officer." *Jacobs v. Alam*, 915 F.3d 1028, 1040-41 (6th Cir. 2019); *Heeter*, 99 F.4th at 915 ("[I]t was also clearly established in November 2018 that, even if [a suspect] was armed and had disobeyed the officers' commands, these facts do not alone amount to a threat of serious or deadly harm."). And "[i]t cannot be reasonably contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, without evidence of any intention on the suspect's part to seriously harm the officer, could constitute probable cause that the suspect poses an imminent danger of *serious* physical harm." *Bouggess*, 482 F.3d at 891.

Some cases are illustrative, particularly *Bouggess*, *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989), and *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005). In *Bouggess*, an officer arrived at the scene of a drug sting operation. 482 F.3d at 888. Several suspects reached into the officer's car and took money. *Id.* They all ran, but the officer saw one stopping to pick up a fallen bill. *Id.* The officer "sought to arrest" that suspect, initiating a physical struggle. *Id.* The suspect broke free and ran away from the officer; the officer then shot him three

18

times. *Id.* at 889. The court held that was "an obvious case" where the officer "should have been aware that his actions violated clearly established constitutional rights." *Id.* at 895. In *Brandenburg,* a suspect holding a rifle fired six shots into the air and told police officers to "leave his property or they would be killed." 882 F.2d at 213. The officers left in their cars, and he followed them in a truck to a gate at the edge of his property. *Id.* When he arrived, he got out of his truck, put down his rifle, and closed the gate. *Id.* The officers ordered him to submit and to not pick up the rifle. *Id.* He moved to pick up the rifle, and one officer fired a warning shot. *Id.* When he actually picked up the rifle, another officer shot and killed him. *Id.* The court held that because a rational jury could conclude he was not pointing the rifle toward the officers when he was shot, it could conclude that the officer who shot him violated his constitutional rights. *Id.* at 215. In *Smith,* an officer handcuffed a suspect and left him in the back of his police car. 430 F.3d at 769. After the officer walked away to speak with a tow truck driver, the suspect got into the driver's seat of the police car and took control of it. *Id.* The officer shot the suspect; the parties disputed whether the car's trajectory was consistent with running over the officer or whether it meant the suspect was just fleeing. *Id.* at 770. The court explained that "[t]hough [the suspect] could have used the police cruiser to injure or kill [the officer], under the plaintiffs' version of the facts he was not doing so when [the officer] shot him or even before" then. *Id.* at 775. The suspect had "a dangerous 'weapon,'" but "he was not threatening the lives of those around him with it when he was fatally shot. . . . A jury would therefore be entitled to determine that [the officer's] use of force was unreasonable and accordingly unconstitutional." *Id.*

These cases clearly established that in the circumstances Defendant encountered, his actions were unconstitutional. *Bouggess* established that a physical struggle to avoid control by an officer is not sufficient to indicate a threat of serious harm. *Brandenburg* established that a suspect who had previously threatened to kill officers, was disobeying orders, and held an unequivocally deadly weapon, still did not present a threat of serious harm absent any additional indication that he would use the weapon. And *Smith* established that a suspect who stole something usable as a deadly weapon from an officer does not pose a threat of serious harm if the evidence does not indicate he was going to use it as a deadly weapon. If Lyoya was not holding the Taser, then Defendant had nothing more before him to demonstrate a serious threat than the shooting officer in *Bouggess*.[5] If Lyoya was holding the Taser, then Defendant still confronted a *less* dangerous situation than the shooting officer in *Brandenburg*. And even if Lyoya's hold on the Taser could be characterized as disarming Defendant, then Defendant faced the same level of danger as the officer in *Smith*.[6] The facts of this case, even when *not* viewed in the light most favorable to Plaintiff, are sufficiently materially similar to those of controlling cases to clearly establish that Defendant's actions were unconstitutional.

---

[5] Defendant's argument in the reply brief that *Bouggess* "turned on the absence of a weapon-based threat," (ECF No. 120 at PageID.2589), illustrates a persistent problem with Defendant's arguments: the failure to construe the record in the light most favorable to Plaintiff. The record, viewed that way, establishes that Lyoya also posed no "weapon-based threat" because he was not holding it in the several seconds before the shooting and was only blocking its use by Defendant, not trying to take it.

[6] Defendant argues that *Smith* is "expressly limited to a 'non-dangerous' suspect" and does not address "the fact that controls here, a suspect in sole control of the officer's own weapon." (ECF No. 120 at PageID.2589). *Smith*, of course, illuminates what factors sufficiently establish that a suspect is "dangerous," and the court there held that stealing something from an officer usable as a deadly weapon was not sufficient to deem a suspect "dangerous."

Defendant's attempts to analogize the facts here to those in cases where the court granted qualified immunity are unavailing. Defendant cites *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015). (*See* ECF No. 117 at PageID.1768-71). In *Mullins*, an officer saw people throwing guns over a fence, and when the officer approached, the people ran toward downtown Cincinnati. 805 F.3d at 762-63. Later that day, the officer was downtown when he saw two of the individuals from the earlier incident with another man. *Id.* at 763. Based on that man's movements, the officer had reason to believe he had a gun. *Id.* The officer told the man to stop; when he did, the officer grabbed his wrists, then pushed him to the ground and got on his back. *Id.* During the struggle, the officer saw a gun in the man's hand with his finger on the trigger, then ordered him to drop it. *Id.* The man threw the gun over the officer's shoulder. *Id.* As the man threw the gun, the officer "quickly rose from his crouched position and fired twice;" only "five seconds elapsed between when [the man] threw his firearm and when [the officer] fired his final shot." *Id.* at 764. The court found it significant that "all of these events transpired in the early evening hours in a breezeway leading onto . . . a populated city square with shops, restaurants, hotels, and offices in downtown Cincinnati" when it concluded that "[b]ecause only a few seconds passed between when [the man] brandished his firearm and when [the officer] shot [him], a reasonable officer in the same situation could have fired with the belief that [the man] still had the gun in his hand." *Id.* at 767. The court also cited the presence of another fleeing suspect at the scene. *Id.* Many factors in *Mullins* thus constrained the alternatives available to the officer that were not present here: there was another fleeing suspect, the altercation was close to an area densely occupied with potentially vulnerable bystanders, and when the officer saw the gun, the man's

finger was on the trigger, suggesting he might imminently fire it. The court's key conclusion—that a reasonable officer could believe the man was still holding the weapon, even though he was not—is also not the case here. The jury could reasonably conclude from the video that Lyoya was not holding the Taser at all for at least eight seconds before Defendant shot him, and that even if he was holding it, no reasonable officer would have thought he would or could use it. *Mullins* is thus inapposite.

Next, Defendant cites *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397 (6th Cir. 2007), *abrogation recognized by Romero*, 159 F.4th at 1009. Defendant summarized the facts of *Livermore* thusly: "the suspect contributed to a standoff with officers that led to his co-conspirator's death, had set fire to buildings, was present when his co-conspirator shot at officers, had wired his home with explosives, was in close proximity to a vulnerable officer, and 'rather than surrender as agreed upon—he exited his burning residence armed with a rifle.'" (ECF No. 117 at PageID.1771 (quoting *Livermore*, 476 F.3d at 404-05)). The "standoff" to which Defendant refers was a days-long standoff between the suspect, his co-conspirators, one of whom was killed after attacking an FBI agent, and law enforcement. *See Livermore*, 476 F.3d at 400-01. The officer Defendant references from *Livermore* was in a sniper post and fired at the suspect because he believed the suspect was aiming his rifle at exposed officers in an armored vehicle. *Id.* at 401. The court concluded that even if the suspect was not aiming his rifle at the vehicle, the officer "had probable cause to believe" that the suspect was a serious threat "due to his proximity to the [vehicle] while armed with a rifle, his prior violent behavior, and his continued refusal to surrender and face arrest." *Id.* at 405. Obviously, a days-long armed siege involving the setting of fires and the planting of explosives

22

is far afield from this case, which lasted only minutes and involved Lyoya only attempting to evade physical overpowering by Defendant. *Livermore* does not stand for the proposition that where a weapon was pointed is never an important indication of whether a suspect poses a threat, it only stands for the proposition that where the weapon was pointed in those conditions did not overcome the other extreme indicators of danger. And again, here, a jury could reasonably conclude that Lyoya had no weapon at all at the time Defendant shot him.

Defendant next cites *Thomas*. (ECF No. 117 at PageID.1771-72). In *Thomas*, an officer responded to a burglary alert, indicating an "ongoing life-threatening crime[]," and heard commotion coming from the apartment to which he was heading. 854 F.3d at 363. Two men came out of the apartment and ran toward the officer; one had a gun. *Id.* The officer shouted, then fired two shots at the man with the gun. *Id.* Unbeknownst to the officer, the man with the gun was in fact the victim of the burglary, who had managed to disarm one of his assailants. *Id.* The court held that while the man never raised the gun to point it at the officer, the officer "responded to a dangerous call in a high-crime area" and would have had "little or no time" to react if the man did raise the gun at the short distance between them. *Id.* at 365-66. The context here is very different: a mismatched license plate is hardly life-threatening, and Defendant had established physical control over Lyoya, who then was obviously not running at him or displaying any other signs of aggression. As the court explained in *Thomas*, those contextual differences matter: "[w]hether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances." *Id.* at 366. And, of course, the jury could find that Lyoya did not have a weapon at all at the time of the shooting.

The other cases in Defendant's long string cite offer him no more help. (ECF No. 117 at PageID.1767-68). *Mitchell v. Schlabach*, 864 F.3d 416, 422-23 (6th Cir. 2017), featured an unarmed suspect rapidly advancing toward an officer in a threatening manner after a high-speed car chase, and the court concluded that the officer "could have reasonably believed [the suspect] had a handgun" and that the "aggressive approach suggested that he might well have attacked" the officer to take his gun. There was no high-speed chase indicating danger here, no rapid approach, and no indication that Lyoya would use violence against Defendant. In *Rush v. City of Lansing*, 644 F. App'x 415, 417 (6th Cir. 2009), officers responding to an alarm call from a bank found a suspect waving scissors in a storage room. The officers struggled to disarm her, but then the suspect pulled out a knife and "slashed" at the officers. *Id.* One officer then shot her twice. The plaintiff challenged the *second* shot as unconstitutional, and the court held that the two shots were fired so close together that the officer could not have reassessed the situation between them. *Id.* at 423-24. Lyoya did not have a weapon, nor did he use one against anybody. In *Chappell v. City of Cleveland*, 585 F.3d 901, 905 (6th Cir. 2009), officers encountered a boy in a closet while performing a protective sweep of a house. They ordered him to come out and show his hands, and he stepped out holding a knife. *Id.* The officers told him to drop it, but he did not, and "continued to move quickly" toward them. *Id.* The officers shot and killed him when he was between five and seven feet from the officers. *Id.* The court held that the officers were entitled to qualified immunity because the boy "chose to continue advancing toward the

officers with the knife held high." *Id.* at 915.[7] There is no armed and rapid advance by Lyoya here. Finally, in *Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991), officers responded to a call about a man with a machete threatening a woman. The woman met the officers at the door, and escorted them to the living room, where a man with a machete advanced toward them. *Id.* The officers told him to drop it, he did not, and when he came within six feet of them, one officer shot him. *Id.* The court found that a threatening, machete-wielding, rapidly advancing suspect posed a threat, and so using deadly force was reasonable. *Id.* at 120. Here, Defendant had no indication that Lyoya was armed or dangerous, and Lyoya never advanced toward anyone to indicate aggression.

The record here, taken in the light most favorable to Plaintiff, suggests that Defendant shot Lyoya in the back of the head when he had demonstrated no aggressive tendencies or intent, was unarmed, and was subdued. That is obviously unconstitutional. Even making factual concessions to Defendant that the Court cannot make at this procedural stage, the shooting was *still* unconstitutional under clearly established law because a person having a hand on a weapon, even a deadly one, is not enough reason to kill that person. It will be up to a jury to determine whether Defendant's conduct was as egregious as the Court describes above or if Defendant could reasonably have perceived a serious threat.

### C.  Plaintiff's State Law Claims for Intentional Torts Will Proceed.

Plaintiff alleges Michigan law claims styled as gross negligence and willful and wanton misconduct. (*See* ECF No. 2 at PageID.24). Defendant argues he is entitled to governmental

---

[7] Importantly, though, the court's decision was not based solely on the boy's disobedience with officer commands. Officers may not "use lethal force merely because someone disobeys the officer's orders." *Palma v. Johns*, 27 F.4th 419, 443 (6th Cir. 2022) (citing *Wright v. City of Euclid*, 962 F.3d 852, 868 (6th Cir. 2020)).

immunity from these claims. (ECF No. 117 at PageID.1778). The labels Plaintiff puts on these state law claims appear to be attempts to establish that governmental immunity does not apply, as there are no independent causes of action by those names under Michigan law. *See Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011) ("Although establishing that a governmental official's conduct amounted to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action."). The Court must determine what sort of recognized causes of action Plaintiff could actually pursue.

Plaintiff's claims only sound in intentional torts. In excessive force cases, "[t]he only cause of action available" is typically "assault and battery." *Id.* (citing *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004), *abrogated on other grounds by Odom v. Wayne Cnty.*, 760 N.W.2d 217 (Mich. 2008)). In *VanVorous*, the Michigan Court of Appeals considered a plaintiff's claims that defendant officers "breached the duty of care they owed to Mr. VanVorous by utilizing excessive force to subdue or control Mr. VanVorous and failing to follow proper police procedure in apprehending him" and that the defendants "undertook the obligation to properly perform their duties to ensure the safety of all parties during the chase and subsequent attempted apprehension of Mr. VanVorous." 687 N.W.2d at 143. The court held that the "plaintiff's claim of gross negligence is fully premised on her claim of excessive force," noting that the court had previously "rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." *Id.* (citing *Smith v. Stolberg*, 586 N.W.2d 103, 104-05 (Mich. Ct. App. 1998)); *see also Latits v. Phillips*, 826 N.W.2d 190, 196 (Mich. Ct. App. 2012) ("[T]here was nothing

negligent or reckless about defendant's decision to point his firearm . . . and shoot—he did so intentionally."). Federal courts applying Michigan law in cases where state law claims are based on the same facts as a constitutional excessive force claim have concluded that plaintiffs may only proceed with intentional tort theories, not ones grounded in negligence. *See, e.g., Bletz*, 641 F.3d at 756; *Collins v. Ferguson*, No. 17-CV-10898, 2017 WL 4387287, at *8 (E.D. Mich. Oct. 3, 2017); *Spicer v. Michigan*, No. 2:19-cv-13718, 2020 WL 12443428, at *5 (E.D. Mich. May 19, 2020).

Plaintiff's attempts to distinguish *VanVorous* and the cases following it are of no avail. Plaintiff argues that Defendant "committed numerous acts of gross negligence that preceded, and resulted in, the use of lethal force," such as "initiat[ing] . . . needless physical aggression," chasing Lyoya, drawing his Taser, and failing to warn Lyoya that he might shoot. (ECF No. 118 at PageID.2112). But these arguments closely parallel the ones the court rejected in *VanVorous* that the defendant officers breached a duty of care owed during the chase, apprehension, and shooting. 687 N.W.2d at 143. And all of these arguments are based on the same facts underlying the excessive force claim, as they bear on the reasonableness of Defendant's decision to shoot. *See Latits*, 826 N.W.2d at 196 ("[A]ny failure to follow procedures would potentially be relevant to the correctness of the decision to shoot, but not whether that decision was intentional."). Finally, the complaint makes clear that the ultimate injury for which these claims seek recompense is the shooting. (*See* ECF No. 2 at PageID.25 ¶ 65). The Court finds that a negligence claim would be inseparable from the excessive force claim, so no negligence theory can go forward under the *VanVorous* rule.

Plaintiff's intentional tort theories, meanwhile, can go forward. Defendant does not dispute that Plaintiff can make out the elements of an intentional tort; instead, Defendant argues that he is entitled to governmental immunity. Government officials are entitled to governmental immunity from intentional tort liability under Michigan law if: their actions were taken during the course of the officials' employment and the officials were, or reasonably believed they were, acting within the scope of their authority; their acts were undertaken in good faith, or were taken without malice; and the acts were discretionary and not ministerial. *Odom*, 760 N.W.2d at 228. There does not appear to be any dispute in this case over the first and third elements, leaving the second. For that second element of good faith, "the standard is a subjective one from the perspective of defendant with respect to whether he was acting in good faith." *Latits*, 826 N.W.2d at 195. "In other words, Michigan state law imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind, in contrast to the objective test for federal qualified immunity." *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015).[8]

So, the question is whether the record, viewed in the light most favorable to Plaintiff, establishes that Defendant acted in subjective good faith when he shot Lyoya. Defendant cites his belief that Lyoya was "beginning to rise and turn toward him" and his beliefs about the Taser potentially being deadly. (ECF No. 117 at PageID.1782). But these arguments rest on the premise that Defendant subjectively believed at the time that Lyoya was holding the

---

[8] While Defendant cites the correct legal standard from *Latits* in its brief in support of the motion, (ECF No. 117 at PageID.1781), he also bizarrely cites an incorrect legal standard on the same page, arguing that "to hold an officer liable for their intentional conduct, the plaintiff must demonstrate that his conduct was . . . 'not objectively reasonable,'" (*id.*). Plaintiff took "no issue" with that latter argument, (ECF No. 118 at PageID.2113), and Defendant treated this as some kind of useful concession, (ECF No. 120 at PageID.2590). The Court, though, must apply the law as it actually is, not as the parties mistakenly misrepresent it.

Taser. But if the jury concludes, as it reasonably could, that Lyoya was not holding the Taser at all when Defendant shot him, then it could also conclude that Defendant is lying, and was misrepresenting what was happening when he issued the final command to "drop the Taser." This would allow the jury to conclude that Defendant was not acting in good faith. Thus, there is a genuine dispute of material fact regarding whether Defendant is entitled to governmental immunity to Plaintiff's intentional tort claims, so summary judgment will be denied as to those claims.

### D. The Court Will Not Decide Defendant's Contention About Damage Distribution Because That Would Be Decided on a Separate, Post-Award Motion.

Defendant argues that a non-party, Dorcas Lyoya, would not be entitled to any part of the damages potentially awarded in this case as a "parent[]" under Michigan's wrongful death statute. Mich. Comp. Laws § 600.2922(3)(a). Plaintiff argues that opining on this subject is inappropriate, as proceeds from any damages would be distributed on a separate motion governed by statute. (ECF No. 118 at PageID.2113-14). Plaintiff is correct. Under the wrongful death statute, proceeds are distributed upon a motion by the personal representative of an estate "to distribute the proceeds," the court where the motion is filed "shall order a hearing," and "notice of the hearing shall be served upon all persons who may be entitled to damages." Mich. Comp. Laws § 600.2922(a)-(b); *see Burgess v. Clark*, 547 N.W.2d 59, 61 (Mich. Ct. App. 1996). Plaintiff is the personal representative of Lyoya's estate. If Plaintiff secures an award of damages, it will be his responsibility to file an appropriate motion to distribute the proceeds, and the legal questions about what parties are

entitled to distribution will be resolved in the court where that motion is filed. *See McTaggart v. Lindsey*, 509 N.W.2d 881, 882-83 (Mich. Ct. App. 1993).

Defendant argues in his reply brief that resolution of this issue could limit the damages Plaintiff may seek at trial. But the questions of who may be entitled to distribution, Mich. Comp. Laws § 600.2922(3), and whose losses "of financial support" or "of the society and the companionship of the deceased" may be considered, *id.* § 600.2922(6), are different. Defendant has not briefed the latter. Defendant provides no reason that resolving the distribution question now is appropriate, nor does it appear that it would be procedurally permissible under Michigan law. The Court will thus deny Defendant's motion insofar as it seeks summary judgment on this question and does not opine on the question presented.

## IV.

From the video footage in the record, a rational jury could conclude that Defendant shot an unarmed man who showed no signs of violence in the back of the head after physically subduing him. Under those facts, it is obvious that Defendant violated Lyoya's constitutional rights and it is reasonable to conclude that Defendant acted in bad faith because he lied in the moment about what he saw before shooting Lyoya. The Court expresses no opinion as to whether this is the best interpretation of the videos or of the record as a whole: that is the province of the jury. The Court concludes only that a rational jury could so find. Thus, there is a genuine dispute of material fact precluding summary judgment as to whether Defendant is entitled to qualified immunity from Plaintiff's constitutional claim and as to whether he is entitled to governmental immunity from Plaintiff's intentional tort claims under state law. Defendant's motion will thus be denied as

to Plaintiff's constitutional claim and intentional tort claims. Defendant's motion will also be denied as to the argument about damages, as Defendant only briefed a question relevant to distribution which it would be inappropriate to resolve now. But Plaintiff cannot sustain a state law claim for negligence under the *VanVorous* rule, so Defendant's motion will be granted insofar as it seeks dismissal of negligence claims. Defendant's motion (ECF No. 117) is thus **GRANTED IN PART** and **DENIED IN PART** consistent with this opinion.

**IT IS SO ORDERED**.

Date:  August 6, 2026                         /s/ Paul L. Maloney
                                              Paul L. Maloney
                                              United States District Judge